3006595-RTV

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA, a Connecticut
corporation, f/k/a THE TRAVELERS
INDEMNITY COMPANY OF ILLINOIS,
and THE TRAVELERS INDEMNITY
COMPANY OF CONNECTICUT, a
Connecticut corporation,

               Plaintiffs,

v.

OSCAR MUNOZ, JOSE LOZADA,
ESTEBAN DELGADO, and SUPERIOR
FOOD MACHINERY, INC., a California
Corp.

               Defendants.

NO:

```
FILED: SEPTEMBER 3, 2008
08CV5015
JUDGE MORAN
MAGISTRATE JUDGE ASHMAN

PH
```

## COMPLAINT FOR DECLARATORY JUDGMENT

    Plaintiffs, TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,

formerly known as THE TRAVELERS INDEMNITY COMPANY OF ILLINOIS

("Travelers of America"), and THE TRAVELERS INDEMNITY COMPANY OF

CONNECTICUT ("Travelers of Connecticut"), by SmithAmundsen LLC, pursuant to 28

U.S.C. §§ 2201 and 2202, for their Complaint for Declaratory Judgment against

Defendants, OSCAR MUNOZ ("Munoz"), JOSE LOZADA ("Lozada"), ESTEBAN

DELGADO ("Delgado") and SUPERIOR FOOD MACHINERY, INC., a California

corporation ("Superior") state as follows:

## I.     JURISDICTION

1.     The jurisdiction of the court is premised upon 28 U.S.C. §1332(a) in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

## II.     VENUE

2.     Venue is premised upon 28 U.S.C. §1391(a) (2) in that a substantial part of the events or omissions giving rise to this suit occurred in this District.

## III.     THE PARTIES

3.     Travelers of America is a Connecticut corporation, duly authorized to conduct insurance business in Illinois.  Travelers of America's principal place of business is in Hartford, Connecticut.  Travelers of America issued a certain insurance policy, which included commercial general liability insurance, to its named insured "Taqueria Atotonilco II."  Travelers of America also issued a certain Commercial Excess Liability (Umbrella) insurance policy to its named insured, "Tortilleria Atotonilco, Inc."  Both policies will be detailed herein.

4.     Travelers of Connecticut is a Connecticut corporation, duly authorized to conduct insurance business in Illinois.  Travelers of Connecticut's principal place of business is in Hartford, Connecticut.  Travelers of Connecticut issued a certain insurance policy, which included commercial general liability insurance, to its named insured, "Tortilleria Atotonilco, Inc.", as will be detailed herein.  (Where appropriate for ease of reference, Travelers of Connecticut and Travelers of America will be collectively referred to as "Travelers".)

2

5.      Munoz is an individual who, on information and belief is a citizen of Illinois.  Munoz is the president of Tortilleria Atotonilco, Inc. ("TAI").  He has been named as a defendant in the *Delgado* and *Lozada* suits, as will be detailed below.

6.      Lozada is an individual who, on information and belief, is a citizen of Illinois.  Lozada is the plaintiff in the *Lozada* lawsuit described below.  Lozada has been named a defendant to this suit in order to bind him to any judgment entered by this Court.  In the event that Lozada stipulates to be bound by this court's judgment, Travelers will voluntarily dismiss him from this suit.

7.      Delgado is an individual who, on information and belief, is a citizen of Illinois.  Delgado is the plaintiff in the *Delgado* lawsuit described below.  Delgado has been named a defendant to this suit in order to bind him to any judgment entered by this Court.   In the event that Delgado stipulates to be bound by this court's judgment, Travelers will voluntarily dismiss him from this suit.

8.      On information and belief, Superior is a corporation which is incorporated under the laws of California and has its principal place of business in Pico Rivera, California.   Superior allegedly manufactured certain equipment on which Delgado and Lozada were injured and has filed third party complaints against Munoz in the *Delgado* and *Lozada* suits.  Superior has been named a party to this suit in order to bind it to any judgment entered by this court.  In the event that Superior stipulates to be bound by this Court's judgment, Travelers will voluntarily dismiss it from this suit.

## IV.     THE UNDERLYING LAWSUITS

### A.      Third and Fourth Amended Complaints at Law – *Lozada* suit

9.    Lozada has filed a lawsuit in the Circuit Court of Cook County, Illinois, *Lozada v. Superior Machinery, etc, et al*., No. 06 L 3478 (the "*Lozada* suit").  He seeks to recover damages for bodily injury that he allegedly sustained while he was working in the course of his employment for TAI at TAI's tortilla-manufacturing facility located at 1707 W. 47th Street, Chicago, Illinois.

10.    Lozada has filed a Third Amended Complaint in the *Lozada* suit, naming Munoz as a defendant.  Counts III and V are directed to Munoz and parts of Count IV also refer to him.  A copy of the Third Amended Complaint is attached hereto as Exhibit A.

11.    Count III of the Third Amended Complaint contains allegations against Munoz "individually and d/b/a (TAI)."  Munoz was allegedly an officer and/or director and/or owner of TAI (Par. 4).  He allegedly operated and controlled the premises where Lozada was injured and the machinery that was located there (Par. 5).   He was allegedly aware that the subject machine was unreasonably dangerous and unsafe  (Par. 6).  He allegedly "directly, expressly (and) intentionally committed an intentional tort … by authorizing and directing employees, so as to require and cause operators of the subject machine to perform work in unguarded areas" (Par. 7).  A number of alleged facts are pleaded in Paragraph 9 which allegedly evidence the "direct and express intentional commission of an intentional tort" by Munoz.  As a consequence of one or more of these alleged actions, Lozada was injured.

12.    Count IV of the Third Amended Complaint states in its preamble that it is a claim against TAI.  It contains allegations substantially similar to those of Count III.  In

its prayer for relief, Count IV seeks a judgment against " … Munoz individually and d/b/a (TAI) or (TAI) jointly and individually."

13.    Count V of the Third Amended Complaint alleges that Munoz, individually, owned, operated, and controlled the premises at which Lozada was injured (Par. 2).  Lozada was not an employee of, nor employed by, Munoz, individually (Par. 3).  Munoz allegedly was aware of the subject machine being unreasonably dangerous (Par. 4).  Munoz allegedly caused or permitted persons to work on the dangerous machine (Par. 5).  Prior to Lozada's injury, Munoz allegedly was informed by OSHA of the "absolute necessity for instituting a lockout/tagout program as to the … machine" which, if instituted, would have prevented the injury sustained by Lozada. (Par. 6).  Munoz allegedly owed Lozada duties of care and breached them in one or more of several ways (Par. 7).  Lozada claims to have been injured as a result of one or more of these breaches (Par. 8).

14.    Lozada has also filed a Fourth Amended Complaint in the *Lozada* suit, which names Munoz as a defendant.  A copy of the Fourth Amended Complaint is attached hereto as Exhibit B.  Counts VI and VIII are directed to Munoz and parts of Count VII also refer to him.

15.    Count VI of the Fourth Amended Complaint alleges intentional commission of an intentional tort by Munoz.  Its allegations appear to be substantially similar to those of Count III in the Third Amended Complaint.   Count VII of the Fourth Amended Complaint states in its preamble that it is brought against TAI, but its prayer for relief is directed to both Munoz d/b/a (TAI) and TAI.  Its allegations appear to be substantially similar to those of Count IV of the Third Amended Complaint.  Count VIII

of the Fourth Amended Complaint alleges negligence against Munoz in his capacity as the owner of the premises where the injury occurred. Its allegations are substantially similar to those of Count V of the Third Amended Complaint.

16.    Each count against Munoz in both the Third and Fourth Amended Complaints seeks an award of damages in excess of the jurisdictional minimum of the Law Division of the Circuit Court of Cook County.

**B.    Superior's First Amended Third Party Complaint – *Lozada* Suit**

17.    Superior has filed a First Amended Third Party Complaint against TAI and Munoz in the *Lozada* suit, a copy of which is attached hereto as Exhibit C.

18.    Count II of Superior's Amended Third Party Complaint is labeled "Oscar Munoz, Individually as Manufacturer". It alleges that Munoz "not in his capacity whatsoever as the President or sole shareholder of co-defendant (TAI) acted in his capacity as a manufacturer, designer or modifier of tortilla-making equipment". Munoz allegedly "made substantial modifications and alterations to the tortilla-making machine" on which Lozada was injured (Par. 5).

19.    The alterations allegedly made by Munoz are alleged to have "effectively altered, modified and changed the machine into a tortilla-making equipment manufactured by Munoz and not by Superior". (Par. 6). It is further alleged that Munoz introduced the equipment into the stream of commerce in an allegedly dangerous and defective condition (Par. 9). These alleged acts, in conjunction with specific alleged breaches of duties by Munoz set forth in Paragraph 10 of Count II, were the alleged direct and proximate cause of the injuries suffered by Lozada (Par. 11). Count II seeks contribution from Munoz pursuant to the Illinois Joint Tortfeasor Contribution Act.

20.    Count III of Superior's Amended Third Party Complaint is entitled "Intentional Act against Oscar Munoz".  It alleges that Munoz, "not in his capacity as either President or sole shareholder of (TAI), but rather strictly in his capacity as manufacturer, designer or modifier of tortilla-making equipment, intentionally made extensive and unforeseen modifications to and remanufactured the subject tortilla-making machine" (Par. 5).    Munoz allegedly knew that such remanufacture, modification or alteration would lead to a "substantial likelihood of serious bodily injury" to operators (Par. 7).  Munoz's conduct is described as "intentional … in removing all safety features from this machine" (Par. 8).  The bodily injuries allegedly sustained by  Lozada were a proximate result of the "intended modification, or remanufacture of the subject … machine by … Munoz" (Par. 9).  Count III seeks contribution from Munoz pursuant to the Joint Tortfeasor Contribution Act.

21.    Count V is entitled "Premises Liability against Oscar Munoz".  This Count alleges that Munoz was the "sole owner" of the premises at which Lozada was injured (Par. 3) and that he leased the premises to TAI ( Par. 5) Munoz allegedly owed a duty of reasonable care to invitees on the premises (Par. 6).  Munoz allegedly had knowledge that TAI "altered the design, manufacture and furnished a product known as a tortilla-making machine to those lawfully upon the premises when it was dangerous and unsafe to do so" (Par. 7).  Munoz allegedly breached the duties he owed as a "landlord" by "carelessly and negligently" allowing TAI to install and operate dangerous machinery and by failing to warn invitees and others lawfully upon the premises of the dangerous conditions on the premises.  (Par. 10).  Count V seeks contribution from Munoz pursuant to the Joint

Tortfeasor Contribution Act "not based upon his role as the Plaintiff's employer but based on his role as the owner of record of the premises" (Par. 14).

**C.    Superior's Amended Third Party Complaint for Contribution in *Delgado* suit.**

22.    Delgado has filed a lawsuit in the Circuit Court of Cook County, Illinois, *Delgado v. Superior Machinery, etc, et al*., No. 06 L 1819 (the "*Delgado* suit"). He seeks to recover damages for bodily injury that he allegedly sustained while he was working in the course of his employment for TAI at TAI's tortilla-manufacturing facility located at 1707 W. 47th Street, Chicago, Illinois.

23.    Superior has filed an Amended Third Party Complaint against TAI and Munoz in the *Delgado* suit.  A copy of the Amended Third Party Complaint is attached as Exhibit D.

24.    Count II of Superior's Amended Third Party Complaint is entitled "Premises Liability against Oscar Munoz".  It alleges that Munoz was the owner and landlord of the premises where Delgado was injured, and that he owed duty of reasonable care to invitees (Par. 5, 6).    Munoz allegedly had personal knowledge that TAI had altered, modified or changed a product known as a "tortilla oven" and had failed to train its employees in proper operation of the oven (Par. 7).  Munoz, as landlord, breached his duty to Delgado by allowing TAI to maintain and operate the aforesaid oven, which allegedly created a dangerous condition, and failed to warn Delgado of the dangerous condition (Par. 10).  Superior seeks contribution from Munoz pursuant to the Illinois Joint Tortfeasor Contribution Act.

## V.    THE TRAVELERS POLICIES

### A.    The "630" and "660" Policies and General Liability Coverage Parts.

25.    Travelers of Connecticut issued Policy No. Y-630-843K1319-TCT-04 to its named insured, "Tortilleria Atotonilco, Inc." (the "630 Policy"). The 630 Policy was effective from January 1, 2004 to January 1, 2005. It has an "each occurrence" limit of liability insurance of $1 million. 1707-11 West 47th Street, Chicago is listed on the "Location Schedule" of the 630 Policy. Munoz is not a named insured on the 630 Policy.

26.    Travelers of America issued Policy Y-660-843K1356-TIL-04 to its named insured "Taqueria Atotonilco II" (hereafter the "660 Policy"). The 660 policy was effective from January 1, 2004 to January 1, 2005. It has an "each occurrence" limit of liability insurance of $1 million. The facility at 1707 W. 47th Street, Chicago, is not included in the 660 Policy's "Location Schedule". Munoz is a "named insured" on the 660 Policy, but only with respect to certain designated premises as detailed herein.

27.    The 630 Policy and the 660 Policy each include a Commercial General Liability coverage part ("CGL part"). A copy of the CGL part of the 630 Policy, including all endorsements, is attached hereto as Exhibit E. A copy of the CGL part of the 660 Policy, including all endorsements, is attached hereto as Exhibit F.

28.    Each CGL part provides that, throughout the policy, the words "you" and "your" refer to the named insured shown in the Declaration and any other person or organization qualifying as a named insured under the terms of the policy.

29.    Each CGL part contains "Coverage A", with an "Insuring  Agreement" that provides as follows:

    a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" … to which this

insurance applies.  We will have the right and duty to defend any "suit" seeking those damages.

b.    This insurance applies to "bodily injury" … only if:

(1)    The "bodily injury" … is caused by an "occurrence" …

* * *

30.    Coverage A of each CGL part is subject to the following exclusion:

This insurance does not apply to:

**a.    Expected or Intended Injury**

"Bodily injury" … expected or intended from the standpoint of the insured.

* * *

**e.    Employer's Liability**

"Bodily injury" to:

(1)    An "employee" of the insured arising out of and in the course of:

(a)    Employment by the insured;

This exclusion applies:

(2)    To any obligation to share damages with or repay someone else who must pay damages because of the injury.

* * *

31.    Each CGL part contain the following terms regarding "Who Is An Insured":

1.    If you are designated in the Declarations as:

a.    An individual… you are insured(s) but only with respect to the conduct of a business of which you are the sole owner.

10

\* \* \*

    c.    An organization other than a partnership or joint venture, you are an insured.   Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2.    Each of the following is also an insured:

    a.    Your "employees", <u>other than your executive officers</u>, but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.   However, <u>none of these "employees" is an insured for</u>:

    (1)    "Bodily injury"…,

    (a)    … <u>to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business</u>;

    \* \* \*

    (c)    For which there is <u>any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs (1)(a)</u> or (b) above; (Underline supplied).

    \* \* \*

32.    Each CGL part  contain the following Definition:

"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\* \* \*

33.    Each CGL part is endorsed with an "Employment – Related Practices Exclusion" which provides as follows:

This insurance does not apply to:

**1.**    "Bodily injury" to:

    **a.**    A person arising out of any:

        **(3)**    Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; …

\* \* \*

This exclusion applies

    **b.**    to any obligation to share damages with or repay someone else who must pay damages because of the injury.

\* \* \*

34.    Each CGL part contains an endorsement entitled "Limitation When Two or More Policies Apply" which provides as follows:

**1.**    Injury, damage or loss might be covered by this policy and also by other policies issued to you by us or any affiliate.  When these other policies contain a provision similar to this one, the amount we will pay is limited.  The maximum that we will pay under all such policies combined is the highest limit that applies in any one of these policies.

\* \* \*

35.    The CGL part of the 660 Policy includes a "Designated Entities – Limitation of Coverage to Designated Premises" endorsement that provides as follows:

**SCHEDULE**

Designated Persons(s) or Organization(s):

Oscar Munoz

Designated Premises:

Loc. 11, Bldg. 15    5659 S. Sawyer, Chicago, IL  60632
Loc. 13, Bldg. 17    1648 Pulaski, Chicago, IL  60609
Loc. 15, Bldg. 19    4129 Wolcott, Chicago, IL  60609

Provisions:

With respect to the person . . . designated in the schedule above, this insurance applies only to "bodily injury", … arising out of the ownership, maintenance or use of the premises shown in the schedule above and operations necessary or incidental to those premises.

\* \* \*

**B.    The Travelers Commercial Excess Liability (Umbrella) Insurance Policy**

36.    Travelers of America issued Commercial Excess Liability (Umbrella) Insurance Policy, No. YSM-CUP-571K 7746-TIL-04 (the "Umbrella Policy").  A copy of the Umbrella Policy is attached hereto as Exhibit G.  The Umbrella Policy was effective from January 1, 2004 to January 1, 2005.  It has aggregate and "per occurrence" limits of liability of $9 million.  The named insured shown on the  Declarations is "Tortilleria Atotonilco, Inc."  The Umbrella Policy is endorsed to include "Oscar Munoz" as a named insured.

37.    The CGL parts of the 630 Policy and the 660 Policy are both identified on the Umbrella Policy's "Schedule of Underlying Insurance".

38.    The Umbrella Policy provides that, throughout it, the words "you" and "your" refer to the Named Insured shown in the Declarations.

39.    The Insuring Agreement of the Umbrella Policy provides in relevant part as follows:

     a.     We will pay on behalf of the insured the "ultimate net loss" in excess of the "applicable underlying limit" which the insured becomes legally obligated to pay as damages because of "bodily injury" … to which this insurance applies. This insurance applies only to:

          (1)     "Bodily injury":

                        * * *

          (b)     Caused by an "occurrence" …

                        * * *

40.     The insurance provided by the Umbrella Policy is subject to certain exclusions of coverage, including the following:

This insurance does not apply to:

     a.     "Bodily injury" …  expected or intended from the standpoint of the insured.

                        ***

     c.     "Bodily injury" consisting of humiliation, mental injury or mental anguish directly or indirectly related to the employment of any person … by any insured.

                        * **

41.     Section II of the Umbrella Policy sets forth "Who is an Insured" and provides in relevant part as follows:

**SECTION II – WHO IS AN INSURED.**

     1.     If you are designated in the Declarations as:

          a.     An individual, you … are insured(s) but only with respect to the conduct of a business of which you are the sole owner.

                        * * *

          c.     An organization other than a partnership or joint venture, you are an insured.

                        * * *

2.      Each of the following is also an insured:

* * *

c.      Except as respects aircraft and the "auto hazard":

(1)     Your executive officers, employees, directors or stockholders while acting within the scope of their duties;

* * *

No person is an insured as respects "bodily injury" to a fellow employee unless insurance for such liability is afforded by the "underlying insurance".

* * *

42.     The Umbrella Policy contains the following Condition:

**10.     OTHER INSURANCE.**

This insurance is excess over any other valid and collectible insurance whether such other insurance is stated to be primary, contributing, excess, contingent or otherwise.   This provision does not apply to a policy bought specifically to apply in excess of this insurance.

* * *

43.     The Umbrella Policy contains the following Definitions:

6.      "Bodily injury" means bodily injury, shock, fright, mental injury, disability, mental anguish, humiliation, sickness or disease sustained by a person, including death resulting from any of these at any time.

* * *

8.      "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

* * *

16.     "Underlying insurance" means the policies listed in the Schedule of Underlying Insurance and includes:

**a.**     Any renewal or replacement of such policies; and

**b.**     Any other insurance available to the insured.

\* \* \*

44.     The Umbrella Policy also includes an "Employment-Related Practices Exclusion" Endorsement that bars coverage for:

**c.**     "Bodily injury" arising out of:

(1)     Humiliation, mental injury or mental anguish directly or indirectly related to the employment of any person or persons by any insured.

\* \* \*

(4)     Coercion, demotion, evaluation, reassignment, discipline, defamation or other employment-related practices, policies, acts, or omissions; or

(5)     Consequential "bodily injury" as a result of **(1)** through **(4)** above.

This exclusion applies whether the insured may be held liable as an employer or in any other capacity and to any obligation to share damages with or to repay someone else who must pay damages because of the injury.

\* \* \*

45.     The Umbrella policy contains an endorsement entitled "Designated Entities – Limitation of Coverage to Designated Premises",  which limits coverage to Munoz as follows:

**SCHEDULE**

Designated Persons(s) or Organization(s):

Oscar Munoz

Designated Premises:

Loc. 11, Bldg. 15      5659 S. Sawyer, Chicago, IL  60632
Loc. 13, Bldg. 17      1648 Pulaski, Chicago, IL  60609
Loc. 15, Bldg. 19      4129 Wolcott, Chicago, IL  60609

Provisions:

With respect to the person . . . designated in the schedule above, this insurance applies only to "Bodily Injury" … arising out of the ownership, maintenance or use of the premises shown in the schedule above and operations necessary or incidental to those premises.

* * *

## VI.    BASES FOR RELIEF

### A.    The 660 Policy and the Umbrella Policy – Both Suits

46.    All claims against Munoz in the *Delgado* and *Lozada* suits arise from injuries sustained by Delgado and Lozada while they were working in the course of their employment for TAI, at its facility located at 1707 W. 47th Street, Chicago, Illinois.

47.    The Umbrella Policy and the 660 policy each identify Munoz, individually, as a named insured.  However, each policy contains an endorsement which expressly restricts coverage for Munoz, individually, to claims arising from one of three designated premises, none of which is 1707 West 47th Street, Chicago.  Therefore, Munoz, individually, is entitled to neither defense nor indemnity for any of the claims against him in the *Lozada* and/or *Delgado* suits under either of the policies.

48.    In addition, TAI is not a named insured or an insured on the 660 Policy and, therefore, its officers, directors, stockholders or employees do not qualify as insureds either.  Therefore, Munoz does not qualify as an insured and is entitled to neither defense

nor indemnity with respect to any of the claims against him in the *Lozada* and/or *Delgado* suits under the 660 Policy.

### B.    630 Policy- Third and Fourth Amended Complaints - *Lozada*  Suit

49.    Counts III and IV of the Third Amended Complaint in the *Lozada* suit, and Counts VI and VII of the Fourth Amended Complaint, allege that Munoz was an officer or director of TAI and that he "intentionally committed an intentional tort … by authorizing and directing employees, so as to require and cause operators of the subject machine to perform work in unguarded areas".  These allegations do not fall within the definition of "occurrence", or the Insuring Agreement, of the 630 policy.  In addition, the "expected or intended injury" exclusion of the policy applies to exclude coverage for these counts.

50.    Count V of the Third Amended Complaint in the *Lozada* suit, and Count VIII of the Fourth Amended Complaint, allege that Munoz, individually, owned, operated and controlled the premises at 1707 West 47th Street.  They allege that Lozada was an employee at the premises, but was not employed by Munoz.  There are no allegations that Munoz's liability is with respect to his duties as an "executive officer" or director of TAI, nor as a stockholder.  Therefore, Munoz does not qualify as an "insured" on the 630 Policy with respect to the allegations of these Counts.

51.    In addition, with respect to all counts, Munoz is not alleged to be an "employee" of TAI, nor would he qualify as an insured based on being an "employee" of TAI, because he is also an "executive officer" and therefore falls outside of the category of "employees" who qualify as insureds.  In addition, even if he were deemed an "employee" of TAI, the 630 Policy provides that no "employee" is an insured for bodily

injury to co-"employee" while that co-employee is in the course of his or her employment or while performing duties related to the conduct of TAI's business. Therefore, Munoz would not qualify as an insured with respect to Lozada's injuries because Lozada would be his co-"employee", who was in the course of his employment and/or performing duties related to the conduct of TAI's business at the time that he was injured.

      **C.**    **660 Policy and Umbrella Policy- Third and Fourth Amended Complaints - *Lozada* Suit**

52.    Without prejudice to the position that the "Designated Premises" endorsements to the Umbrella Policy and the 660 Policy preclude coverage to Munoz, individually, for Lozada's injuries, and that the 660 policy affords no coverage to TAI or its officers, directors, stockholders or employees, each defense to coverage that is set forth with respect to the 630 policy would apply to the 660 Policy and the Umbrella Policy, if the coverage of the policies was otherwise applicable.

      **D.**    **The 630 Policy - Superior's First Amended Third Party Complaint- *Lozada* Suit**

53.    Munoz is not a named insured on the 630 policy. He qualifies as an "insured" under Section II on the basis of his status as an "executive officer" or director of TAI, but only with respect to his duties as an officer or director. He qualifies as an insured as a "stockholder" of TAI, but only with respect to his liability as a stockholder.

54.    Count II of Superior's First Amended Third Party Complaint alleges that Munoz "not in his capacity whatsoever as the president, or sole shareholder of (TAI) acted in his capacity as a manufacturer, designer or modifier of tortilla-making equipment". Based on these allegations, Munoz does not qualify as an "insured" because his liability is not alleged to be with respect to his duties as an executive officer,

19

director or stockholder of TAI, but rather his actions as an alleged "manufacturer" of a tortilla machine.

55.     Munoz is not alleged to be an "employee" of TAI in Count II, nor would he qualify as an insured based on being an "employee" of TAI, because he is also an "executive officer" and therefore falls outside of the category of "employees" who qualify as insureds.  In addition, even if he were deemed to be an "employee" of TAI, the policy provides that no "employee" is an insured for bodily injury to co-"employee" while that co-employee is in the course of his or her employment or while performing duties related to the conduct of TAI's business.  Therefore, Munoz would not qualify as an insured with respect to Lozada's injuries because Lozada would be his co-"employee", who was in the course of his employment and/or performing duties related to the conduct of TAI's business at the time that he was injured.

56.     Count III contains allegations against Munoz substantially similar to those of Count II, then further alleges that Mr. Munoz acted "intentionally" in removing safety features from the machine that injured Lozada.

57.     Munoz does not qualify as an insured with respect to the allegations of Count III for the same reasons he does not so qualify with respect to Count II.

58.     In addition, the allegations of Count III do not fall within the definition of "occurrence" because Lozada's injuries were not allegedly caused by an accident. Therefore, the allegations do not fall within the Insuring Agreement of Coverage A of the CGL part of the 630 Policy.

59.    In addition, and without prejudice to any of the foregoing, any coverage otherwise available to Munoz with respect to Count III would be barred by the "expected or intended injury" exclusion of the 630 Policy.

60.    In Count V, Munoz's liability is alleged to arise from his status as the owner and landlord of 1707 West 47th Street, which he leased to TAI. It is further alleged that the allegations are "not based upon ( Munoz's) role as (Lozada's) employer, but based upon his role as owner".

61.    Munoz does not qualify as an insured on the 630 Policy with respect to Count V because his liability is not alleged to be with respect to his duties as an officer or director of TAI, nor as a stockholder, nor as a co-employee of Mr. Lozada. Further, Munoz would not qualify as an insured based on being an "employee" of TAI, because he is also an "executive officer" and therefore falls outside of the category of "employees" who qualify as insureds. In addition, even if he were deemed an "employee" of TAI, the 630 Policy provides that no "employee" is an insured for bodily injury to co-"employee" while that co-employee is in the course of his or her employment or while performing duties related to the conduct of TAI's business. Therefore, Munoz would not qualify as an insured with respect to Lozada's injuries because Lozada would be his co-"employee", who was in the course of his employment and/or performing duties related to the conduct of TAI's business at the time that he was injured.

E.    **660 Policy and Umbrella Policy- Superior's First Amended Third Party Complaint – *Lozada* Suit**

62.    Without prejudice to Travelers' position that the "Designated Premises" endorsements to the Umbrella policy and the 660 policy preclude coverage to Munoz,

individually, for Lozada's injuries, and that the 660 policy affords no coverage to TAI or its officers, directors, stockholders or employees, the terms of the 660 Policy and Umbrella Policy defining "Who is an Insured" are identical in substance to those of the 630 Policy and would preclude Munoz from qualifying as an insured with respect to any count of Superior's First Amended Third Party Complaint for the same reasons he does not qualify under the terms of the 630 policy.

63.     Both the 660 Policy and Umbrella Policy contain definitions of "occurrence" and exclusions for "expected or intended injury" that are identical in substance to those contained in the 630 policy. Therefore, the claim set forth in Count III of Superior's First Amended Third Party Complaint would not fall within the Insuring Agreements of these policies, or, alternatively, any coverage otherwise present would be barred by the "expected or intended injury" exclusions of these policies.

**F.     630 Policy- Superior's Amended Third Party Complaint in *Delgado* Suit**

64.     Count II of Superior's Amended Third Party Complaint is a claim of premises liability against Munoz, based on his alleged status as an owner and landlord of the premises where Delgado was injured. There are no allegations that his alleged liability is in connection with his duties as an executive officer or director of TAI, nor is he allegedly liable as a stockholder of TAI. Therefore, Mr. Munoz does not qualify as an insured under the 630 Policy.

65.     In addition, Munoz is not alleged to be an "employee" of TAI, nor would he qualify as an insured based on being an "employee" of TAI, because he is also an "executive officer" and therefore falls outside of the category of "employees" who qualify as insureds. In addition, even if he were deemed an "employee" of TAI, the 630

Policy provides that no "employee" is an insured for bodily injury to co-"employee" while that co-employee is in the course of his or her employment or while performing duties related to the conduct of TAI's business.  Therefore, Munoz would not qualify as an insured with respect to Delgado's injuries because Delgado would be his co-"employee", who was in the course of his employment and/or performing duties related to the conduct of TAI's business at the time that he was injured.

### G. 660 Policy and Umbrella Policy- Superior's Amended Third Party Complaint – *Delgado* Suit

66.    Without prejudice to Travelers' position that the "Designated Premises" endorsements to the Umbrella policy and the 660 policy preclude coverage to Munoz, individually, for Delgado's injuries, and that the 660 policy affords no coverage to TAI or its officers, directors, stockholders or employees, the terms of those policies defining "Who is an Insured" are identical in substance to those of the 630 policy and would preclude Munoz from qualifying as an insured with respect to Superior's Amended Third Party Complaint for the same reasons he does not qualify under the terms of the 630 policy.

### H.    Additional Coverage Defenses

67.    The course of conduct alleged against Munoz in the *Delgado* and *Lozada* suits, if proven, would establish that any injuries sustained by Lozada and Delgado, at a minimum, should have reasonably been anticipated by Munoz and, therefore, would not arise from an "occurrence" but, rather, would constitute "expected" injuries and fall outside of the Insuring Agreement of each CGL part and the Umbrella Policy and/or fall within the "expected or intended injury" exclusion of each CGL part and the Umbrella Policy.

68.    In the event that Munoz is determined to have been the employer of Delgado and/or Lozada, the "Employers' Liability" exclusion of each CGL part would apply to bar coverage for the claims made against him, if any was otherwise present.

69.    The "Limitation When Two or More Policies Applies" endorsement precludes the coverage of the 630 Policy CGL part and the 660 Policy CGL part from both applying to the same injury, damage or loss, if any coverage under either part was otherwise present.

70.    In the event that Munoz is determined to have been the employer of Delgado and/or Lozada, the "Employment-Related Practice Exclusion" contained in each CGL part and the Umbrella Policy would apply to bar coverage for the claims made against him, if any, was otherwise present.

71.    Exclusion c. of the Umbrella Policy will apply to bar coverage for Munoz, if any was otherwise present, for damages for "bodily injury" consisting of humiliation, mental injury or mental anguish sustained by Delgado and/or Lozada, if any.

72.    The coverage of the Umbrella Policy, if any was otherwise available,  does not provide a duty to defend Munoz and is excess to any and all underlying insurance available to Munoz with respect to the claims made against him in the *Delgado* and *Munoz* suits.

73.    Travelers' investigation into the facts and circumstances that gave rise to the *Delgado* and *Lozada* suits is ongoing, and Travelers reserves its rights to raise additional defenses to coverage for Munoz under all policies, to the full extent permitted by law.

## VII.    PRAYER FOR RELIEF

74.    Counsel for Munoz has tendered the pleadings from the *Delgado* and *Lozada* suits described herein to Travelers for a defense and indemnification.

75.    Travelers has written to counsel for Munoz, denying that Munoz is entitled to coverage for said claims against him in the *Delgado* and *Lozada* suits, and requesting that Munoz withdraw his tender to Travelers.

76.    On August 28, 2008, Munoz's counsel informed Travelers' counsel that Munoz will not withdraw said tender.

77.    Actual controversies exist between the parties hereto and, pursuant to 28 U.S.C. 2201 and 2202, this Court is granted the power to determine and adjudicate the rights and obligations of the parties hereto.

WHEREFORE, for the reasons set forth hereinabove, Travelers prays that this Court find and declare that Munoz is not entitled to defense or indemnity under any of the policies issued by Travelers of America or Travelers of Connecticut with respect to the pleadings against him in the *Delgado* and *Lozada* suits, that Delgado, Lozada and Superior are entitled to no rights against Travelers as judgment creditors of Munoz, for an award of Travelers' costs incurred herein and for such further relief as the Court deems just and equitable.

Respectfully submitted,

TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA, a Connecticut
corporation, f/k/a THE TRAVELERS
INDEMNITY COMPANY OF ILLINOIS,
and THE TRAVENERS INDEMNITY
COMPANY OF CONNECTICUT, a
Connecticut corporation


By:      <u>s/Richard T. Valentino</u>
           One of Its Attorneys

Richard T. Valentino, Esq. ( ARDC #6188317)
SmithAmundsen LLC
150 N. Michigan Ave., Suite 3300
Chicago, IL 60601
Phone: (312) 894-3200
FAX:  (312) 894-3210

08CV5015

JUDGE MORAN

MAGISTRATE JUDGE ASHMAN

200683/bds                    PH                                    Atty. No. 42999

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

JOSE LUIS LOZADA,                           )
                                            )
            Plaintiff,                      )
                                            )
      v.                                    )      Court No.: 06 L 003478
                                            )
SUPERIOR FOOD MACHINERY, INC., a            )
Corp.; OSCAR MUNOZ, Ind. and d/b/a          )
TORTILLERIA ATOTONILCO, INC., a             )
Corp.; TORTILLERIA ATOTONILCO, INC.,        )
a Corp.; SAFETY SUPPLY ILLINOIS, a          )
Corp.; and SAFETY CHECK, INC.,              )
                                            )
            Defendants.                     )

### THIRD AMENDED COMPLAINT AT LAW

NOW COMES the plaintiff, JOSE LUIS LOZADA, by and through his attorneys,

STEINBERG, GOODMAN & KALISH, and STEVEN A. DENNY, and complaining of

defendant, SUPERIOR FOOD MACHINERY, INC., a Corp. (hereinafter referred to as

"SUPERIOR"), and, pursuant to 735 ILCS 5/2-402, having named former respondents in

discovery as additional defendants, OSCAR MUNOZ, Ind. and d/b/a TORTILLERIA

ATOTONILCO, INC., a Corp. (hereinafter and also referred to as "MUNOZ" and

"TORTILLERIA"); and TORTILLERIA ATOTONILCO, INC., a Corp. (hereinafter ALSO

referred to as "TORTILLERIA, INC."), alleges as follows:

### COUNT I

1.     That prior to May 1, 2004, the defendant, SUPERIOR, its predecessor and/or

successors in interest, did design, manufacture, engineer, fabricate, distribute and sell a machine

identified as Model – 4C H8.5 – TM, Serial No. 488256, which subject machine was to be used



**EXHIBIT**
**A**

1  G:\Data\wp\Lozada, Jose Luis\Pleadings\3rd Amended Complaint.wpd

by workers in the course and scope of their employment with regard to the preparation of food products. Hereinafter, the subject machine will be referred to as "product" and/or "product machine."

2.    That prior to May 1, 2004, the subject product machine and components thereof were sold by defendant, SUPERIOR, and were thereafter owned and/or operated by either or both defendants, MUNOZ, individually and d/b/a TORTILLERIA and/or defendant, TORTILLERIA, INC., at 1707 West 47th St., in the City of Chicago, County of Cook, State of Illinois (hereinafter referred to as the "subject premises").

3.    That on and prior to May 1, 2004, the plaintiff, JOSE LUIS LOZADA, was employed at the subject premises, and in the course and scope of his employment did and was caused to work with the subject product machine.

4.    That at the time the said product machine left the control of the defendant, SUPERIOR, and, including the services performed by said defendant in connection therewith, said product machine was unreasonably dangerous and therefore defective when put to a use which the said defendant, SUPERIOR, knew or should have known would occur or take place; that it was the duty of the said defendant, SUPERIOR, their predecessors or successors in interest, not to design, engineer, fabricate, distribute, manufacture, sell, refurbish, install or cause to be installed or provided, the subject product, including services undertaken and provided in connection therewith, that was unreasonably dangerous and therefore defective; yet, notwithstanding said duty, the said product machine, including services undertaken and provided in connection therewith and components thereof, was unreasonably dangerous and therefore defective in one or more of the following ways.

a.    The said product machine, including undertaken services provided in

2

connection therewith, failed to give proper and adequate protection to persons engaged in the use and/or maintenance of the said equipment and machinery, to the injury of the plaintiff;

b.    That the subject product machine was not provided with safe, suitable, or proper safety guarding to protect an operator or other person engaged in work in or about said product, to the injury of the plaintiff;

c.    That the subject product machine failed to provide in its design, refurbishing, assembly, and/or installation, a safe, suitable and proper area within which an operator and/or other person could perform his reasonably foreseeable duties pertaining to said machine product, to the injury of the plaintiff;

d.    That the aforesaid product machine failed to contain or be provided with a properly located emergency stopping device and/or did fail to include a properly placed emergency stopping device at a location where said defendants knew of should have known it was required for use by an individual engaged in work reasonably foreseeable with regard to the subject product machine, to the injury of the plaintiff;

e.    The subject product machine was otherwise improperly designed, refurbished, assembled, equipped, and/or installed at the aforesaid premises, so as to provided a dangerous and unsafe work area with regard to said product machine for persons engaged in connection with the inspection, operation, maintenance and/or other reasonably foreseeable procedures with regard to the subject product machine, to the injury of the plaintiff;

f.    That the subject product machine was improperly equipped and/or provided and/or maintained without a safe, suitable and proper guarding device at a place where said defendants jointly and or individually knew or should have known that an individual reasonably foreseeable as performing his work at said location would come into contact with a portion of said product machine, to the injury of the plaintiff;

g.    That the subject machine was improperly equipped and/or provided with inadequate warnings and lacked other information as to operation and/or maintenance of the subject machine reasonably foreseeable to the defendant, to the injury of the plaintiff;

h.    That the subject machine was improperly equipped or provided with guards or guarding devices which when removed for purposes reasonably foreseeable to the defendant permitted the subject machine and components therein to continue operating, to the injury of the plaintiff;

i.    That the subject machine was improperly and/or inadequately equipped so as to permit guards to be removed without requiring lockout/tagout usage, to the

3

injury of the plaintiff;

j.    That the subject machine failed to be furnished and equipped so as to stop the operation of said machine upon removal of a guard, to the injury of the plaintiff.

5.    That as a direct and proximate result of one or more of the aforementioned, the plaintiff, JOSE LUIS LOZADA, while acting within the course and scope of his employment on May 1, 2004, was caused to be injured while performing work reasonably foreseeable to the defendants with regard to the subject product machine and components thereof which food product was being processed by said subject product machine; that as a result thereof, the plaintiff did sustain severe and serious injury to diverse portions of his body; that the plaintiff incurred great pain and suffering and will in the future incur great pain and suffering; that said injuries are permanent; that the plaintiff incurred great medical expense and will in the future incur great medical expense; that the plaintiff suffered losses of time and wages from work and will in the future be caused to lose time and wages from work and/or loss of income in connection with an inability to perform work; that the plaintiff incurred other pecuniary expense and will in the future incur pecuniary expense.

WHEREFORE, the plaintiff, JOSE LUIS LOZADA, prays for judgment against the defendant, SUPERIOR FOOD MACHINERY, INC., a Corp., in an amount in excess of Fifty Thousand Dollars and 00/100 ($50,000.00), and in an amount to be determined at the trial of the above entitled cause.

## COUNT II

NOW COMES the plaintiff, JOSE LUIS LOZADA, and, in addition to or alternatively to the allegations of Count I, as to the defendant, SUPERIOR FOOD MACHINERY, INC., a Corp., alleges as follows:

1.    The plaintiff realleges paragraph 1 of Count I.

4

2.    The plaintiff realleges paragraph 2 of Count I.

3.    The plaintiff realleges paragraph 3 of Count I.

4.    That it was the duty of the defendant, SUPERIOR, its predecessors and/or successors in interest, to exercise ordinary care toward the plaintiff; yet; notwithstanding said duty, the said defendants, SUPERIOR, their predecessors or successors in interest were guilty of one or more of the following acts or omissions:

   a.    Did negligently, carelessly and improperly fail to give proper and adequate protection to persons engaged in the use and/or maintenance of the said equipment and machinery, to the injury of the plaintiff;

   b.    Did negligently, carelessly and improperly fail to provide the subject product machine with safe, suitable, or proper safety guarding to protect an operator or other person engaged in work in or about said product, to the injury of the plaintiff;

   c.    Did negligently, carelessly and improperly fail to provide in its design, refurbishing, assembly, and/or installation, a safe, suitable and proper area within which and operator and/or other person could perform his reasonably foreseeable duties pertaining to said machine product, to the injury of the plaintiff;

   d.    Did negligently, carelessly and improperly fail to provide a properly located emergency stopping device and/or did fail to include a properly placed emergency stopping device at a location where said defendants knew of should have known it was required for use by an individual engaged in work reasonably foreseeable with regard to the subject product machine, to the injury of the plaintiff;

   e.    Did negligently, carelessly and improperly design, refurbish, assemble, equip, and/or install at the aforesaid premises, so as to provided a dangerous and unsafe work area with regard to said product machine for persons engaged in connection with the inspection, operation, maintenance and/or other reasonably foreseeable procedures with regard to the subject product machine, to the injury of the plaintiff;

   f.    Did negligently, carelessly and improperly equip and/or provide and/or maintain without a safe, suitable and proper guarding device at a place where said defendants jointly and or individually knew or should have known that an individual reasonably foreseeable as performing his work at said location would come into contact with a portion of said product machine, to the injury

of the plaintiff;

g.  Did negligently, carelessly and improperly equip and/or provide the subject machine with inadequate warnings and other information as to the operation and/or maintenance of the subject machine, to the injury of the plaintiff;

h.  Did negligently, carelessly and improperly equip or provide the subject machine with guards or guarding devices which when removed from purposes reasonably foreseeable to the defendant permitted the subject machine and components thereof to continue operating, to the injury of the plaintiff;

i.  Did negligently, carelessly and improperly inadequately equip the subject machine so as to permit guards to be removed without requiring lockout/tagout usage, to the injury of the plaintiff;

j.  Did otherwise negligently, carelessly and improperly fail to equip the subject machine so as to stop the operation and running of said machine upon removal of the gear guarding component, to the injury of the plaintiff.

5.  The plaintiff realleges paragraph 5 of Count I.

WHEREFORE, the plaintiff, JOSE LUIS LOZADA, prays for judgment against the defendant, SUPERIOR FOOD MACHINERY, INC., a Corp., in an amount in excess of Fifty Thousand Dollars and 00/100 ($50,000.00), and in an amount to be determined at the trial of the above entitled cause.

## COUNT III

That in addition to and/or alternatively to the allegations of Counts I and II, the plaintiff, JOSE LUIS LOZADA, alleges as follows as to defendant, MUNOZ, individually and d/b/a TORTILLERIA:

1.  The plaintiff realleges paragraph 1 of Count I.

2.  The plaintiff realleges paragraph 2 of Count I.

3.  The plaintiff realleges paragraph 3 of Count I.

4.  That on and prior to May 1, 2004, the defendant, OSCAR MUNOZ, was an

6

officer and/or director and/or owner of the defendant, TORTILLERIA INC.

    5.     In addition to and/or alternatively to the allegations of paragraph 4, on and prior to May 1, 2004, the defendant, OSCAR MUNOZ, individually did business as and was sole owner of TORTILLERIA and/or TORTILLERIA, INC, and/or did individually own, operate, and control the premises and machinery and other personal property within the subject premises, including, but not limited to, the product machine and components thereof.

    6.     The plaintiff realleges paragraph 4 of Count I and all subparagraphs thereof and incorporates same by reference herein, and further alleges that on and prior to May 1, 2004, defendants, OSCAR MUNOZ and/or TORTILLERIA, INC., were aware of the subject machine being unreasonably, or otherwise, dangerous and unsafe.

    7.     That the defendant, OSCAR MUNOZ, on and prior to May 1, 2004, did directly, expressly, intentionally, commit an intentional tort and knowing the dangers thereof by authorizing and directing employees, so as to require and cause operators of machines located at the subject premises, including the product machine, to remove guards and perform work in unguarded areas of running machines, including the product machine, which led to four amputations and one finger crushing injury sustained by persons performing work at the subject premises since March 2003.That four of the five amputations/crushing injuries sustained by persons performing work at the subject premises did occur within six months prior to and including May 1, 2004.

    8.     That the defendant, MUNOZ, during an inspection of said machinery by the Occupational Safety and Health Administration (i.e., OSHA) of the United States Department of Labor during the year 2000 was informed and made aware in the year 2000 of the absolute

necessity for instituting a lockout/tagout program as to the aforesaid machine, including the

product machine; that the implementation and enforcement of such procedures, which, if

instituted and enforced, would have prevented all five of the aforesaid injuries, including that

sustained by the plaintiff, JOSE LUIS LOZADA.

9.    As hereinafter set forth, the following facts evidence direct and expressed

intentional commission of an intentional tort committed and/or inflicted by the defendants,

MUNOZ, TORTILLERIA and/or TORTILLERIA INC., a Corp.:

a.    Prior to May 1, 2004, pursuant to the OSHA inspection above-referred to in
paragraph 8 hereof, a written lockout/tagout program was developed by and/or
brought to the attention of the defendant, MUNOZ and TORTILLERIA and
TORTILLERIA, INC., which clearly required the use of locks to lockout
machines, including the subject product machine, so as to prevent the
performing of work in unguarded areas of running machines, including the
product machine, the purpose of which was to protect persons, including the
plaintiff, from injury in the performance of work in unguarded area of running
machines and including the protection of persons, including the plaintiff, when
performing work when guards were removed from running machines;

Notwithstanding knowledge of the need for and requirement in compliance
with OSHA of said lockout/tagout program, the defendants, MUNOZ,
TORTILLERIA, and TORTILLERIA, INC., a Corp., intentionally disregarded
the requirements of said program requiring a lock to lockout said machines,
including the product machine, and never prior to May 1, 2004, provided a
lock for any of the machines at the subject premises, including the product
machine, so as to prevent machinery guard(s), including the guard on the
product machine, from being removed to perform work in a then exposed area
of moving gears while the product machine was running in operation;

b.    Prior to and including May 1, 2004, at the subject premises, although
approximately 100 persons, including the plaintiff, performed work with
regard to machinery at the subject premises, including the product machine,
only one person, a supervisor at the subject premises, received training as to
said "lockout/tagout" program and at no time did he or any other workers at
the subject premises, including the plaintiff, receive a lock so as to implement
the lockout/tagout program in any way when work was being or to be
performed on running machines, including the product machine.Further, at no
time prior to and including May 1, 2004, was the plaintiff ever instructed as to
a lockout/tagout program or provided with a lock, as required by said program,
when performing work or service on machinery, including the product

8

machine;

c.   That prior to and including May 1, 2004, none of the aforesaid injured persons had received any training in procedures to be followed during lockout/tagout and all of the aforesaid injured persons would not have received injuries, including the plaintiff, had they been trained in and required to follow a lockout/tagout program, including being provided with a lock;

d.   The defendant, OSCAR MUNOZ, has admitted and stated to an OSHA representative with regard to the aforesaid injured individuals, including the plaintiff, that the aforesaid injuries sustained by said persons, including the plaintiff, "are not my problem, they are the insurance company's problem, and that the aforesaid employees were purposefully injuring themselves on the machines for monetary gain";

e.   That prior to May 1, 2004, operators of machines at the subject premises were required and caused to perform work in unguarded areas of running machines without the use of lockout/tagout procedures notwithstanding said defendants MUNOZ and/or TORTILLERIA, INC. being aware of and having been ordered by OSHA to institute and enforce said lockout/tagout procedures and being aware that said work was being performed by workers at the subject premises and with regard to the subject machinery without lockout/tagout procedures and in violation of said OSHA orders regarding same;

f.   That prior to May 1, 2004, the defendant did intentionally alter, cause to be altered and/or otherwise maintain said subject machine in a dangerous and unsafe condition;

g.   That prior to May 1, 2004, the defendant did otherwise intentionally act out or cause intentional harm to the plaintiff by requiring dangerous and unsafe conduct as to the condition and use of the subject machine.

10.   That as a direct and proximate result of one or more of the aforementioned acts of intentional commission of an intentional tort by the defendant, MUNOZ, individually and d/b/a TORTILLERIA and/or TORTILLERIA, INC., by its servant or agent, being aware of the necessity for lockout/tagout procedures and the dangers attached to their intentional failure to institute and utilize said procedures, and/or alternatively, the aforesaid alteration and/or maintenance of said subject machine, did proximately cause injury to the plaintiff, JOSE LUIS LOZADA, while he was acting within the course and scope of his employment on May 1, 2004,

9

at the subject premises and while performing work with regard to the subject product machine

and components thereof while the machine was running and food product was being processed

by said subject product machine was caused to be injured; that as a result thereof, the plaintiff did

sustain severe and serious injury to diverse portions of his body; that the plaintiff incurred great

pain and suffering and will in the future incur great pain and suffering; that said injuries are

permanent; that the plaintiff incurred great medical expense and will in the future incur great

medical expense; that the plaintiff suffered losses of time and wages from work and will in the

future be caused to lose time and wages from work and/or loss of income in connection with an

inability to perform work; that the plaintiff incurred other pecuniary expense and will in the

future incur pecuniary expense.

WHEREFORE, the plaintiff, JOSE LUIS LOZADA, prays for judgment against the

defendant, OSCAR MUNOZ, individually and/or doing business as TORTILLERIA, and that

judgment be entered in an amount in excess of Fifty Thousand Dollars and 00/100 ($50,000.00),

and in an amount to be determined at the trial of the above entitled cause.

## COUNT IV

That in addition to and/or alternatively to Counts I, II and III, the plaintiff, JOSE LUIS

LOZADA, alleges as follows as to the defendant, TORTILLERIA, INC., a Corp.:

1.    The plaintiff realleges paragraph 1 of Count I.

2.    The plaintiff realleges paragraph 2 of Count I.

3.    The plaintiff realleges paragraph 3 of Count I.

4.    The plaintiff realleges paragraph 4 of Count III.

5.    The plaintiff realleges paragraph 5 of Count III.

6.    The defendants, MUNOZ and/or TORTILLERIA INC., a Corp., by its agents,

servants or representatives, on and prior to May 1, 2004, were aware of the subject machine being unreasonably dangerous and defective in and/or for one or more of the ways set forth in the subparagraphs (a) through and including (j) of paragraph 4 of Count I, which allegations are incorporated by reference herein.

7.    The plaintiff realleges paragraph 7 of Count III.

8.    The plaintiff realleges paragraph 8 of Count III.

9.    That the defendant, MUNOZ, individually and/or as agent, servant and/or in his executive capacity, did commit and/or did cause the defendant, TORTILLERIA, INC., to commit, an intentional tort and/or while knowing the dangers thereof did cause to occur and was and/or were aware of the following:

a.    Prior to May 1, 2004, pursuant to the OSHA inspection above-referred to in paragraph 7 hereof, a written lockout/tagout program was developed by and/or brought to the attention of the defendants, MUNOZ and TORTILLERIA, INC., which clearly required the use of locks to lock out machines, including the subject product machine, so as to prevent the performing of work in unguarded areas of running machines, including the product machine, the purpose of which was to protect persons, including the plaintiff, from injury in the performance of work in unguarded area of running machines and including the protection of persons, including the plaintiff, when performing work when guards were removed from running machines;

Notwithstanding knowledge of the need for and requirement in compliance with OSHA of said lockout/tagout program, however, the defendants, MUNOZ and TORTILLERIA, INC., a Corp., intentionally disregarded the requirements of said program requiring a lock to lockout said machines, including the product machine, and never prior to May 1, 2004, provided a lock for any of the machines at the subject premises, including the product machine, so as to prevent machinery guard(s), including the guard on the product machine, from being removed to perform work in a then exposed area of moving gears while the product machine was running in operation;

b.    Prior to and including May 1, 2004, at the subject premises, although approximately 100 persons, including the plaintiff, performed work with regard to machinery at the subject premises, including the product machine, only one person, a supervisor at the subject premises, received training as to said "lockout/tagout" program and at no time did he or any other workers at the

subject premises, including the plaintiff, receive a lock so as to implement the lockout/tagout program in any way when work was being or to be performed on running machines, including the product machine. Further, at no time prior to and including May 1, 2004, was the plaintiff, ever instructed as to a lockout/tagout program or provided with a lock, as required by said program, when performing work or service on machinery, including the product machine;

c.      That prior to and including May 1, 2004, none of the aforesaid injured persons had received any training in procedures to be followed during lockout/tagout and all of the aforesaid injured persons would not have received injuries, including the plaintiff, had they been trained in and required to follow a lockout/tagout program, including being provided with a lock;

d.      The defendant, MUNOZ, individually and or as agent and/or an executive of defendant, TORTILLERIA, INC., a Corp., has admitted and stated to an OSHA representative with regard to the aforesaid injured individuals, including the plaintiff, that the aforesaid injuries sustained y said persons, including the plaintiff, "are not my problem, they are the insurance company's problem, and that the aforesaid employees were purposefully injuring themselves on the machines for monetary gain."

e.      That prior to May 1, 2004, operators of machines at the subject premises were required and caused to perform work in unguarded areas of running machines without the use of lockout/tagout procedures notwithstanding said defendants MUNOZ and/or TORTILLERIA, INC. being aware of and having been ordered by OSHA to institute and enforce said lockout/tagout procedures and being aware that said work being performed by workers at the subject premises and with regard to the subject machinery without lockout/tagout procedures and in violation of said OSHA orders regarding same;

f.      That prior to May 1, 2004, the defendant MUNOZ and/or defendant, TORTILLERIA, INC., did intentionally alter, cause to be altered and/or otherwise maintain said subject machine in a dangerous and unsafe condition;

g.      That prior to May 1, 2004, the defendant did otherwise intentionally act out or cause intentional harm to the plaintiff by requiring dangerous and unsafe conduct as to the condition and use of the subject machine.

10.    Plaintiff realleges the allegations of paragraph 10 of Count III.

WHEREFORE, the plaintiff, JOSE LUIS LOZADA, prays for judgment against the

defendants, OSCAR MUNOZ, Ind. and d/b/a TORTILLERIA ATOTONILCO; and/or

TORTILLERIA ATOTONILCO, INC., a Corp., jointly and individually, and that judgment be

12

FEB-28-2008 THU 10:08 AM Summit Insurance Agency    FAX NO. 17085948246    P. 32

entered in an amount in excess of Fifty Thousand Dollars and 00/100 ($50,000.00), and in an amount to be determined at the trial of the above entitled cause.

## COUNT V

That in addition and/or alternative to the allegations of Counts I, II, III, and IV, the plaintiff, JOSE LUIS LOZADA, alleges as follows as to defendant OSCAR MUNOZ individually:

1.    The plaintiff realleges paragraph 1 of Count I.

2.    That prior to May 1, 2004, the defendant, OSCAR MUNOZ, did individually own, operate, and control the subject premises and machinery and other personal property within said subject premises, including, but not limited to, the product machine and components thereof, at 1707 West 47th St., in the City of Chicago, County of Cook, State of Illinois.

3.    The plaintiff realleges paragraph 3 of Count I, and, in addition, alleges he was not employed by or an employee of the defendant, OSCAR MUNOZ, individually.

4. The plaintiff realleges paragraph 4 of Count I and all subparagraphs thereof, and incorporates same by reference herein, and further alleges that on and prior to May 1, 2004, the defendant, OSCAR MUNOZ, was aware of the subject product machine being unreasonably dangerous or otherwise dangerous and unsafe in one or more of the ways alleged.

5.    That the defendant, OSCAR MUNOZ, on and prior to May 1, 2004, knowing the dangers thereof, did, individually, cause or permit persons working within the subject premises and/or knowingly was aware that persons working within the subject premises and using the subject product machine, were operating said machine, which included the removal of guards and the performance of work in unguarded areas with running machines, including the subject machine, which led to four amputations and one finger crushing injury sustained by persons

13

FEB-28-2008 THU 10:08 AM Summit Insurance Agency    FAX NO. 17085948246    P. 33

performing work at the subject premises since March 2003. That four of the five

amputations/crushing injuries sustained by persons performing work at the subject premises did

occur within six months prior to and including May 1, 2004.

6.    The plaintiff realleges paragraph 8 of Count III.

7.    That it was the duty of the defendant, OSCAR MUNOZ, to exercise ordinary care

toward the plaintiff; yet notwithstanding said duty, as hereinafter set forth, the following facts

evidence that MUNOZ failed to exercise ordinary care and was guilty of negligence in one or

more of the following ways:

a.    Prior to May 1, 2004, pursuant to the OSHA inspection above-referred to in
paragraph 6 hereof, a written lockout/tagout program was developed by and/or
brought to the attention of the defendant, OSCAR MUNOZ, which clearly
required the use of locks to lockout machines, including the subject product
machine, so as to prevent the performing of work in unguarded areas of
running machines, including the product machine, the purpose of which was
to protect persons, including the plaintiff, from injury in the performance of
work in unguarded area of running machines and including the protection of
persons, including the plaintiff, when performing work when guards were
removed from running machines;

Notwithstanding knowledge of the need for and requirement in compliance
with OSHA of said lockout/tagout program, the defendant, OSCAR MUNOZ,
disregarded the requirements of said program requiring a lock to lockout
machines, including the product machine, and never prior to May 1, 2004,
provided a lock for any of the machines at the subject premises, including the
product machine, so as to prevent machinery guard(s), including the guard on
the product machine, from being removed to perform work in a then exposed
area of moving gears while the product machine was running in operation;

b.    Prior to and including May 1, 2004, at the subject premises, although
approximately 100 persons, including the plaintiff, performed work with
regard to machinery at the subject premises, including the product machine,
only one person, a supervisor at the subject premises, received training as to
said "lockout/tagout" program and at no time did he or any other workers at
the subject premises, including the plaintiff, receive a lock so as to implement
the lockout/tagout program in any way when work was being or to be
performed on running machines, including the product machine. Further, at no
time prior to and including May 1, 2004, was the plaintiff ever instructed as to

14

a lockout/tagout program or provided with a lock, as required by said program, when performing work or service on machinery, including the product machine;

c.  That prior to and including May 1, 2004, none of the aforesaid injured persons had received any training in procedures to be followed during lockout/tagout and all of the aforesaid injured persons would not have received injuries, including the plaintiff, had they been trained in and required to follow a lockout/tagout program, including being provided with a lock;

d.  The defendant, OSCAR MUNOZ, has admitted and stated to an OSHA representative with regard to the aforesaid injured individuals, including the plaintiff, that the aforesaid injuries sustained by said persons, including the plaintiff, "are not my problem, they are the insurance company's problem, and that the aforesaid employees were purposefully injuring themselves on the machines for monetary gain";

e.  That prior to May 1, 2004, operators of machines at the subject premises were required and caused to perform work in unguarded areas of running machines without the use of lockout/tagout procedures notwithstanding said defendant OSCAR MUNOZ being aware of and having been ordered by OSHA to institute and enforce said lockout/tagout procedures and being aware that said work was being performed by workers at the subject premises and with regard to the subject machinery without lockout/tagout procedures and in violation of said OSHA orders regarding same;

f.  That prior to May 1, 2004, the defendant did alter, cause to be altered and/or otherwise maintain said subject machine in a dangerous and unsafe condition;

g.  That prior to May 1, 2004, the defendant did otherwise act out or cause harm to the plaintiff by requiring dangerous and unsafe conduct as to the condition and use of the subject machine.

8.  That as a direct and proximate result of one or more of the aforementioned acts of

negligence by defendant OSCAR MUNOZ, individually, the plaintiff, JOSE LUIS LOZADA,

while he was acting within the course and scope of his employment on May 1, 2004, at the

subject premises and performing work with regard to the subject product machine and

components thereof while the machine was running and food product was being processed by

said subject product machine was caused to be injured; that as a result of the defendant's

foregoing conduct, the plaintiff did sustain severe and serious injury to diverse portions of his

15

body; that the plaintiff incurred great pain and suffering and will in the future incur great pain and suffering; that said injuries are permanent; that the plaintiff incurred great medical expense and will in the future incur great medical expense; that the plaintiff suffered losses of time and wages from work and will in the future be caused to lose time and wages from work and/or loss of income in connection with an inability to perform work; that the plaintiff incurred other pecuniary expense and will in the future incur pecuniary expense.

WHEREFORE, the plaintiff, JOSE LUIS LOZADA, prays for judgment against the defendant, OSCAR MUNOZ, individually, and that judgment be entered in an amount in excess of Fifty Thousand Dollars and 00/100 ($50,000.00), and in an amount to be determined at the trial of the above entitled cause.

Respectfully submitted,

By: _____
    Bradley D. Steinberg

Steinberg, Goodman & Kalish
20 North Clark Street, 31st Floor
Chicago, Illinois 60602–5913
312.782.1386 (tel)
312.782.6739 (fax)

200683/bds  Atty. No. 42999

PH

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| JOSE LUIS LOZADA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Court No. 06 L 003478 |
| | ) |
| SUPERIOR FOOD MACHINERY,  INC., a | ) |
| Corp.; OSCAR MUNOZ, Ind. and d/b/a | ) |
| TORTILLERIA ATOTONILCO, INC., a | ) |
| Corp.; TORTILLERIA ATOTONILCO, INC., | ) |
| a Corp.; SAFETY SUPPLY ILLINOIS, a | ) |
| Corp.; and SAFETY CHECK, INC., | ) |
| | ) |
| Defendants. | ) |

### FOURTH AMENDED COMPLAINT AT LAW

NOW, pursuant to this Court's Order of February 28, 2008, COMES the plaintiff, JOSE LUIS

LOZADA, by and through his attorneys, STEINBERG, GOODMAN & KALISH, and STEVEN A.

DENNY, and complaining in this Fourth Amended Complaint of defendant, SUPERIOR FOOD

MACHINERY, INC., a Corp. (hereinafter referred to as "SUPERIOR"), and, pursuant to 735 ILCS

5/2-402, having named former respondents in discovery as additional defendants, OSCAR MUNOZ,

Ind. and d/b/a TORTILLERIA ATOTONILCO, INC., a Corp. (hereinafter and also referred to as

"MUNOZ" and "TORTILLERIA"); and TORTILLERIA ATOTONILCO, INC., a Corp. (hereinafter

ALSO referred to as "TORTILLERIA, INC."), alleges as follows:

### COUNT I

1. That prior to May 1, 2004, the defendant, SUPERIOR, its predecessor and/or successors in

interest, did design, manufacture, engineer, fabricate, distribute and sell a machine identified as

Model – 4C H8.5 – TM, Serial No. 488256, which subject machine was to be used by workers in



1     J:\Lozada, Jose Luis\Pleadings\4th Amended Complaint.wpd

the course and scope of their employment with regard to the preparation of food products. Hereinafter, the subject machine will also be referred to as "product," "equipment" and/or "product machine."

2.  That prior to May 1, 2004, the subject product machine and components thereof were sold by defendant, SUPERIOR, and were thereafter owned and/or operated by either or both defendants, MUNOZ, individually and d/b/a TORTILLERIA and/or defendant, TORTILLERIA, INC., and/or operated by servants, employees and/or agents of said defendants at 1707 West 47th St., in the City of Chicago, County of Cook, State of Illinois (hereinafter referred to as the "subject premises").

3.  That included within the Terms and Conditions of said sale, a copy of which is attached hereto as Exhibit A, the defendant, SUPERIOR, did retain the right to make changes in the design of the subject equipment Model 4C H8.5 and components thereof subsequent to the sale of said subject equipment and components thereof. In addition, the defendant, SUPERIOR, was aware and did intend that the subject product machine Model 4C H8.5, Serial No. 488256, would be used, operated and cleaned by employees of the purchaser(s) thereof.

4.  That prior to May 1, 2004, the defendant, SUPERIOR, did undertake and make changes as to Model 4C H8.5 machines so as to include a killer switch or interlock mechanism therein which, upon opening and/or removal of the guard cover over gears, would automatically cause or result in moving parts, including gears, to be stopped in their motion irrespective of whether the machine was in the operating mode or idling mode.

5.  That at no time prior to May 1, 2004, did defendant, SUPERIOR, inform or advise defendants, MUNOZ, individually and d/b/a TORTILLERIA, and/or defendant, TORTILLERIA, INC., or servants, agents, employees thereof as to the undertaken design and/or component changes to the Model 4C H8.5 set forth in paragraph 4 and which undertaken changes were applicable to the

2

subject equipment product previously sold to and in the possession and use of defendants, MUNOZ, individually and d/b/a TORTILLERIA, and/or defendant, TORTILLERIA, INC., and/or servants, agents or employees of said defendant(s), as regards a killer switch or interlock mechanism which, upon opening and/or removal of the guard cover over gears, would automatically cause or result in the stopping of moving parts, including gears, irrespective of whether the subject machine was in an operating mode or idling mode.

6. That at no time prior to May 1, 2004, did the defendant, SUPERIOR, provide the aforesaid killer switch or interlock components to defendants, MUNOZ, individually and d/b/a TORTILLERIA, and/or defendant, TORTILLERIA, INC., and/or servants, agents or employees of said defendant(s), for the subject Model 4C H8.5, Serial No. 488256.

7. That on and prior to May 1, 2004, the plaintiff, JOSE LUIS LOZADA, was employed at the subject premises, and in the course and scope of his employment did and was caused to work with the subject product machine and/or equipment.

8. That at the time the said product machine or equipment left the control of the defendant, SUPERIOR, and, including the services performed by said defendant in connection therewith, said product machine was and continued to remain unreasonably dangerous and therefore defective when put to a use which the said defendant, SUPERIOR, knew or should have known would occur or take place; that it was the duty of the said defendant, SUPERIOR, their predecessors or successors in interest, not to design, engineer, fabricate, distribute, manufacture, sell, refurbish, install or cause to be installed or provided, the subject product or equipment, including services undertaken and provided in connection therewith, that was unreasonably dangerous and therefore defective; yet, notwithstanding said duty, the said product machine, including services undertaken and provided or required to be provided in connection therewith and components thereof, was unreasonably

3

dangerous and therefore defective in one or more of the following ways.

a. The said product machine, or equipment including undertaken services provided in connection therewith, failed to give proper and adequate protection to persons engaged in the use and/or maintenance of the said equipment and machinery, to the injury of the plaintiff;

b. That the subject product machine or equipment was not provided with safe, suitable, or proper safety guarding to protect an operator or other person engaged in work in or about said product, to the injury of the plaintiff;

c. That the subject product machine or equipment failed to provide in its design, refurbishing, assembly, and/or installation, a safe, suitable and proper area within which an operator and/or other person could perform his reasonably foreseeable duties pertaining to said machine product, to the injury of the plaintiff;

d. That the aforesaid product machine or equipment failed to contain or be provided with a properly located emergency stopping device and/or did fail to include a properly placed emergency stopping device at a location where said defendants knew of should have known it was required for use by an individual engaged in work reasonably foreseeable with regard to the subject product machine, to the injury of the plaintiff;

e. The subject product machine or equipment was otherwise improperly designed, refurbished, assembled, equipped, and/or installed at the aforesaid premises, so as to provided a dangerous and unsafe work area with regard to said product machine for persons engaged in connection with the inspection, operation, maintenance and/or other reasonably foreseeable procedures with regard to the subject product machine, to the injury of the plaintiff;

f. That the subject product machine or equipment was improperly equipped and/or provided and/or maintained without a safe, suitable and proper guarding device at a place where said defendants jointly and or individually knew or should have known that an individual reasonably foreseeable as performing his work at said location would come into contact with a portion of said product machine, to the injury of the plaintiff;

g. That the subject machine or equipment was improperly equipped and/or provided with inadequate warnings and lacked other information as to operation and/or maintenance of the subject machine reasonably foreseeable to the defendant, to the injury of the plaintiff;

h. That the subject machine or equipment was improperly equipped or provided with guards or guarding devices which when removed for purposes reasonably foreseeable to the defendant permitted the subject machine and components therein to continue operating, to the injury of the plaintiff;

4

i. That the subject machine or equipment was improperly and/or inadequately equipped so as to permit guards to be removed without requiring lockout/tagout usage, to the injury of the plaintiff;

j. That the subject machine or equipment failed to be furnished and equipped so as to stop the operation of said machine upon opening or removal of a guard, to the injury of the plaintiff.

k. That no interlock or killer switch was supplied or furnished for the subject equipment so as to automatically stop movement of moving parts, including gears upon opening and/or removal of the guard cover, to the injury of the plaintiff.

l. That no interlock or killer switch component(s) was supplied or furnished for the subject equipment to automatically stop moving components, including gears, upon opening and/or removal of the guard cover, although such components were included in and with the Model 4C H8.5 product sold to other purchasers prior to May 1, 2004, to the injury of the plaintiff.

9. That as a direct and proximate result of one or more of the aforementioned, the plaintiff, JOSE LUIS LOZADA, while acting within the course and scope of his employment on May 1, 2004, was caused to be injured while performing work reasonably foreseeable to the defendants with regard to the subject product machine and components thereof which food product was being processed by said subject product machine; that as a result thereof, the plaintiff did sustain severe and serious injury to diverse portions of his body; that the plaintiff incurred great pain and suffering and will in the future incur great pain and suffering; that said injuries are permanent; that the plaintiff incurred great medical expense and will in the future incur great medical expense; that the plaintiff suffered losses of time and wages from work and will in the future be caused to lose time and wages from work and/or loss of income in connection with an inability to perform work; that the plaintiff incurred other pecuniary expense and will in the future incur pecuniary expense.

WHEREFORE, the plaintiff, JOSE LUIS LOZADA, prays for judgment against the defendant, SUPERIOR FOOD MACHINERY, INC., a Corp., in an amount in excess of Fifty Thousand Dollars and 00/100 ($50,000.00), and in an amount to be determined at the trial of the above entitled cause.

5

## COUNT II

NOW COMES the plaintiff, JOSE LUIS LOZADA, and, in addition to or alternatively to the allegations of Counts I, III, IV, V, VI, VII, and/or VIII, as to the defendant, SUPERIOR FOOD MACHINERY, INC., a Corp., alleges as follows:

1. The plaintiff realleges paragraph 1 of Count I.

2. The plaintiff realleges paragraph 2 of Count I.

3. The plaintiff realleges paragraph 3 of Count I.

4. That it was the duty of the defendant, SUPERIOR, its predecessors and/or successors in interest, to exercise ordinary care toward the plaintiff; yet; notwithstanding said duty, the said defendants, SUPERIOR, their predecessors or successors in interest were guilty of one or more of the following acts or omissions:

    a.  Did negligently, carelessly and improperly fail to give proper and adequate protection to persons engaged in the use and/or maintenance of the said equipment and machinery, to the injury of the plaintiff;

    b.  Did negligently, carelessly and improperly fail to provide the subject product machine with safe, suitable, or proper safety guarding to protect an operator or other person engaged in work in or about said product, to the injury of the plaintiff;

    c.  Did negligently, carelessly and improperly fail to provide in its design, refurbishing, assembly, and/or installation, a safe, suitable and proper area within which and operator and/or other person could perform his reasonably foreseeable duties pertaining to said machine product, to the injury of the plaintiff;

    d.  Did negligently, carelessly and improperly fail to provide a properly located emergency stopping device and/or did fail to include a properly placed emergency stopping device at a location where said defendants knew of should have known it was required for use by an individual engaged in work reasonably foreseeable with regard to the subject product machine, to the injury of the plaintiff;

    e.  Did negligently, carelessly and improperly fail to inform the purchases and/or reasonably foreseeable users of the subject product machine as to the need for and/or existence of an interlock or killer switch component(s) to automatically stop moving machine components, including gears, upon opening and/or removal of the guard covers, and, without which said subject machine provided a dangerous and unsafe work area with

6

regard to said product machine for persons engaged in connection with the inspection, operation, maintenance and/or other reasonably foreseeable procedures with regard to the subject product machine, to the injury of the plaintiff;

f.  Did negligently, carelessly and improperly equip and/or provide and/or maintain without a safe, suitable and proper guarding device at a place where said defendants jointly and or individually knew or should have known that an individual reasonably foreseeable as performing his work at said location would come into contact with a portion of said product machine, to the injury of the plaintiff;

g.  Did negligently, carelessly and improperly equip and/or provide the subject machine with inadequate warnings and other information as to the operation and/or maintenance of the subject machine, to the injury of the plaintiff;

h.  Did negligently, carelessly and improperly equip or provide the subject machine with guards or guarding devices which when removed from purposes reasonably foreseeable to the defendant permitted the subject machine and components thereof to continue operating, to the injury of the plaintiff;

i.  Did negligently, carelessly, improperly, and inadequately equip the subject machine so as to permit guards to be removed without requiring lockout/tagout usage, to the injury of the plaintiff;

j.  Did otherwise negligently, carelessly and improperly fail to equip the subject machine so as to stop the operation and running of said machine upon removal of the gear guarding component, to the injury of the plaintiff;

k.  Did negligently, carelessly and improperly fail to provide an interlock or killer switch for the subject equipment, so as to automatically stop movement of moving parts, including gears, upon opening and/or removal of the guard cover, to the injury of the plaintiff;

l.  Did negligently, carelessly and improperly fail to provide an interlock or killer switch component(s) which were supplied or furnished for the subject model equipment to automatically stop moving components, including gears, upon opening and/or removal of the guard cover, although such components and/or design was included in and with the Model 4C H8.5 product sold to other purchasers prior to May 1, 2004, to the injury of the plaintiff.

5.  The plaintiff realleges paragraph 4 of Count I.

6.  The plaintiff realleges paragraph 5 of Count I.

7.  The plaintiff realleges paragraph 6 of Count I.

8.  The plaintiff realleges paragraph 7 of Count I.

7

9. The plaintiff realleges paragraph 9 of Count I.

WHEREFORE, the plaintiff, JOSE LUIS LOZADA, prays for judgment against the defendant, SUPERIOR FOOD MACHINERY, INC., a Corp., in an amount in excess of Fifty Thousand Dollars and 00/100 ($50,000.00), and in an amount to be determined at the trial of the above entitled cause.

## COUNT III

That in addition to and/or alternatively to the allegations of Counts I, II, IV, VI, VII, and/or VIII, the plaintiff, JOSE LUIS LOZADA, alleges as follows as to defendant, SUPERIOR:

1. The plaintiff realleges paragraph 1 of Count I.

2. The plaintiff realleges paragraph 2 of Count I.

3. The plaintiff realleges paragraph 3 of Count I.

4. The plaintiff realleges paragraph 4 of Count I.

5. The plaintiff realleges paragraph 5 of Count I.

6. The plaintiff realleges paragraph 6 of Count I.

7. The plaintiff realleges paragraph 7 of Count I.

8. That the defendant, SUPERIOR, prior to May 1, 2004, was aware that the subject equipment and/or product Model 4C H8.15 – TM, Serial No. 488256, did not contain or include a killer switch or interlock device or component(s) which upon opening and/or removal of the guard cover automatically stopped moving parts, including gears, irrespective of whether the subject equipment was in an operating mode or idling mode.

9. That the plaintiff, JOSE LUIS LOZADA, was and is a third-party beneficiary of the contractual Terms and Conditions above referred to in Exhibit A, attached hereto, and is entitled to the protection of its provisions, he being an employee assigned to the operation and use of said subject equipment, which provision and factual circumstance is expressly included in said Terms and

8

Conditions. In addition, plaintiff, JOSE LUIS LOZADA, being an employee assigned to the operation and use of the said subject equipment, was and is entitled to the protection of its provisions as to those changes above referred to in paragraphs 4 and 5 of this Count, undertaken by defendant, SUPERIOR, as to the Model 4C H8.5, which undertaken changes, and/or information regarding same, were not provided by defendant, SUPERIOR, to or for the subject product Model 4C H8.5, Serial No. 488256 prior to May 1, 2004, in the course of said undertaking.

That the failure by the defendant, SUPERIOR, to provide the aforesaid undertaken changes was a breach of the aforesaid Terms and Conditions of the subject contract and as a result of said breach the plaintiff, JOSE LUIS LOZADA, as a third-party beneficiary, did sustain severe and serious injuries and damages.

10. That in addition to and/or alternatively to the allegations of Count 9, plaintiff alleges that for the reasons set forth in paragraph 9, the subject product, absent a killer switch or interlock device or component(s), which upon opening and/or removal of the guard cover, would automatically stop moving partes, including gears, irrespective of whether the subject equipment was in an operating or idling mode, was unreasonably dangerous and defective; that said product was also unreasonably dangerous and therefore defective for one or more of the reasons set forth in paragraph 8 of Count I, subparagraphs (a) through and including (I), incorporated by reference herein, which, jointly and/or individually, constituted a breach of the aforesaid contractual Terms and Conditions to which the plaintiff, JOSE LUIS LOZADA, was a third-party beneficiary and did thereby sustain injury and damage.

11. The plaintiff realleges paragraph 9 of Count I.

WHEREFORE, the plaintiff, JOSE LUIS LOZADA, prays for judgment against the defendant, SUPERIOR FOOD MACHINERY, INC., a Corp., in an amount in excess of Fifty Thousand Dollars

and 00/100 ($50,000.00), and in an amount to be determined at the trial of the above entitled cause.

## COUNT IV

That in addition to and/or alternatively to the allegations of Counts I, II, III, V, VI, VII, and/or VIII, the plaintiff, JOSE LUIS LOZADA, alleges as follows as to defendant, SUPERIOR:

1. The plaintiff realleges paragraph 1 of Count I.

2. The plaintiff realleges paragraph 2 of Count I.

3. That defendant, SUPERIOR, in making the aforesaid sale of the subject product machine and components thereof, was a "seller" as that term is defined in 810 ILCS 5/2-103, and subject to the duties and requirements imposed by the Illinois Uniform Commercial Code, 810 ILCS 5/2-101 *et seq.*

4. That the sale of the subject product machine and components thereof by defendant, SUPERIOR, was subject to certain implied warranties, including that of merchantability and usage of trade under 810 ILCS 5/2-314.

5. That pursuant to an implied warranty of merchantability and usage of trade, the subject equipment, Model 4C H8.15 – TM, Serial No. 488256, and components thereof were warranted to be fit for the ordinary purpose for which such goods are used, which ordinary purpose included ability to be used, operated, and cleaned by employees of the purchaser(s) thereof in a reasonably safe manner such that upon the opening and/or removal of the guard cover over gears, would cause moving parts, including gears, to automatically stop their motion irrespective of whether the machine was in the operating mode or idling mode.

6. That the subject equipment, Model 4C H8.15 – TM, Serial No. 488256, and components thereof as sold and delivered to its purchaser(s), either or both defendants, MUNOZ, individually and d/b/a TORTILLERIA and/or defendant, TORTILLERIA, INC., at the subject premises prior to

10

May 1, 2004, did not contain or include a killer switch or interlock mechanism therein which, upon opening and/or removal of the guard cover over gears, would automatically cause or result in moving parts, including gears, to be stopped in their motion irrespective of whether the subject equipment was in the operating mode or idling mode, and/or otherwise lacked provision for reasonably safe use, operation, or cleaning of the subject equipment and components thereof.

7. The plaintiff realleges paragraph 4 of Count I.

8. The plaintiff realleges paragraph 5 of Count I.

9. The plaintiff realleges paragraph 6 of Count I.

10. The plaintiff realleges paragraph 7 of Count I.

11. The plaintiff realleges paragraph 8 of Count III.

12. That the plaintiff, JOSE LUIS LOZADA, was and is a third-party beneficiary of the implied warranty of merchantability and usage of trade above referred to, and is entitled to the protection of its provisions, he being an employee assigned to the operation and use of said subject equipment, and his safety, as an employee of the purchaser(s), his employer(s), either or both defendants, MUNOZ, individually and d/b/a TORTILLERIA and/or defendant, TORTILLERIA, INC., being a part of the basis of the bargain in the purchase of the subject equipment and components thereof.

13. In addition, plaintiff, JOSE LUIS LOZADA, being an employee assigned to the operation and use of the said subject equipment, was and is entitled to the protection of those changes above referred to in paragraph 7 of this Count, undertaken by defendant, SUPERIOR, as to the Model 4C H8.5, which undertaken changes were not provided by defendant, SUPERIOR, to or for the subject product Model 4C H8.5, Serial No. 488256 prior to May 1, 2004, in the course of said undertaking, and which changes are incorporated into the implied warranty of merchantability and usage of trade above referred to.

11

That the failure by the defendant, SUPERIOR, to provide the aforesaid safety devices or mechanisms and/or the undertaken changes was a breach of the aforesaid implied warranty of merchantability and usage of trade, and as a result of said breach the plaintiff, JOSE LUIS LOZADA, as a third-party beneficiary, did sustain severe and serious injuries and damages.

14. That in addition to and/or alternatively to the allegations of paragraph 13 of this Count, plaintiff alleges that for the reasons set forth in paragraph 13, the subject product, absent a killer switch or interlock device or component(s), and which upon opening and/or removal of the guard cover, moving parts, including gears, would automatically stop irrespective of whether the subject equipment was in an operating or idling mode, was unreasonably dangerous and defective; that said product was also unreasonably dangerous and therefore defective for one or more of the reasons set forth in paragraph 8 of Count I, subparagraphs (a) through and including (l), incorporated by reference herein, which, jointly and/or individually, constituted a breach of the aforesaid implied warranty of merchantability and usage of trade, to which the plaintiff, JOSE LUIS LOZADA, was a third-party beneficiary and did thereby sustain injury and damage.

15. The plaintiff realleges paragraph 9 of Count I.

WHEREFORE, the plaintiff, JOSE LUIS LOZADA, prays for judgment against the defendant, SUPERIOR FOOD MACHINERY, INC., a Corp., in an amount in excess of Fifty Thousand Dollars and 00/100 ($50,000.00), and in an amount to be determined at the trial of the above entitled cause.

## COUNT V

That in addition to and/or alternatively to the allegations of Counts I , II, III, IV, VI, VII, and/or VIII, the plaintiff, JOSE LUIS LOZADA, alleges as follows as to defendant, SUPERIOR:

1.  The plaintiff realleges paragraph 1 of Count I.

2.  The plaintiff realleges paragraph 2 of Count I.

12

3. The plaintiff realleges paragraph 3 of Count IV.

4. That the sale of the subject product machine and components thereof by defendant, SUPERIOR, was subject to certain implied warranties, including that of fitness for a particular purpose under 810 ILCS 5/2-315.

5. That an implied warranty of fitness for a particular purpose arose concerning and by virtue of the fact that the defendant, SUPERIOR, was aware the purchaser of the subject equipment Model 4C H8.5 and components thereof intended employees to use, operate, and clean said equipment and components, which involved removing the guard cover over gears and that said subject machine be provided and equipped so as to cause said use and operation, including cleaning, be accomplished in a reasonably safe manner to avoid potential for injury.

6. That the subject equipment Model 4C H8.5 and components thereof as sold and delivered to its purchaser(s), either or both defendants, MUNOZ, individually and d/b/a TORTILLERIA and/or defendant, TORTILLERIA, INC., at the subject premises prior to May 1, 2004, did not contain or include a killer switch or interlock mechanism therein which, upon opening and/or removal of the guard cover over gears, would automatically cause or result in moving parts to be stopped in their motion irrespective of whether the machine was in the operating mode or idling mode, or otherwise provide and equip the subject machine so as to cause its use and operation, including cleaning, to be accomplished in a reasonably safe manner.

7. The plaintiff realleges paragraph 4 of Count I.

8. The plaintiff realleges paragraph 5 of Count I.

9. The plaintiff realleges paragraph 6 of Count I.

10. The plaintiff realleges paragraph 7 of Count I.

11. The plaintiff realleges paragraph 8 of Count III.

13

12. That the plaintiff, JOSE LUIS LOZADA, was and is a third-party beneficiary of the implied warranty of fitness for a particular purpose above referred to, and is entitled to the protection of its provisions, he being an employee assigned to the operation and/or use, incluidng cleaning, of said subject equipment, and his safety as an employee of the purchaser(s), his employer(s), either or both defendants, MUNOZ, individually and d/b/a TORTILLERIA and/or defendant, TORTILLERIA, INC., being a part of the basis of the bargain in the purchase of the subject equipment and components thereof.

13. The plaintiff, JOSE LUIS LOZADA, being an employee assigned to the operation and/or use, including cleaning, of the said subject equipment, was and is entitled to the protection of those changes above referred to in paragraph 7 of this Count undertaken by defendant, SUPERIOR, as to the Model 4C H8.5, which undertaken changes were not provided by defendant, SUPERIOR, to or for the subject product Model 4C H8.5, Serial No. 488256 prior to May 1, 2004, in the course of said undertaking; that the aforementioned changes are incorporated into the implied warranty of fitness for a particular purpose(s) above referred to.

That the failure of the defendant, SUPERIOR, to provide the aforesaid safety devices or mechanisms and/or the undertaken changes, heretofore referred to as the killer switch or interlock mechanism, was a breach of the aforesaid implied warranty of fitness for a particular purpose , and as a result of said breach the plaintiff, JOSE LUIS LOZADA, as a third-party beneficiary, did sustain severe and serious injuries and damages.

14. That in addition to and/or alternatively to the allegations of paragraph 13 of this Count, plaintiff alleges that for the reasons set forth in paragraph 13, the subject product, absent a killer switch or interlock device or component(s), which upon opening and/or removal of the guard cover would automatically stop moving partes, including gears, irrespective of whether the subject

14

equipment was in an operating or idling mode, was unreasonably dangerous and defective, was also unreasonably dangerous and therefore defective for one or more of the reasons set forth in paragraph 8 of Count I, subparagraphs (a) through and including (l), incorporated by reference herein, which, jointly and/or individually, constituted a breach of the aforesaid implied warranty, to which the plaintiff, JOSE LUIS LOZADA, was a third-party beneficiary and by virtue of the breach thereof did sustain injury and damage.

15. The plaintiff realleges paragraph 9 of Count I.

WHEREFORE, the plaintiff, JOSE LUIS LOZADA, prays for judgment against the defendant, SUPERIOR FOOD MACHINERY, INC., a Corp., in an amount in excess of Fifty Thousand Dollars and 00/100 ($50,000.00), and in an amount to be determined at the trial of the above entitled cause.

### COUNT VI

That in addition to and/or alternatively to the allegations of Counts I, II, III, IV, V, VII, and/or VIII, the plaintiff, JOSE LUIS LOZADA, alleges as follows as to defendant, MUNOZ, individually and d/b/a TORTILLERIA:

1. The plaintiff realleges paragraph 1 of Count I.

2. The plaintiff realleges paragraph 2 of Count I.

3. The plaintiff realleges paragraph 7 of Count I.

4. That on and prior to May 1, 2004, the defendant, OSCAR MUNOZ, was an officer and/or director and/or owner of the defendant, TORTILLERIA INC.

5. In addition to and/or alternatively to the allegations of paragraph 4, on and prior to May 1, 2004, the defendant, OSCAR MUNOZ, individually did business as and was sole owner of TORTILLERIA and/or TORTILLERIA, INC, and/or did individually own, operate, and control the premises and machinery and other personal property within the subject premises, including, but not

15

limited to, the product machine and components thereof.

6.  The plaintiff realleges paragraph 8 of Count I and all subparagraphs thereof and incorporates same by reference herein, and further alleges that on and prior to May 1, 2004, defendants, OSCAR MUNOZ and/or TORTILLERIA, INC., were aware of the subject machine being unreasonably, or otherwise, dangerous and unsafe.

7.  That the defendant, OSCAR MUNOZ, on and prior to May 1, 2004, did directly, expressly, intentionally, commit an intentional tort and knowing the dangers thereof by authorizing and directing employees, so as to require and cause operators of machines located at the subject premises, including the product machine, to remove guards and perform work in unguarded areas of running machines, including the product machine, which led to four amputations and one finger crushing injury sustained by persons performing work at the subject premises since March 2003. That four of the five amputations/crushing injuries sustained by persons performing work at the subject premises did occur within six months prior to and including May 1, 2004.

8.  That the defendant, MUNOZ, during an inspection of said machinery by the Occupational Safety and Health Administration (i.e., OSHA) of the United States Department of Labor during the year 2000 was informed and made aware in the year 2000 of the absolute necessity for instituting a lockout/tagout program as to the aforesaid machine, including the product machine; that the implementation and enforcement of such procedures, which, if instituted and enforced, would have prevented all five of the aforesaid injuries, including that sustained by the plaintiff, JOSE LUIS LOZADA.

9.  As hereinafter set forth, the following facts evidence direct and expressed intentional commission of an intentional tort committed and/or inflicted by the defendants, MUNOZ, TORTILLERIA and/or TORTILLERIA INC., a Corp.:

16

a. Prior to May 1, 2004, pursuant to the OSHA inspection above-referred to in paragraph 8 hereof, a written lockout/tagout program was developed by and/or brought to the attention of the defendant, MUNOZ and TORTILLERIA and TORTILLERIA, INC., which clearly required the use of locks to lockout machines, including the subject product machine, so as to prevent the performing of work in unguarded areas of running machines, including the product machine, the purpose of which was to protect persons, including the plaintiff, from injury in the performance of work in unguarded area of running machines and including the protection of persons, including the plaintiff, when performing work when guards were removed from running machines;

Notwithstanding knowledge of the need for and requirement in compliance with OSHA of said lockout/tagout program, the defendants, MUNOZ, TORTILLERIA, and TORTILLERIA, INC., a Corp., intentionally disregarded the requirements of said program requiring a lock to lockout said machines, including the product machine, and never prior to May 1, 2004, provided a lock for any of the machines at the subject premises, including the product machine, so as to prevent machinery guard(s), including the guard on the product machine, from being removed to perform work in a then exposed area of moving gears while the product machine was running in operation;

b. Prior to and including May 1, 2004, at the subject premises, although approximately 100 persons, including the plaintiff, performed work with regard to machinery at the subject premises, including the product machine, only one person, a supervisor at the subject premises, received training as to said "lockout/tagout" program and at no time did he or any other workers at the subject premises, including the plaintiff, receive a lock so as to implement the lockout/tagout program in any way when work was being or to be performed on running machines, including the product machine. Further, at no time prior to and including May 1, 2004, was the plaintiff ever instructed as to a lockout/tagout program or provided with a lock, as required by said program, when performing work or service on machinery, including the product machine;

c. That prior to and including May 1, 2004, none of the aforesaid injured persons had received any training in procedures to be followed during lockout/tagout and all of the aforesaid injured persons would not have received injuries, including the plaintiff, had they been trained in and required to follow a lockout/tagout program, including being provided with a lock;

d. The defendant, OSCAR MUNOZ, has admitted and stated to an OSHA representative with regard to the aforesaid injured individuals, including the plaintiff, that the aforesaid injuries sustained by said persons, including the plaintiff, "are not my problem, they are the insurance company's problem, and that the aforesaid employees were purposefully injuring themselves on the machines for monetary gain";

e. That prior to May 1, 2004, operators of machines at the subject premises were required and caused to perform work in unguarded areas of running machines without the use of lockout/tagout procedures notwithstanding said defendants MUNOZ and/or TORTILLERIA, INC. being aware of and having been ordered by OSHA to institute and

17

enforce said lockout/tagout procedures and being aware that said work was being performed by workers at the subject premises and with regard to the subject machinery without lockout/tagout procedures and in violation of said OSHA orders regarding same;

f.   That prior to May 1, 2004, the defendant did intentionally alter, cause to be altered and/or otherwise maintain said subject machine in a dangerous and unsafe condition;

g.   That prior to May 1, 2004, the defendant did otherwise intentionally act out or cause intentional harm to the plaintiff by requiring dangerous and unsafe conduct as to the condition and use of the subject machine.

10. That as a direct and proximate result of one or more of the aforementioned acts of intentional commission of an intentional tort by the defendant, MUNOZ, individually and d/b/a TORTILLERIA and/or TORTILLERIA, INC., by its servant or agent, being aware of the necessity for lockout/tagout procedures and the dangers attached to their intentional failure to institute and utilize said procedures, and/or alternatively, the aforesaid alteration and/or maintenance of said subject machine, did proximately cause injury to the plaintiff, JOSE LUIS LOZADA, while he was acting within the course and scope of his employment on May 1, 2004, at the subject premises and while performing work with regard to the subject product machine and components thereof while the machine was running and food product was being processed by said subject product machine was caused to be injured; that as a result thereof, the plaintiff did sustain severe and serious injury to diverse portions of his body; that the plaintiff incurred great pain and suffering and will in the future incur great pain and suffering; that said injuries are permanent; that the plaintiff incurred great medical expense and will in the future incur great medical expense; that the plaintiff suffered losses of time and wages from work and will in the future be caused to lose time and wages from work and/or loss of income in connection with an inability to perform work; that the plaintiff incurred other pecuniary expense and will in the future incur pecuniary expense.

WHEREFORE, the plaintiff, JOSE LUIS LOZADA, prays for judgment against the defendant, OSCAR MUNOZ, individually and/or doing business as TORTILLERIA, and that judgment be

18

entered in an amount in excess of Fifty Thousand Dollars and 00/100 ($50,000.00), and in an amount to be determined at the trial of the above entitled cause.

## COUNT VII

That in addition to and/or alternatively to Counts I, II, III, IV, V, VI, and/or VIII, the plaintiff, JOSE LUIS LOZADA, alleges as follows as to the defendant, TORTILLERIA, INC., a Corp.:

1. The plaintiff realleges paragraph 1 of Count I.

2. The plaintiff realleges paragraph 2 of Count I.

3. The plaintiff realleges paragraph 7 of Count I.

4. The plaintiff realleges paragraph 4 of Count VI.

5. The plaintiff realleges paragraph 5 of Count VI.

6. The defendants, MUNOZ and/or TORTILLERIA INC., a Corp., by its agents, servants or representatives, on and prior to May 1, 2004, were aware of the subject machine being unreasonably dangerous and defective in and/or for one or more of the ways set forth in the subparagraphs (a) through and including (j) of paragraph 8 of Count I, which allegations are incorporated by reference herein.

7. The plaintiff realleges paragraph 7 of Count VI.

8. The plaintiff realleges paragraph 8 of Count VI.

9. That the defendant, MUNOZ, individually and/or as agent, servant and/or in his executive capacity, did commit and/or did cause the defendant, TORTILLERIA, INC., to commit, an intentional tort and/or while knowing the dangers thereof did cause to occur and was and/or were aware of the following:

a. Prior to May 1, 2004, pursuant to the OSHA inspection above-referred to in paragraph 7 hereof, a written lockout/tagout program was developed by and/or brought to the attention of the defendants, MUNOZ and TORTILLERIA, INC., which clearly required the use of locks to lock out machines, including the subject product machine, so as to

19

prevent the performing of work in unguarded areas of running machines, including the product machine, the purpose of which was to protect persons, including the plaintiff, from injury in the performance of work in unguarded area of running machines and including the protection of persons, including the plaintiff, when performing work when guards were removed from running machines;

Notwithstanding knowledge of the need for and requirement in compliance with OSHA of said lockout/tagout program, however, the defendants, MUNOZ and TORTILLERIA, INC., a Corp., intentionally disregarded the requirements of said program requiring a lock to lockout said machines, including the product machine, and never prior to May 1, 2004, provided a lock for any of the machines at the subject premises, including the product machine, so as to prevent machinery guard(s), including the guard on the product machine, from being removed to perform work in a then exposed area of moving gears while the product machine was running in operation;

b.  Prior to and including May 1, 2004, at the subject premises, although approximately 100 persons, including the plaintiff, performed work with regard to machinery at the subject premises, including the product machine, only one person, a supervisor at the subject premises, received training as to said "lockout/tagout" program and at no time did he or any other workers at the subject premises, including the plaintiff, receive a lock so as to implement the lockout/tagout program in any way when work was being or to be performed on running machines, including the product machine. Further, at no time prior to and including May 1, 2004, was the plaintiff, ever instructed as to a lockout/tagout program or provided with a lock, as required by said program, when performing work or service on machinery, including the product machine;

c.  That prior to and including May 1, 2004, none of the aforesaid injured persons had received any training in procedures to be followed during lockout/tagout and all of the aforesaid injured persons would not have received injuries, including the plaintiff, had they been trained in and required to follow a lockout/tagout program, including being provided with a lock;

d.  The defendant, MUNOZ, individually and or as agent and/or an executive of defendant, TORTILLERIA, INC., a Corp., has admitted and stated to an OSHA representative with regard to the aforesaid injured individuals, including the plaintiff, that the aforesaid injuries sustained y said persons, including the plaintiff, "are not my problem, they are the insurance company's problem, and that the aforesaid employees were purposefully injuring themselves on the machines for monetary gain."

e.  That prior to May 1, 2004, operators of machines at the subject premises were required and caused to perform work in unguarded areas of running machines without the use of lockout/tagout procedures notwithstanding said defendants MUNOZ and/or TORTILLERIA, INC. being aware of and having been ordered by OSHA to institute and enforce said lockout/tagout procedures and being aware that said work being performed by workers at the subject premises and with regard to the subject machinery without lockout/tagout procedures and in violation of said OSHA orders regarding same;

f.  That prior to May 1, 2004, the defendant MUNOZ and/or defendant, TORTILLERIA, INC., did intentionally alter, cause to be altered and/or otherwise maintain said subject machine in a dangerous and unsafe condition;

g.  That prior to May 1, 2004, the defendant did otherwise intentionally act out or cause intentional harm to the plaintiff by requiring dangerous and unsafe conduct as to the condition and use of the subject machine.

10. Plaintiff realleges the allegations of paragraph 10 of Count VI.

11. That the plaintiff further alleges he is expressly preserving Count IV of his former Third Amended Complaint directed to the defendant, TORTILLERIA ATOTONILCO, INC., a Corp., which Count was previously dismissed by this Court in its Order of September 12, 2007, and, which is hereby and herein expressly reserved for purposes of an appeal.

WHEREFORE, the plaintiff, JOSE LUIS LOZADA, prays for judgment against the defendants, OSCAR MUNOZ, Ind. and d/b/a TORTILLERIA ATOTONILCO; and/or TORTILLERIA ATOTONILCO, INC., a Corp., jointly and individually, and that judgment be entered in an amount in excess of Fifty Thousand Dollars and 00/100 ($50,000.00), and in an amount to be determined at the trial of the above entitled cause.

## COUNT VIII

That in addition and/or alternative to the allegations of Counts I, II, III, IV, V, VI, and/or VII, the plaintiff, JOSE LUIS LOZADA, alleges as follows as to defendant OSCAR MUNOZ individually:

1.  The plaintiff realleges paragraph 1 of Count I.

2.  That prior to May 1, 2004, the defendant, OSCAR MUNOZ, did individually own, operate, and control the subject premises and machinery and other personal property within said subject premises, including, but not limited to, the product machine and components thereof, at 1707 West 47th St., in the City of Chicago, County of Cook, State of Illinois.

21

3. The plaintiff realleges paragraph 7 of Count I, and, in addition, alleges he was not employed by or an employee of the defendant, OSCAR MUNOZ, individually.

4. The plaintiff realleges paragraph 8 of Count I and all subparagraphs thereof, and incorporates same by reference herein, and further alleges that on and prior to May 1, 2004, the defendant, OSCAR MUNOZ, was aware of the subject product machine being unreasonably dangerous or otherwise dangerous and unsafe in one or more of the ways alleged.

5. That the defendant, OSCAR MUNOZ, on and prior to May 1, 2004, knowing the dangers thereof, did, individually, cause or permit persons working within the subject premises and/or knowingly was aware that persons working within the subject premises and using the subject product machine, were operating said machine, which included the removal of guards and the performance of work in unguarded areas with running machines, including the subject machine, which led to four amputations and one finger crushing injury sustained by persons performing work at the subject premises since March 2003. That four of the five amputations/crushing injuries sustained by persons performing work at the subject premises did occur within six months prior to and including May 1, 2004.

6. The plaintiff realleges paragraph 8 of Count VI.

7. That it was the duty of the defendant, OSCAR MUNOZ, to exercise ordinary care toward the plaintiff; yet notwithstanding said duty, as hereinafter set forth, the following facts evidence that MUNOZ failed to exercise ordinary care and was guilty of negligence in one or more of the following ways:

    a. Prior to May 1, 2004, pursuant to the OSHA inspection above-referred to in paragraph 6 hereof, a written lockout/tagout program was developed by and/or brought to the attention of the defendant, OSCAR MUNOZ, which clearly required the use of locks to lockout machines, including the subject product machine, so as to prevent the performing of work in unguarded areas of running machines, including the product machine, the purpose of which was to protect persons, including the plaintiff, from injury in the

22

performance of work in unguarded area of running machines and including the protection of persons, including the plaintiff, when performing work when guards were removed from running machines;

Notwithstanding knowledge of the need for and requirement in compliance with OSHA of said lockout/tagout program, the defendant, OSCAR MUNOZ, disregarded the requirements of said program requiring a lock to lockout said machines, including the product machine, and never prior to May 1, 2004, provided a lock for any of the machines at the subject premises, including the product machine, so as to prevent machinery guard(s), including the guard on the product machine, from being removed to perform work in a then exposed area of moving gears while the product machine was running in operation;

b.   Prior to and including May 1, 2004, at the subject premises, although approximately 100 persons, including the plaintiff, performed work with regard to machinery at the subject premises, including the product machine, only one person, a supervisor at the subject premises, received training as to said "lockout/tagout" program and at no time did he or any other workers at the subject premises, including the plaintiff, receive a lock so as to implement the lockout/tagout program in any way when work was being or to be performed on running machines, including the product machine. Further, at no time prior to and including May 1, 2004, was the plaintiff ever instructed as to a lockout/tagout program or provided with a lock, as required by said program, when performing work or service on machinery, including the product machine;

c.   That prior to and including May 1, 2004, none of the aforesaid injured persons had received any training in procedures to be followed during lockout/tagout and all of the aforesaid injured persons would not have received injuries, including the plaintiff, had they been trained in and required to follow a lockout/tagout program, including being provided with a lock;

d.   The defendant, OSCAR MUNOZ, has admitted and stated to an OSHA representative with regard to the aforesaid injured individuals, including the plaintiff, that the aforesaid injuries sustained by said persons, including the plaintiff, "are not my problem, they are the insurance company's problem, and that the aforesaid employees were purposefully injuring themselves on the machines for monetary gain";

e.   That prior to May 1, 2004, operators of machines at the subject premises were required and caused to perform work in unguarded areas of running machines without the use of lockout/tagout procedures notwithstanding said defendant OSCAR MUNOZ being aware of and having been ordered by OSHA to institute and enforce said lockout/tagout procedures and being aware that said work was being performed by workers at the subject premises and with regard to the subject machinery without lockout/tagout procedures and in violation of said OSHA orders regarding same;

f.   That prior to May 1, 2004, the defendant did alter, cause to be altered and/or otherwise maintain said subject machine in a dangerous and unsafe condition;

g.  That prior to May 1, 2004, the defendant did otherwise act out or cause harm to the plaintiff by requiring dangerous and unsafe conduct as to the condition and use of the subject machine.

8.  That as a direct and proximate result of one or more of the aforementioned acts of negligence by defendant OSCAR MUNOZ, individually, the plaintiff, JOSE LUIS LOZADA, while he was acting within the course and scope of his employment on May 1, 2004, at the subject premises and performing work with regard to the subject product machine and components thereof while the machine was running and food product was being processed by said subject product machine was caused to be injured; that as a result of the defendant's foregoing conduct, the plaintiff did sustain severe and serious injury to diverse portions of his body; that the plaintiff incurred great pain and suffering and will in the future incur great pain and suffering; that said injuries are permanent; that the plaintiff incurred great medical expense and will in the future incur great medical expense; that the plaintiff suffered losses of time and wages from work and will in the future be caused to lose time and wages from work and/or loss of income in connection with an inability to perform work; that the plaintiff incurred other pecuniary expense and will in the future incur pecuniary expense.

WHEREFORE, the plaintiff, JOSE LUIS LOZADA, prays for judgment against the defendant, OSCAR MUNOZ, individually, and that judgment be entered in an amount in excess of Fifty Thousand Dollars and 00/100 ($50,000.00), and in an amount to be determined at the trial of the above entitled cause.

Respectfully submitted,

By: _____
Bradley D. Steinberg

Steinberg, Goodman & Kalish
20 North Clark St., 31st Floor
Chicago, Illinois 60602–5913
312.782.1386 (tel.)
312.782.6739 (fax)

24

# TERMS AND CONDITIONS

This contract to be between buyer and Superior Food Machinery, hereafter known as seller.

1. **ACCEPTANCE** All orders are offers to purchase. No contract exists until accepted and acknowledge by seller.

2. **PRICES** The prices quoted are current prices for a prompt order and are the prices at which the machines and equipment will be billed by the seller; unless specified herein. All prices herein quoted supersede all prior quotations and are F.O.B. factory unless specified herein.

3. **PAYMENTS** Payments shall be due according to terms on invoice. Orders shall be accompanied with ⅓ down payment and balance on delivery. Alternations to payments are subject to prior approval by seller's credit department.

International sales shall be by Irrevocable and confirmed Letter of Credit through a prime U.S. Bank, unless a line-of-credit has been established with seller's credit department.

4. **DELIVERY** Unless otherwise stated, delivery will be made F.O.B. our factory. Shipping dates are approximate only and are based on prompt receipt of all necessary components from our suppliers as well as prompt receipt of all required information from purchaser. Purchaser shall pay all freight costs. All shipments to be made by common carrier will be sent from the factory charges collect.

5. **TAXES** The prices quoted herein do not include sales, use, excise or similar taxes. Buyer agrees to pay, in addition to the price specified herein, any such taxes, presently existing or imposed in the future, which are applicable to the sale or use of the equipment hereunder. Buyer may, in lieu of payment of such taxes provide seller, with a tax exemption certificate which is acceptable to the applicable taxing authorities.

6. **TITLE** Title and security interest in the equipment sold hereunder shall remain in seller and such equipment shall remain their personal property until fully paid for in cash; and purchaser agrees to perform all acts which may be necessary to protect the seller's security interest in such equipment.

7. **LOSS, DAMAGE OR DELAY** Seller shall not be liable for any loss, damage, detention or delay resulting from causes beyond its reasonable control or caused by fire, strike, civil or military authority, wrecks or delays in transportation, car shortages, insurrection, riots, acts of God or war, federal, state or local governmental laws, regulations or restrictions, or inability due to causes beyond our control to obtain necessary labor, materials, components or manufacturing facilities. Receipt of the equipment by purchaser upon its delivery shall constitute a waiver of all claims for delay.

**RISK OF LOSS AND TRANSPORTATION CLAIMS** Unless otherwise specified seller's responsibility for loss or damage to the equipment ceases upon delivery of the equipment in good order, to the transportation companies F.O.B. our factory, and further all equipment is shipped at purchaser's risk and should be examined carefully before freight bill or delivery receipt is signed. If transportation company delivers goods in bad order, purchaser should insist on carrier's agents making notation of the condition on freight bill or delivery receipt to protect purchaser's claim against the carrier.

**CANCELLATIONS** Cancellations by purchaser of an order for seller's standard equipment (equipment ordered without alterations or modifications thereto) must be made in writing and is subject to payment of reasonable charges based upon expenses already incurred and commitments made by seller which since difficult to ascertain, shall be deemed 10% of the purchase price of such equipment.

**ALTERATIONS** Order for non-standard equipment which is to be modified, or altered at the request of purchaser are non-cancellable after date of acknowledgement of such orders by seller. Any alterations of an order for equipment to be delivered hereunder after date of acceptance is subject to a reasonable charge to be determined by seller.

**RETURNS** No equipment may be returned for credit to seller without written approval. A restocking charge will be assessed by seller at the time permission for return is granted. All equipment returned must have freight prepaid.

12. **RETENTION WITHOUT PAYING** The equipment to be delivered hereunder shall be deemed finally inspected and accepted within 30 days after receipt thereof by purchaser, unless written notice of claim is given in writing to seller within that time.

13. **WARRANTY** Seller warrants its equipment to be delivered hereunder to be free from defects in material and/or workmanship for a period of one (1) year from the date of delivery, and further warrants that:

A: Seller will replace, free of charge, any defective parts within 30 days of delivery. Shop or field labor, if incurred during this period, will be absorbed by the company.

B. Beyond the 30-day period and until 1 year from date of delivery, warranty will apply to repairing or exchanging any part which in our judgment shows evidence of defect in material and/or workmanship, if the purchaser promptly notifies the company and, if requested by the company, returns such part or parts as are claimed defective, transportation charges prepaid, however, that the purchaser shall be responsible for all transportation and labor charges relating to removal and installation of any replacement or defective part. Parts replaced or exchanged during this period will be charged to the purchaser on a pro-rata basis of a new part sales price. A credit will be granted to the purchaser for the unused portion of the warranty period.

C. This warranty does not cover parts which wear out from normal use, or parts that are damaged or broken in use or service, or claims arising because of failure to follow good operating or maintenance procedures.

THE FOREGOING WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, EXCEPT TITLE AND DESCRIPTION, WHETHER WRITTEN, ORAL OR IMPLIED.

14. **INDEMNITY** Buyer agrees to instruct all of its employees who may at any time be assigned to the operation, use or cleaning of the equipment in the proper operation, use and cleaning of said equipment. Buyer agrees to indemnify and hold Seller harmless from any loss or liability, or claims for loss or liability, which may be asserted against Seller for personal injury by reason of Buyer's failing to properly supervise or instruct his employees in the operation, use or cleaning of the described machinery. In addition, Buyer agrees to maintain comprehensive liability insurance insuring Seller against any loss by reason of Buyer's failing to instruct or supervise its employees in the operation, use or cleaning of said equipment.

15. **ELECTRIC AND PLUMBING WORK** The purchaser must absorb the cost of any and all electrical, gas, and all plumbing work required to operate the equipment at his facility. State and Municipal laws prohibit seller from doing said work.

16. **GENERAL** Seller reserves the right to revise this agreement if, in our opinion, the purchaser's requirements warrant it. If revision is necessary, a new proposal will be submitted. If customer's purchase order contains terms or conditions in contradiction to those contained herein such terms and conditions are null and void upon signature hereon by said customer.

Seller reserves the right to terminate construction of the equipment hereunder without expense to the purchaser, or without recourse to the seller. When in the opinion of the seller's technical advisors the equipment will not fulfill the requirements specified in the order.

Seller reserves the right to make any changes in the design of the equipment without notice and without incurring any obligation to furnish or supervise the installation of such changes or modifications on products previously or subsequently sold.

Any assignment of this order or any rights hereunder, by purchaser without written consent from seller shall be void.

The provisions of any contract resulting from this quotation are for the benefit of the parties hereto and not for any other person.

No waiver, alteration or modification of any of the provisions hereof shall be binding unless in writing and signed by a duly authorized executive of seller.

BUYER _____ DATE _____



PLAINTIFF'S EXHIBIT A

~~ known as seller.

FEB-28-2008 THU 10:00 AM Summit Insurance Agency        FAX NO. 17085948246        P. 04

08CV5015

JUDGE MORAN

MAGISTRATE JUDGE ASHMAN

I.D. No: 21392
Our File No: 721.13572/aba

PH

STATE OF ILLINOIS          )
                           ) SS
COUNTY OF COOK             )

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

JOSE LUIS LOZADA,                          )
                                           )
    Plaintiff(s),                          )
vs.                                        )        No: 06 L 003478
                                           )
SUPERIOR FOOD MACHINERY, INC., a Corp.,    )
OSCAR MUNOZ, Individually and d/b/a        )
TORTILLERIA ATOTONILCO, INC., a Corp. and  )
TORTILLERIA ATOTONILCO, INC., a Corp.,     )
SAFETY CHECK, INC.,                        )
                                           )
    Defendant(s).                          )
                                           )
SUPERIOR FOOD MACHINERY, INC,              )
                                           )
    Third-Party Plaintiff(s),              )
                                           )
v.                                         )
                                           )
TORTILLERIA ATOTONILCO, INC, and           )
OSCAR MUNOZ, individually,                 )
                                           )
    Third-Party Defendant(s).              )

## <u>DEFENDANT"S FIRST AMENDED THIRD PARTY COMPLAINT FOR CONTRIBUTION</u>

NOW COMES Defendant/Third Party Plaintiff, SUPERIOR FOOD MACHINERY, INC.,

(Hereinafter "SUPERIOR"), by and through its attorneys, CONDON & COOK, L.L.C. and

for its First Amended Third Party Complaint for Contribution against Third Party

Defendants, TORTILLERIA ATOTONILCO., INC. (hereinafter "T.A."), and, OSCAR

MUNOZ, individually, (hereinafter "MUNOZ"), states, in the alternative, as follows:



EXHIBIT
C

## COUNT I – NEGLIGENCE AGAINST TORTILLERIA ATOTONILCO., INC.

1.    JOSE LUIS LOZADA ("hereinafter referred to as "LOZADA") has filed a lawsuit against SUPERIOR and T.A., for personal injuries he sustained on May 1, 2004 while employed by T. A. at a manufacturing facility commonly known as Tortilleria Atotonilco, 1707 W. 47th St., Chicago, County of Cook County, State of Illinois. A true and accurate copy of the LOZADA Second Amended Complaint at Law is attached hereto as Exhibit A.

2.    SUPERIOR has filed its Answer to the Complaint, denying the material allegations thereof, and said Answer is incorporated herein by reference.

3.    Upon information and belief, Third-Party Defendant, T. A., did possess and control a certain tortilla-making machine, identified in the Complaint as model number 4CH8.5-TM and serial number 488256, and, T. A. had continuous and sole possession of said machine since the date of purchase in February, 1988.

4.    Notwithstanding said denials filed in its Answer to the Complaint at Law, and in the alternative to the relief sought in said Answer, SUPERIOR alleges that at the time and place set forth in Exhibit A, Third-Party Defendant, T. A., had a duty to provide the Plaintiff, LOZADA, with a safe place to perform his duties as an employee of T.A., and while acting as such employee, and using the tortilla making machine described in the attached Exhibit A.

5.    That at all times material hereto, Third-Party Defendant, T. A., had a further duty to exercise reasonable care to the Plaintiff, LOZADA, to provide LOZADA with appropriate training, and equipment in order to use of the aforesaid tortilla-making machine that contained certain guards and other safety devices as originally equipped when said tortilla-

2

making machine left the control of SUPERIOR in February, 1988, and, to use that equipment in a manner that was reasonably foreseeable to SUPERIOR.

6.      Notwithstanding said duties of reasonable care, Third-Party Defendant, T.A. breached said duty of care to provide a safe place to work for Plaintiff, LOZADA in one or more of the following respects that were not reasonably foreseeable to SUPERIOR::

a.      Upon information and belief, it altered the design of the safety, and operating equipment on said tortilla making machine (as described in Exhibit A) and, then knowingly required, ordered, and directed Plaintiff, LOZADA, to allegedly operate the tortilla machine without said safety, and operating guards, and devices, thereby exposing the Plaintiff to the alleged hazards described in the attached Exhibit A, after T. A., its agents, servants and employees knew or should have known that the removal of said guards, and other safety devices would substantially increase the likelihood that the Plaintiff, and other employees required work on said equipment would sustain serious injury;

b.      Removed numerous safety devices, including guards, and electrical shut down devices provided by SUPERIOR that it T. A. knew, or should have known, were designed to prevent operators of the aforesaid machine from allegedly accessing the in-running nip points of said machine while the machine was still operating, thereby, as alleged in the attached Exhibit A, creating an unreasonable risk of injury to those operating said machine, including LOZADA;

c.      Failed to warn LOZADA that, contrary to SUPERIOR'S original design, condition and distribution of the aforesaid tortilla making machine, at the time it was sold into the stream of commerce by SUPERIOR, that T. A. had removed certain safety and emergency operating devices designed to prevent the operator of the equipment, including Plaintiff, from having access to allegedly dangerous in-running nip. points while said machine was in operation; and further failed to warn the Plaintiff, that this machine, as altered, was allegedly unreasonably dangerous;

d.      Otherwise engaged in the alteration of the design, as installed, and equipped, of the safety, and operating equipment, of the aforesaid tortilla making machine after it had been sold to and arrived at the premises T.A., by removing the emergency electrical shut-off devices from one or more of the crucial locations on said machine, thereby modifying the design, and operation of said safety and operating features thereof, and thereby rendered it to an altered condition, contrary to the design and/or manufacture of the original equipment as distributed by SUPERIOR; See Plaintiff's Complaint at Law. (See Exhibit A attached hereto inc. herein).

3

7.      The bodily injuries allegedly sustained by LOZADA, were proximately caused by the not reasonably foreseen alteration or modification of the subject tortilla making machine by Third Party Defendant, T.A., its agents, servants or employees, thereby rendering the aforesaid tortilla making machine allegedly defective in its altered designed, and altered manufactured condition, as set forth in Exhibit A attached hereto.

8.      That in the event that Third-Party Plaintiff, SUPERIOR, is found liable for any of the injuries allegedly sustained by LOZADA, it shall be entitled to contribution from Third-Party Defendant, T.A., pursuant to 740 ILCS 100/0.1 et. seq. commonly known as the Joint Tortfeasor Contribution Act, in an amount commensurable to a degree of fault attributable to said Third-Party Defendant T.A.

9.      This cause of action seeks contribution pursuant to the aforesaid statute commonly known as the Joint Tortfeasor Contribution Act.

WHEREFORE, Defendant/Third-Party Plaintiff, SUPERIOR FOOD MACHINERY, INC. respectfully prays that if judgment is entered in favor of LOZADA and against it, its is entitled to a Judgment for Contribution against Third-Party Defendant, Tortilleria Atotonilco, in an amount commensurate with a degree of fault or misuse attributable to said Third-Party Defendant by a trier of fact in this cause.

### COUNT II OSCAR MUNOZ INDIVIDUALLY AS MANUFACTURER

1-3.     SUPERIOR repeats and realleges paragraphs 1 through 3 of Count I hereof as paragraphs 1 through 3 of Count II, as if fully set forth herein.

4.      Upon information and belief, at all times set forth herein, MUNOZ, not in his capacity whatsoever as the president, or sole shareholder of Co-Third Party Defendant, T.A., acted in his capacity as a manufacturer, designer, or modifier of tortilla-making

4

equipment, for the specific purpose of increasing the capacity of any and all tortilla-making equipment to produce more tortillas than was originally specified and designed by the manufacturer of the equipment, SUPERIOR.

5.    Upon information and belief, MUNOZ, individually, made substantial modifications, and alterations to the tortilla-making machine, identified in the attached Exhibit A as model number 4CH8.5-TM and serial number 488256, including but not limited to the removal of the operating clutch and other safety devices, and the installation of a device he referred to in his recent deposition as a speed inverter, which device was not originally a component part of said machine when it left the control of SUPERIOR.

6.    That said modifications made by MUNOZ significantly altered the design and function of SUPERIOR'S tortilla-making machine, identified in the Complaint as model number 4CH8.5-TM and serial number 488256, and effectively altered, modified and changed the machine into a tortilla-making equipment manufactured by MUNOZ, and not by SUPERIOR.

7.    That MUNOZ altered the design, and manufacture of this tortilla-making machine to solely increase the speed of the tortilla-making machine without regard to the safety of any person whom he should have reasonably anticipated would operate this machinery in the course and scope of such person's job.

8.    As a manufacturer of tortilla-making equipment, MUNOZ owed a duty to refrain from introducing into the stream of commerce a defective and unreasonably dangerous tortilla-making machine for use by those persons who were reasonably foreseeable operators of the machine as modified, altered, manufactured by MUNOZ during 1988 or later.

9.    Notwithstanding the duty alleged in paragraph 9 hereof, Third Party Defendant, MUNOZ, introduced into the stream of commerce an allegedly dangerous and defective tortilla-making machine that was allegedly defective in its design, and manufacture, in the ways described in the attached Exhibit A, incorporated herein by reference.

10.    Notwithstanding the duty to not introduce a dangerous and defective tortilla-making machine into the stream of commerce, Third-Party Defendant, MUNOZ breached said duty in one or more of the following respects that were not reasonably foreseeable to SUPERIOR:

a.    Upon information and belief, it altered the design of the safety, and operating equipment on said tortilla making machine (as described in Exhibit A) and, then knowingly required, ordered, and directed Plaintiff, LOZADA, to allegedly operate the tortilla machine without said safety, and operating guards, and devices, thereby exposing the Plaintiff to the alleged hazards described in the attached Exhibit A, after MUNOZ, his agents, servants and employees, knew or should have known that the removal of said guards, and other safety devices would substantially increase the likelihood that the Plaintiff, and other employees required work on said equipment would sustain serious injury;

b.    Removed numerous safety devices, including guards, and electrical shut down devices provided by SUPERIOR that it MUNOZ knew, or should have known, were designed to prevent operators of the aforesaid machine from allegedly accessing the in-running nip points of said machine while the machine was still operating, thereby, as alleged in the attached Exhibit A, creating an unreasonable risk of injury to those operating said machine, including LOZADA;

c.    Failed to warn LOZADA that, contrary to SUPERIOR'S original design, condition and distribution of the aforesaid tortilla making machine, at the time it was sold into the stream of commerce by SUPERIOR, that MUNOZ had removed certain safety and emergency operating devices designed to prevent the operator of the equipment, including Plaintiff, from having access to allegedly dangerous in-running nip points while said machine was in operation; and further failed to warn the Plaintiff, that this machine, as altered, was allegedly unreasonably dangerous;

d.    Otherwise engaged in the alteration of the design, as installed, and equipped, of the safety, and operating equipment, of the aforesaid tortilla making machine after it had been sold to and arrived at the premises, MUNOZ, by removing the

6

emergency electrical shut-off devices from one or more of the crucial locations on said machine, thereby modifying the design, and operation of said safety and operating features thereof, and thereby rendered it to an altered condition, contrary to the design and/or manufacture of the original equipment as distributed by SUPERIOR; See Plaintiff's Complaint at Law. (See Exhibit A attached hereto inc, herein).

11.    The bodily injuries allegedly sustained by Plaintiff, LOZADA, were caused as a direct and proximate result of the aforesaid dangerous and defective conditions of the tortilla-making machine, as modified, altered, or manufactured by Third Party Defendant, MUNOZ, in the way set forth in the Plaintiff's Complaint. See Exhibit A attached hereto and incorporated herein.

12.    That in the event that Third-Party Plaintiff, SUPERIOR, is found liable for any of the injuries allegedly sustained by LOZADA, it shall be entitled to contribution from Third-Party Defendant, MUNOZ, pursuant to 740 ILCS 100/0.1 et. seq. commonly known as the Joint Tortfeasor Contribution Act, in an amount commensurable to a degree of fault attributable to said Third-Party Defendant MUNOZ.

13.    As this cause of action seeks contribution pursuant to the aforesaid statute commonly known as the Joint Tortfeasor Contribution Act.

WHEREFORE, Defendant/Third-Party Plaintiff, SUPERIOR FOOD MACHINERY, INC. respectfully prays that if judgment is entered in favor of LOZADA and against it, it shall be entitled to a Judgment for contribution against Third-Party Defendant, OSCAR MUNOZ, in an amount commensurate with his degree of fault attributable to said Third-Party Defendant by a trier of fact in this cause.

## COUNT III INTENTIONAL ACT AGAINST OSCAR MUNOZ

1-3.    SUPERIOR realleges and incorporates paragraphs 1 through 3 of Count I as paragraphs 1 through 3 of Count III.

7

4. Upon information and belief, MUNOZ, is the president and sole shareholder of T.A.

5. Upon information and belief, MUNOZ, not in his capacity as either president or sole shareholder of T. A., but rather strictly in his capacity as manufacturer, designer, or modifier of tortilla-making equipment, intentionally made extensive and unforeseen modifications to, and remanufactured the subject tortilla-making machine, identified in the Complaint as model number 4CH8.5-TM and serial number 488256, including but not limited to the removal of the clutch and the addition of a device known as a speed inverter.

6. That MUNOZ altered the design of the subject tortilla-making machine for the sole purpose of increasing the speed at which the tortilla-making machine produced tortillas, without any regard to the safety of the operator whom MUNOZ did foresee was required to use this machine, and clean it during the course of the operation of the machine, as remanufactured or altered by MUNOZ.

7. That by modifying the tortilla-making machine, MUNOZ knew that such remanufacture, modification or alteration would lead to a substantial likelihood of serious boldly injury to any foreseeable operator of the modified machine, when such operator, including LOZADA, was engaged in the operation of cleaning out dough or masa that had clogged or blocked the moving parts of this modified machine, whose use and activity was reasonably foreseeable to MUNOZ.

8. That MUNOZ owed a duty to the operator of the tortilla-machine to not intentionally injure that party by manufacturing a machine that was unreasonably dangerous, and defective due to his removal of certain safeguards, and the addition of a speed inverter, all of which changes, or re-manufactured designs, were known to MUNOZ

8

to lead to the increased likelihood that any foreseeable user , including LOZADA, would be at a much higher risk for injury due to the intentional conduct of MUNOZ, in removing all safety features from this machine.  .

9.    The bodily injuries allegedly sustained by LOZADA, were a proximate result of the intended modification, or remanufacture of the subject tortilla making machine by Third Party Defendant, MUNOZ, thereby making the aforesaid tortilla making machine allegedly defective, unreasonably designed and modified in the way set forth in the Plaintiffs Complaint.

10.    Notwithstanding the aforesaid duty to refrain from intentionally causing injury to a reasonably foreseeable user of the machine, including Plaintiff, LOZADA, Third-Party Defendant, MUNOZ breached said duty to Plaintiff, LOZADA in one or more of the following respects that were not reasonably foreseeable to SUPERIOR:

a.    Intentionally altered the design, and condition of the aforesaid tortilla making machine by removing the clutch from the machine, thereby rendering the machine to a condition that was unreasonably dangerous, and defective.

b.    Intentionally altered the design, and condition of the aforesaid tortilla making machine by adding a speed inverter to the machine, thereby rendering the machine to a condition that was unreasonably dangerous, and defective.

c.    Had knowledge that the alterations made by him to the aforesaid tortilla making machine had previously resulted in serious injury to one or more operators thereof, but nevertheless allowed LOZADA to use to aforesaid tortilla making machine with no regard for the Plaintiff's safety.

d.    Had knowledge that the alterations, modifications, and remanufacture of the aforesaid tortilla making machine would lead directly to cause injury to Plaintiff, LOZADA.

11.    The bodily injuries allegedly sustained by LOZADA, were a proximate result of the intentional manufacture, alteration or modification of the subject tortilla making machine by Third Party Defendant, MUNOZ, despite his knowledge that such conduct on

9

his part would cause Plaintiff's injuries, and despite his knowing that remanufacture of this tortilla making machine, would lead to virtually certain alleged injury to the Plaintiff, all without the knowledge of SUPERIOR.

12.     That in the event that Third-Party Plaintiff, SUPERIOR, is found liable for any of the injuries allegedly sustained by LOZADA, SUPERIOR shall be entitled to contribution from Third-Party Defendant, MUNOZ, pursuant to 740 ILCS 100/0.1 et. seq. commonly known as the Joint Tortfeasor Contribution Act in an amount commensurable to a degree of fault attributable to the intentional conduct of Third-Party Defendant MUNOZ.

13.     As this cause of action seeks contribution pursuant to the aforesaid statute commonly known as the Joint Tortfeasor Contribution Act.

14.     That the allegations of fault set forth above against Third-Party Defendant, MUNOZ, are not based upon his role as the Plaintiff's employer, but based upon his role as the party which substantially, and, without warning or reasonably reasonable expectation, modified, altered, redesigned, or re-engineered the machine that originally delivered to him by Third-Party Plaintiff, SUPERIOR, on or about February 15, 1988.

WHEREFORE, Defendant/Third-Party Plaintiff, SUPERIOR FOOD MACHINERY, INC. respectfully prays that if judgment is entered in favor of LOZADA and against it, it will be entitled to a Judgment for Contribution against the Third-Party Defendant, OSCAR MUNOZ, in an amount commensurate with the degree of intentional fault attributable to said Third-Party Defendant by the trier of fact in this cause.

## COUNT IV INTENTIONAL ACT AGAINST TORTILLERIA ATOTONILCO, INC.

1-3.    SUPERIOR realleges and incorporates paragraphs 1 through 3 of Count I as paragraphs 1 through 3 of Count V.

10

4.    Upon information and belief, T.A. intentionally made modification to the tortilla-making machine, identified in the Complaint as model number 4CH8.5-TM and serial number 488256, including but not limited to the removal of the clutch and the addition of a speed inverter.

6.    That T.A. made said modifications to increase the speed of the tortilla-making machine without regard to employee safety whatsoever.

7.    That by modifying the tortilla-making machine, T.A. intended to injure any employee who was an alleged reasonably foreseeable user or operator of said machine, including LOZADA.

8.    That T.A. owed a duty to the operator of the tortilla-machine to not intentionally injure that party. That further, T.A., owed a duty to the operator of the tortilla-machine to not intentionally injure that party by manufacturing a machine that was unreasonably dangerous, and defective due to his removal of certain safeguards, and the addition of a speed inverter, all of which changes, or re-manufactured designs, were known to T.A. lead to the increased likelihood that any foreseeable user , including LOZADA, would be at a much higher risk for injury due to the intentional conduct of T. A. in removing all safety features from this machine.  .

9.    The bodily injuries allegedly sustained by LOZADA, were the intended and proximate result of the modification of the subject tortilla making machine by Third Party Defendant, T.A., thereby making the aforesaid tortilla making machine allegedly defective, unreasonably designed and modified in the way set forth in the Plaintiffs Complaint.

11

10.   . Notwithstanding said duty of owed to the Plaintiff, LOZADA, by Third-Party

Defendant, T.A. breached said duty to Plaintiff, LOZADA in one or more of the following

respects that were not reasonably foreseeable to SUPERIOR::

a.   Intentionally altered the design, and condition of the aforesaid tortilla making
machine by removing the clutch from the machine, thereby rendering the
machine into a condition that was unreasonably dangerous, and defective in the
manner set froth in the attached Exhibit A. .

b.   Intentionally altered the design, and condition of the aforesaid tortilla making
machine by adding a speed inverter to the machine, thereby rendering the
machine to a condition that was unreasonably dangerous, and defective.

c.   Had knowledge that the alterations made to aforesaid tortilla making machine
had previously resulted in serious injury to the operator, but still allowed
LOZADA to. use to aforesaid tortilla making machine with intentional, r
disregard for the Plaintiff's safety.

d.   Had knowledge that the modified and reconfigured tortilla making machine
would cause injure Plaintiff, LOZADA, when used in a manner that was
foreseeable to T.A., its agents, servants or employees.

11.   The bodily injuries allegedly sustained by LOZADA, were the proximate result

of the intentional conduct of Third Party Defendant, T.A., in its alteration, remanufacture,

or modification of the subject tortilla making machine by Third Party Defendant, MUNOZ,

all of which intentional conduct was not reasonably foreseeable to Third Party Plaintiff,

SUPERIOR.

12.   That in the event that Third-Party Plaintiff, SUPERIOR, is found liable for any of

the injuries allegedly sustained by LOZADA, it shall be entitled to contribution from Third-

Party Defendant, T.A., pursuant to 740 ILCS 100/0.1 et. seq. commonly known as the Joint

Tortfeasor Contribution Act, in an amount commensurable to a degree of fault attributable

to said Third-Party Defendant T.A.

13.    As this cause of action seeks contribution pursuant to the aforesaid statute commonly known as the Joint Tortfeasor Contribution Act.

14.    That the allegations of fault set forth above against Third-Party Defendant, T.A., are not based upon its role as the Plaintiff's employer, but based upon its role as the party which substantially, and, without warning or reasonably reasonable expectation, modified, altered, redesigned, or re-engineered the machine that originally delivered to him by Third-Party Plaintiff, SUPERIOR, on or about February 15, 1988.

WHEREFORE, Defendant/Third-Party Plaintiff, SUPERIOR FOOD MACHINERY, INC. respectfully prays that if judgment is entered in favor of LOZADA and against it, a judgment for contribution be entered against Third-Party Defendant, TORTILLERIA ATOTONILCO, INC., in an amount commensurate with a degree of fault or misuse attributable to said Third-Party Defendant by a trier of fact in this cause.

## COUNT V – PREMISES LIABILITY AGAINST OSCAR MUNOZ

1-3.    SUPERIOR realleges and incorporates paragraphs 1 through 3 of Count I as paragraphs 1 through 3 of Count V.

4.    Upon information and belief, MUNOZ, individually, is sole owner of record of the premises commonly known as 1707 W. 47th St., Chicago, County of Cook County, State of Illinois.

5.    Upon information and belief, at all times pertinent hereto, MUNOZ leased the premises commonly known as 1707 W. 47th St., Chicago, County of Cook County, State of Illinois to Co-Third-Party Defendant T.A.

13

6.    That as the sole owner of the premises commonly known as 1707 W. 47th St., Chicago, County of Cook County, State of Illinois, MUNOZ owed a duty of reasonable care to invitees and those other persons lawfully on said premises.

7.    Prior to May 1, 2004, MUNOZ, upon information and belief, had knowledge that Third-Party Defendant T.A. altered the design, manufacture and furnished a product known as a tortilla making machine to those lawfully upon the premises when it was dangerous and unsafe to do so.

8.    That the re-design, remanufacture, or alteration of the subject tortilla-making machine, done by T. A. with the knowledge, permission, or consent of its landlord, MUNOZ, caused the premises known as 1707 W. 47th Street, Chicago, II. to become unsafe and dangerous

9.    That MUNOZ knew or in the exercise of reasonable care as the landlord, that Third-Party Defendant T.A. maintained and operated the aforesaid unsafe tortilla making machine, which constituted a fixture, at the premises commonly known as 1707 W. 47th St., Chicago, County of Cook County, State of Illinois.

10.    Notwithstanding a duty of reasonable owed by the landlord, MUNOZ, to the Plaintiff, LOZADA, as a reasonably foreseeable user of said fixture, Third-Party Defendant, MUNOZ breached said duty to Plaintiff, LOZADA in one or more of the following respects that were not reasonably foreseeable to SUPERIOR::

a.    carelessly and negligently allowed T.A. to install such fixture into the premises without first inspecting the fixture to take reasonable precautions to determine that it was equipped with all necessary safety devices, including guards, and electrical shut down devices originally provided by SUPERIOR, and then removed by T. A., thereby creating an unreasonable risk to invitees, others lawfully upon the premises, including LOZADA;

14

b.  carelessly and negligently allowed T.A. to maintain and operate the aforesaid altered unsafe tortilla-making machine creating an unreasonable risk to invitees, or others lawfully upon the premises, and who were required to work upon and near said fixture, including LOZADA;

c.  Failed to warn invitees or others lawfully upon the premises of the dangerous conditions present that allegedly created an unreasonable risk to invitees to the premises, including LOZADA.

10.  The bodily injuries allegedly sustained by LOZADA, were caused as a direct and proximate result of the negligence of Third Party Defendant, MUNOZ in the maintenance of said fixture.

11.  That in the event that Third-Party Plaintiff, SUPERIOR, is found liable for any of the injuries allegedly sustained by LOZADA, it shall be entitled to contribution from Third-Party Defendant, MUNOZ, pursuant to 740 ILCS 100/0.1 et. seq. commonly known as the Joint Tortfeasor Contribution Act, in an amount commensurable to a degree of fault attributable to said Third-Party Defendant MUNOZ.

12.  As this cause of action seeks contribution pursuant to the aforesaid statute commonly known as the Joint Tortfeasor Contribution Act.

14.  That the allegations of fault set forth above against Third-Party Defendant, MUNOZ, are not based upon his role as the Plaintiff's employer, but based upon his role as owner of record of the premises commonly known as 1707 W. 47th St., Chicago, County of Cook County, State of Illinois.

WHEREFORE, Defendant/Third-Party Plaintiff, SUPERIOR FOOD MACHINERY, INC. respectfully prays that if judgment is entered in favor of LOZADA and against it, a judgment for contribution be entitled in its favor against Third-Party Defendant, OSCAR

MUNOZ, in an amount commensurate with a degree of negligence or fault attributable to said Third-Party Defendant by a trier of fact in this cause.

## COUNT VI– KOTECKI WAIVER ACTION
## AGAINST TORTILLERIA ATOTONILCO., INC.

1-9.    SUPERIOR repeats and realleges paragraphs 1 through 9, inclusive of Count I of this Third Party Complaint as and for paragraphs 1 through 9 of Count VI, as if fully set forth herein.

10.    That prior to November 7, 2003, Third Party Plaintiff, SUPERIOR entered into multiple signed "quotations" with Third Party Defendant, T. A. dated June 27, 1986, March 18, 1987, February 15, 1988, and August 22, 1989, and for each of these signed quotations, the contract clearly provided: "This quotation expires... and is subject to the terms ,and conditions on the face and back of this sheet." See Group Exhibit B attached hereto and incorporated herein.

11.    The "Quotation" for the subject machine described in the Plaintiff's Complaint is attached hereto as Exhibit C, and contains the following express term on the back side of the agreement between SUPERIOR and T.A..:

> 14.    INDEMNITY Buyer agrees to instruct all of its employees who may have at any time be assigned to the operation, use or cleaning of the equipment in the proper operation;
> Use and cleaning of said equipment. Buyer agrees to indemnify and hold seller harmless from any loss or liability, or claims for loss or liability, which may be asserted against Seller for personal injury by reason of buyer's failing to properly supervise or instruct his employees in the operation, use or cleaning of the described machinery. In addition, buyer agrees to maintain comprehensive liability insurance insuring Seller against any loss by reason of Buyer's failing to instruct or supervise its employees in the operation, use or cleaning of said equipment.

(See Exhibit C attached hereto and incorporated herein.)

12.    Pursuant to the above-quoted provisions of the quotation and agreement entered into by Third Party Defendant, T.A. and Superior, for the machine described in Plaintiff's Complaint and further described in Exhibit C attached hereto, T.A. has expressly waived its statutory protection under Section V of the Illinois Workers Compensation Act to

limit the amount of its contribution to the amount paid or payable to Jose Luis Lozada pursuant to the Illinois Worker's Compensation Act's Section 305/5. 820 ILCS 305/5.

13.    In the event Third Party Plaintiff, SUPERIOR, is found liable for any injuries sustained by LOZADA, it shall be entitled to contribution from Third Party Defendant, T.A., pursuant to 740 ILCS 100/0.01 et. Seq. in an amount commensurate with the degree or percentage of negligence or fault attributed to Third Party Defendant, T.A., without any limit or cap whatsoever on the amount of contribution due to the aforesaid waiver by T.A. of any such limit under the Worker's Compensation Act.

14.    This cause of action for contribution is brought pursuant to the aforesaid Statute commonly known as the "Joint Tortfeasor Contribution Act," 740 ILCS 100/0.101.

WHEREFORE, Defendant/Third Party Plaintiff, SUPERIOR FOOD MACHINERY, INC., respectfully prays that in the event that judgment is entered in favor of LOZADA and against it, that it be entitled to a judgment for contribution against Third Party Defendant, T.A., an Illinois Corporation, in an amount reflecting Third Party Defendant's actual degree of negligence or fault attributed to said Third Party Defendant, and not limited in any way by virtue of the Illinois Worker's Compensation Act. And further prays for costs incurred in the prosecution of this Third Party Complaint.

Respectfully submitted,

One of the Attorneys For Defendant
/Third Party Plaintiff,
SUPERIOR FOOD MACHINERY, INC.

CONDON & COOK, L.L.C.
745 North Dearborn Street
Chicago, IL 60610
Tel: 312-266-1313 / Fax: 312-266-8148
745 N. Dearborn Street
Chicago, IL 60610
(312) 266-1313

FEB-28-2008 THU 10:09 AM Summit Insurance Agency     FAX NO. 17085948246     P. 36

FROM :CONDON & COOK,L.L.C.     FAX NO. :3122668148     Oct. 03 2007 02:26PM P2/10

08CV5015
JUDGE MORAN
MAGISTRATE JUDGE ASHMAN

PH

I.D. No: 21392
Our File No: 721.13528/aba

STATE OF ILLINOIS    )
                     ) SS
COUNTY OF COOK       )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| ESTEBAN PEREZ DELGADO, ) | |
| ) | |
| Plaintiff, ) | No: 06 L 001819 |
| ) | |
| vs. ) | |
| ) | |
| SUPERIOR FOOD MACHINERY, INCORPORATED, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| SUPERIOR FOOD MACHINERY, INCORPORATED, ) | |
| ) | |
| Third-Party Plaintiff. ) | |
| ) | |
| v. ) | |
| ) | |
| TORTILLERIA ATOTONILCO, INCORPORATED, and ) | |
| OSCAR MUNOZ, individually, ) | |
| ) | |
| Third-Party Defendant. ) | |

## DEFENDANTS AMENDED THIRD PARTY COMPLAINT FOR CONTRIBUTION

NOW COMES Defendant-Third Party Plaintiff, SUPERIOR FOOD MACHINERY, INC., (Hereinafter "SUPERIOR"), by and through its attorneys, CONDON & COOK, LLC, and for its Amended Third Party Complaint for Contribution against Third Party Defendant's TORTILLERIA ATOTONILCO., INC. (hereinafter "T. A."), and, OSCAR MUNOZ, individually, (hereinafter "MUNOZ"), states, in the alternative, as follows:

1

**EXHIBIT**
**D**

FEB-28-2008 THU 10:09 AM Summit Insurance Agency    FAX NO. 17085948246    P. 37

FROM :CONDON & COOK,L.L.C.    FAX NO. :3122668148    Oct. 03 2007 02:26PM P3/10

## COUNT I - NEGLIGENCE AGAINST TORTILLERIA ATOTONILCO, INC.

1.    Esteban Perez Delgado ("hereinafter referred to as "DELGADO") has filed a lawsuit against SUPERIOR, for personal injuries he sustained on August 18, 2004 while employed at a manufacturing facility commonly known as Tortilleria Atotonilco, 1707 W. 47th St., Chicago, County of Cook County, State of Illinois. A true and accurate copy of the DELGADO Complaint at Law is attached hereto as Exhibit A.

2.    SUPERIOR has filed an Answer to the Complaint, denying that material allegations thereof, and said Answer is incorporated herein by reference.

3.    Upon information and belief, Third-Party Defendant, Tortilleria Atotonilco (hereinafter "T. A."), did possess and control a certain product known as a Tortilla Making Machine a/k/a Tortilla Oven ("hereinafter "Oven"), Product Serial #997475, Model #C014-62P, and, T. A. had continuous and sole possession of said machine since the date of purchase in September, 1997.

4.    Notwithstanding said denials filed in its Answer to the Complaint at Law, and in the alternative to the relief sought in said Answer, SUPERIOR alleges that at the time and place set forth in Exhibit A, Third-Party Defendant, T. A. had a duly to provide the Plaintiff, DELGADO, with a safe place to perform his duties as an employee of T.A., Inc., while he was in the course and scope of using a tortilla making machine, as alleged in the attached Exhibit A.

5.    Upon information and belief, Third-Party Defendant, T. A., did possess and control a certain Oven, identified in the Complaint as model number 4C014-62P and serial

2

FEB-28-2008 THU 10:10 AM Summit Insurance Agency        FAX NO. 17085948246          P. 38

FROM :CONDON & COOK,L.L.C.          FAX NO. :3122668148        Oct. 03 2007 02:27PM  P4/10

number 997475, and, T. A. had continuous and sole possession of said Oven since the date of purchase In September, 1997.

6.    That at all times material hereto, Third-Party Defendant, T. A.,  had a further duty to exercise reasonable care to the Plaintiff, DELGADO, in the operation, training, maintenance and use of the aforesaid Oven, and to train DELGADO to use the Oven In a safe, suitable and proper manner, without altering, changing or modifying the original design and safety features of said Oven.

7.    Notwithstanding said duties of reasonable care owed to the Plaintiff, DELGADO, by Third-Party Defendant, T., A. Inc., A. T. breached said duty of care to provide a safe place to work for Plaintiff, Delgado In one or more of the following respects that were not reasonably foreseeable to SUPERIOR:

> a. Allegedly altered the design, manufacture and furnished product known as an Oven, (as described in Exhibit A) and required the Plaintiff, Delgado, to allegedly operate the tortilla machine with numerous in-running nip points, because T. A.,, its agents, servants, or employees, had caused the removal of the housing, cover plates, and/or guards provided at the time of sale by SUPERIOR;
>
> b. Allegedly removed safety devices, including housing, cover plates, and/or guards and electrical shut down devices provided by SUPERIOR that were part of the original design of the Oven; in a manner that was not reasonably foreseeable, and, thereby created the dangers alleged in the attached Exhibit A;
>
> c. Failed to warn DELGADO that T. A. had altered, modified or changed the original design, and condition of the Oven, in a manner that was not reasonably foreseeable, and thereby created the dangers alleged in the attached Exhibit A.
>
> d. Failed to properly train its employee, DELGADO, in the proper maintenance, operation and use of the aforesaid Oven, as originally designed and manufactured by SUPERIOR. (See Exhibit A attached hereto inc. herein).

FEB-28-2008 THU 10:10 AM Summit Insurance Agency    FAX NO. 17085948246    P. 39

FROM :CONDON & COOK,L.L.C.    FAX NO. :3122668148    Oct. 03 2007 02:27PM P5/10

8. The bodily injuries allegedly sustained by DELGADO, were caused as a direct and proximate result of the aforesaid negligent acts or omissions, or unforeseeable misuse on the part of Third Party Defendant, A. T., as described in paragraph 8 hereof.

9. That in the event that Third-Party Plaintiff, SUPERIOR, is found liable for any of the injuries allegedly sustained by Plaintiff, DELGADO, it shall be entitled to contribution from Third-Party Defendant, T.A., Inc. pursuant to 740 ILCS 100/0.1 et. seq. commonly known as the Joint Tortfeasor Contribution Act, in an amount commensurable to a degree of fault attributable to said Third-Party Defendant A.T., Inc.

10. That the allegations of fault set forth above against Third-Party Defendant, T. A., Inc., are not only based upon its role as the Plaintiff's employer, but further based upon its capacity as the party who substantially modified, altered, redesigned, or re-configured the Oven, in the aforementioned ways, and a manner that was not reasonably foreseeable to SUPERIOR.

WHEREFORE, Defendant/Third-Party Plaintiff, SUPERIOR FOOD MACHINERY, INC. respectfully prays that in the event judgment is entered against it and in favor of DELGADO, for an Award in contribution against Third-Party Defendant, Tortilleria Atotonilco, in an amount commensurate with a degree of fault or misuse attributable to said Third-Party Defendant by a trier of fact in this cause.

### COUNT II – PREMISES LIABILITY AGAINST OSCAR MUNOZ

1-3. SUPERIOR realleges and incorporates paragraphs 1 through 3 of Count I as paragraphs 1 through 3 of Count II.

FEB-28-2008 THU 10:10 AM Summit Insurance Agency        FAX NO. 17085948246        P. 40

FROM :CONDON & COOK,L.L.C.          FAX NO. :3122668148        Oct. 03 2007 02:27PM P6/10

4.     Upon Information and belief, MUNOZ, individually, is the sole owner, and landlord of record of the premises commonly known as 1707 W. 47th St., Chicago, County of Cook County, State of Illinois.

5.     Upon information and belief, at all times pertinent hereto, Third-Party Defendant, MUNOZ, leased the premises commonly known as 1707 W. 47th St., Chicago, County of Cook County, State of Illinois to T.A.

6.     That as the sole owner of the premises commonly known as 1707 W. 47th St., Chicago, County of Cook County, State of Illinois, MUNOZ owed a duty of reasonable care to invitees and those other persons lawfully on said premises.

7.     Prior to August 18, 2004, MUNOZ, upon information and belief, had personal knowledge that Third-Party Defendant T.A. altered, modified or changed the original design, and condition of a product known as a tortilla Oven, and had failed to train its employees in the proper operation, maintenance or use of the Oven as originally designed.

8.     Upon information and belief obtained by SUPERIOR after August 18, 20004, T. A. directed, ordered, instructed or otherwise engaged its employees to perform maintenance on rotating/moving parts of its machines, without first shutting down the machines, with the knowledge, permission, or consent of its landlord, MUNOZ, all of which conduct was not reasonably foreseeable to SUPERIOR, and thereby created an alleged dangerous and unsafe premises. (See the attached Exhibit A, incorporated herein.)

9.     That MUNOZ knew or in the exercise of reasonable care as the landlord, that Third-Party Defendant T.A. maintained, and operated in an alleged unsafe manner the

5

FEB-28-2008 THU 10:10 AM Summit Insurance Agency    FAX NO. 17085948246    P. 41

FROM :CONDON & COOK,L.L.C.         FAX NO. :3122668148       Oct. 03 2007 02:27PM P7/10

tortilla making Oven, which constituted a fixture, at the premises commonly known as 1707 W. 47th St., Chicago, County of Cook County, State of Illinois.

10.    Notwithstanding the aforesaid duty of reasonable care owed by MUNOZ, to the Plaintiff, DELGADO, as a reasonably foreseeable user of said fixture, Third-Party Defendant, MUNOZ breached said duty in one or more of the following respects:

> a. carelessly and negligently permitted and allowed T.A. to maintain, and operate the aforesaid Oven at the premises without conducting periodic inspections of the premises, which should have revealed, the exercise of reasonable care, the alleged misuse of the Oven by T. A., and the alleged dangers described in the Plaintiff's Complaint attached as Exhibit A. (See also Counts 1 and II of this Third Party Complaint incorporated by reference.)
>
> b. carelessly and negligently allowed his tenant, T.A., to maintain and operate the aforesaid Oven and thereby created the alleged dangerous conditions described in the attached Complaint field by DELGADO. See Exhibit A.
>
> c. failed to warn invitees or others lawfully upon the premises, including DELGADO, of the alleged dangerous conditions present at the premises, as alleged in the attached Exhibit A.

10.    The bodily injuries allegedly sustained by DELGADO, were caused as a direct and proximate result of one or more of the aforesaid negligent acts or omissions of Third Party Defendant, MUNOZ, as described in paragraph 9.

11.    That in the event that Third-Party Plaintiff, SUPERIOR, is found liable for any of the injuries allegedly sustained by DELGADO, it shall be entitled to contribution from Third-Party Defendant, MUNOZ, pursuant to 740 ILCS 100/0.1 et. seq. commonly known as the Joint Tortfeasor Contribution Act, in an amount commensurable to a degree of fault attributable to said Third-Party Defendant MUNOZ.

WHEREFORE, Defendant/Third-Party Plaintiff, SUPERIOR FOOD MACHINERY, INC. respectfully prays that if judgment is entered in favor of DELGADO and against it, a judgment for contribution be entitled in its favor against Third-Party Defendant, OSCAR MUNOZ, in an amount commensurate with the degree of negligence or fault attributable to said Third-Party Defendant by the trier of fact in this cause.

### COUNT III – KOTECKI WAIVER ACTION
### AGAINST TORTILLERIA ATOTONILCO., INC.

1-3    SUPERIOR repeats and realleges paragraphs 1 through 3, inclusive of Count I of this Third Party Complaint as and for paragraphs 1 through 3 of Count III, as if fully set forth herein.

4.    SUPERIOR and TA have been engaged in business with each other since at least 1987.

5.    That prior to September 30, 1997, Third Party Plaintiff, SUPERIOR entered into multiple signed "quotations" with Third Party Defendant, T. A. dated June 27, 1986, March 18, 1987 and August 22, 1989, and for each of these signed quotations, the contract clearly provided: "This quotation expires... and is subject to the terms, and conditions on the face and back of this sheet." See Group Exhibit B attached hereto and incorporated herein.

6.    That the aforesaid multiple signed "quotations" with Third Party Defendant, T. A. dated June 27, 1986, March 18, 1987 and August 22, 1989 each contain the following express term on the backside of the agreement between SUPERIOR and T.A.:

14.    INDEMNITY Buyer agrees to instruct all of its employees who may have at any time be assigned to the operation, use or cleaning of the equipment in the proper operation; Use and cleaning of said equipment.

7

FEB-28-2008 THU 10:11 AM Summit Insurance Agency    FAX NO. 17085948246    P. 43

FROM :CONDON & COOK,L.L.C.    FAX NO. :3122668148    ;    Oct. 03 2007 02:28PM P9/10

Buyer agrees to indemnify and hold seller harmless from any loss or liability, or claims for loss or liability, which may be asserted against Seller for personal injury by reason of buyer's failing to properly supervise or instruct his employees in the operation, use or cleaning of the described machinery. In addition, buyer agrees to maintain comprehensive liability insurance insuring Seller against any loss by reason of Buyer's failing to instruct or supervise its employees in the operation, use or cleaning of said equipment.

(See Group Exhibit B attached hereto and incorporated herein.)

7.    That Group Exhibit B establishes a course of dealing between SUPERIOR and T. A. whereby T. A. entered into and agreed to all of the terms contained in the "quotations."

8.    The Sales Contract relating to the purchase of the subject Oven ("Sales Contract") incorporates and contains the same "Indemnity Provision" as contained in each of multiple signed "quotations" with Third Party Defendant, T. A. dated June 27, 1986, March 18, 1987 and August 22, 1989. See the Sale Contract dated July 16, 1997 attached hereto and incorporated as Exhibit C. See also Group Exhibit B attached hereto.

9.    That based upon the course of dealing between SUPERIOR and TA, TA agreed to all the terms and conditions of the Sales Contract including the "Indemnity provision." See paragraph 6 of Exhibit C attached hereto and incorporated.

10.    Pursuant to Exhibits B and C attached hereto, and incorporated herein, T.A. has expressly waived its any alleged statutory or other limit as provided under Section 5 of the Illinois Workers Compensation Act, of the amount of contribution SUPERIOR is entitled to receive from T. A. See Exhibits B and C attached hereto, and incorporated herein.

11.    In the event Third Party Plaintiff, SUPERIOR, is found liable for any injuries sustained by DELGADO; it shall be entitled to contribution from Third Party Defendant,

8

T.A., pursuant to 740 ILCS 100/0.01 et. Seq. in an amount commensurate with the degree or percentage of negligence or fault attributed to Third Party Defendant, T.A., without any limit or cap whatsoever on the amount of contribution due to the aforesaid waiver by T.A. of any such limit.

12.    This cause of action for contribution is brought pursuant to the aforesaid Statute commonly known as the "Joint Tortfeasor Contribution Act," 740 ILCS 100/0.101.

WHEREFORE, Defendant/Third Party Plaintiff, SUPERIOR FOOD MACHINERY, INC., respectfully prays that in the event that judgment is entered in favor of DELGADO and against it, that it be entitled to a judgment for contribution against Third Party Defendant, T.A., an Illinois Corporation, in an amount reflecting Third Party Defendant's actual degree of negligence or fault attributed to said Third Party Defendant, and not limited in any way by virtue of the Illinois Worker's Compensation Act. And further prays for costs incurred in the prosecution of this Third Party Complaint.

Respectfully submitted,

_____
One of the Attorneys For Defendant/
Third Party Plaintiff,
SUPERIOR FOOD MACHINERY, INC.

CONDON & COOK, L.L.C.
745 North Dearborn Street
Chicago, IL 60610
Tel: 312-266-1313 / Fax: 312-266-8148
745 N. Dearborn Street
Chicago, IL 60610
(312) 266-1313

9

One Tower Square, Hartford, Connecticut 06183     PH                    **Travelers**

                                        FOOD PRODUCTS
                                        COMMON POLICY DECLARATIONS
                                        ISSUE DATE: 01/16/04

                                    POLICY NUMBER: Y-630-843K1319-TCT-04

INSURING COMPANY:
THE TRAVELERS INDEMNITY COMPANY OF CONNECTICUT

1. **NAMED INSURED AND MAILING ADDRESS:**
   TORTILLERIA ATOTONILCO, INC.  (AS PER IL T8 00)
   1707 W. 47TH STREET
   CHICAGO, IL 60609


2. **POLICY PERIOD:**  From 01/01/04 to 01/01/05 12:01 A.M. Standard Time at
                                        your mailing address.
3. **LOCATIONS**
      Premises  Bldg.
      Loc. No.  No.  Occupancy            Address

      SEE IL T0 03


4. **COVERAGE PARTS FORMING PART OF THIS POLICY AND INSURING COMPANIES:**
   DELUXE PROPERTY COVERAGE PART DECLARATIONS            DX T0 00 09 98 TCT
   COMMERCIAL GENERAL LIABILITY COV PART DECLARATIONS    CG T0 01 03 94 TCT
   COMMERCIAL CRIME COV PART DECLARATIONS                CR T0 01 07 86 TCT
   COMMERCIAL INLAND MARINE COV PART DECLARATIONS        CM T0 01 07 86 TCT


5. **NUMBERS OF FORMS AND ENDORSEMENTS**
   FORMING A PART OF THIS POLICY:  SEE IL T8 01 10 93


6. **SUPPLEMENTAL POLICIES:** Each of the following is a separate policy
                              containing its complete provisions:
   Policy                       Policy No.              Insuring Company


7. **PREMIUM SUMMARY:**
      Provisional Premium   $
      Due at Inception      $
      Due at Each           $ SEE IL T0 30

**NAME AND ADDRESS OF AGENT OR BROKER:**              COUNTERSIGNED BY:
   SUMMIT INS AGCY INC (F4279)
   PO BOX 170                                         _____
   SUMMIT, IL 60501                                   Authorized Representative
                                                      DATE: _____
IL T0 02 11 89     PAGE 1 OF 1

                                                      OFFICE: NAPERVILLE IL



EXHIBIT
*E*

**CERTIFIED POLICY**

The policy to which this certification is affixed is a true and accurate copy of
the policy contained in company records and used in the regular course of
business as of the date shown below. No representation or warranty is made
that this copy is identical in all respects to the policy issued.

No insurance is afforded by this copy.

*The Travelers Indemnity Co & Conn.*

Name of Insuring Company    *H. E. Fitts*

*630-843K1319*

Policy Number    Date: *3/3/08*



**POLICY NUMBER:** Y-630-843K1319-TCT-04

**EFFECTIVE DATE:** 01-01-04

**ISSUE DATE:** 01-16-04

LISTING OF FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

THIS LISTING SHOWS THE NUMBER OF FORMS, SCHEDULES AND ENDORSEMENTS
BY LINE OF BUSINESS.

```
IL T0 02 11 89    COMMON POLICY DECLARATIONS
IL T8 01 10 93    FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS
IL T3 18 03 98    COMMON POLICY CONDITIONS-DELUXE
IL T0 30 12 90    NON-STANDARD PAYMENT SCHEDULE
IL T0 03 04 96    LOCATION SCHEDULE
IL T8 00          GENERAL PURPOSE ENDORSEMENT
```

DELUXE PROPERTY

```
DX T0 00 09 98    DELUXE PROPERTY COV PART DECLARATIONS
DX 00 03 07 94    DELUXE PROP COV PART SCHED-SPECIF LIMITS
DX 00 01 07 94    MORTGAGEE HOLDER SCHEDULE
DX 00 04 03 98    TABLE OF CONTENTS - DELUXE PROP COV PART
DX T1 00 03 98    DELUXE PROPERTY COVERAGE FORM
DX T1 01 03 98    DELUXE BUSINESS INCOME COV FORM AND EE
DX T3 42 03 98    DATA PROCESSING EQUIPMENT & MEDIA COV
DX T3 79 03 98    LOSS PAYABLE PROVISIONS
DX T3 85 03 98    UTILITY SERVICE - DIRECT DAMAGE
DX T3 86 03 98    UTILITY SERVICES - TIME ELEMENT
DX T4 02 11 02    TERRORISM RISK INS ACT 2002 DISCLOSURE
```

COMMERCIAL GENERAL LIABILITY

```
CG T0 01 03 94    COMM'L GENERAL LIABILITY DEC
CG T0 07 09 87    DECLARATIONS PREMIUM SCHEDULE
CG T0 08 07 86    KEY TO DECLARATIONS PREMIUM SCHEDULE
CG T0 34 10 93    TABLE OF CONTENTS
CG 00 01 10 93    COMMERCIAL GENERAL LIABILITY COV FORM
CG 00 57 09 99    AMENDMENT OF INSURING AGRMNT-KNOWN INJ
CG 20 13 11 85    ADD'L INS-STATE OR POL SUB-PERMITS-PRM
CG 21 70 11 02    CAP ON LOSSES CERTIFIED ACTS TERRORISM
CG D0 37 01 99    OTHER INSURANCE-ADDITIONAL INSUREDS
CG D1 94 11 97    CHGS IN COMMERCIAL GENERAL LIAB COV FORM
CG D2 34 02 01    WEB XTEND - LIABILITY
CG 21 47 10 93    EMPLOYMENT-RELATED PRACTICES EXCLUSION
CG D1 42 01 99    EXCLUSION-DISCRIMINATION
CG D1 92 08 97    AMEND POLL EXCL-EXCEPT BLDG HEAT EQUIP
CG D2 42 01 02    EXCLUSION WAR
CG T4 78 02 90    EXCLUSION-ASBESTOS
CG F2 11 01 01    ILLINOIS CHANGES - INSURED CONTRACT
CG T3 33 12 88    LIMIT WHEN TWO OR MORE POLICIES APPLY
CG 02 00 04 87    IL CHANGES -CANCELLATION AND NONRENEWAL
```

 **Travelers**

POLICY NUMBER: Y-630-843K1319-TCT-04

EFFECTIVE DATE: 01-01-04

ISSUE DATE: 01-16-04

INLAND MARINE

| | | |
|---|---|---|
| CM A0 28 08 96 | IMPAK COVERAGE PART DECLARATIONS |
| CM T3 71 08 96 | IM PAK COVERAGE SUMMARY |
| CM T0 29 08 96 | IM PAK COV SCHEDULED PROPERTY SCHEDULE |
| CM T0 11 01 88 | TABLE OF CONTENTS |
| CM 00 01 06 95 | COMMERCIAL INLAND MARINE CONDITIONS |
| CM T1 43 08 96 | IMPAK COVERAGE FORM |
| CM T3 98 11 02 | TERRORISM RISK INS ACT 2002 DISCLOSURE |
| CM 01 28 03 99 | ILLINOIS CHANGES - INTENTIONAL ACTS |
| CM 02 04 04 87 | ILLINOIS CHANGES |

CRIME

| | |
|---|---|
| CR T0 01 07 86 | COMMERCIAL CRIME COVERAGE DECLARATION |
| CR 15 12 10 90 | CONVERT TO SCHEDULE COVERAGE |
| CR T0 14 10 90 | TABLE OF CONTENTS |
| CR 10 00 10 90 | CRIME GENERAL PROVISIONS |
| CR 00 01 10 90 | EMPLOYEE DISHONESTY COV FORM - BLANKET |
| CR 00 04 10 90 | THEFT/DISAPPEARANCE/DESTRUCTION COVERAGE |
| CR T3 11 11 02 | TERRORISM RISK INS ACT 2002 DISCLOSURE |
| CR 10 04 01 89 | EXCLUDE TRADING LOSS |
| CR 10 05 01 86 | EXCLUDE WAREHOUSE RECEIPTS LOSSES |
| CR 02 02 06 90 | ILLINOIS CHANGES |

INTERLINE ENDORSEMENTS

| | |
|---|---|
| IL T3 68 11 02 | FEDERAL TERRORISM RISK INSURANCE ACT |
| IL 00 21 04 98 | NUCLEAR ENERGY LIABILITY EXCLUSION |
| IL 09 52 11 02 | CAP LOSSES-CERTIFIED ACTS OF TERRORISM |
| IL F0 15 10 97 | IL CHANGES-CANCELLATION AND NONRENEWAL |
| IL T3 55 08 98 | EXCL OF CERTAIN COMPUTER REL LOSSES |
| IL T9 14 03 99 | ILLINOIS CHANGES |
| IL T0 10 04 94 | LENDERS CERTIFICATE  OF INSURANCE-FORM A |
| IL T0 11 03 96 | LENDERS' CERTIFICATE OF INSURANCE-FORM B |

# COMMON POLICY CONDITIONS–DELUXE

All Coverage Parts included in this policy are subject to the following conditions:

## A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy or any Coverage part by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 60 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. If the policy is cancelled, that date will become the end of the policy period. If a Coverage Part is cancelled, that date will become the end of the policy period as respects that Coverage Part only.

   Cancellation will not affect coverage on any shipment in transit on the date of the cancellation. Coverage will continue in full force until such property is delivered and accepted.

5. If this policy or any Coverage Part is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy terms can be amended or waived only by endorsement issued by us as part of this policy.

## C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. INSPECTIONS AND SURVEYS

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes, or standards

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

## E. PREMIUMS

1. The first Named Insured shown in the Declarations:

   a. Is responsible for the payment of all premiums; and

   b. Will be the payee for any return premiums we pay.

2. We compute all premiums for this policy in accordance with our rules, rates, rating plans, premiums and minimum premiums. The premium shown in the Declarations was computed based on rates and rules in effect at the time the policy was issued. On each renewal continuation or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

**IL T3 18 03 98**

**F.  TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have rights and duties but only with respect to that property.

**G.  WHEN WE DO NOT RENEW**

If we decide not to renew this policy we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 60 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient- sufficient proof of notice.

**H.  DELUXE PROPERTY COVERAGE PART–REFERENCE TO FORMS AND ENDORSEMENTS**

In some instances, the Deluxe Property Declarations- Declarations may list endorsements included in the Deluxe Property Coverage Part that reference:

1. The Commercial Property Coverage Part;

2. The Commercial Inland Marine Coverage Part;

3. Commercial Property forms including, but not limited to, the following:

    a.  Building and Personal Property Coverage Form;

    b.  Business Income Coverage Form;

    c.  Commercial Property Conditions;

    d.  Causes of Loss–Special Form

    e.  Causes of Loss–Earthquake Form.

4. Commercial Inland Marine Forms including but not limited to the Transportation Coverage–Special Form

Endorsements referencing the Commercial Property Coverage Part, Commercial Inland Marine Coverage Part, Commercial Property Forms, or Commercial Inland Marine Forms apply to the Deluxe Property Coverage Forms in the same manner as they apply to the Forms they reference.

**I.  INSURANCE UNDER TWO OR MORE COVERAGE PARTS**

If two or more of this policy's Coverage Parts apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

This policy consists of the Common Policy Declaration and the Coverage Parts and endorsements listed in that declarations form.

In return for payment of the premium, The Travelers agrees with the Named Insured to provide the insurance afforded by a Coverage Part forming part of this policy. That insurance will be provided by the company indicated as insuring company in the Common Policy Declarations by the abbreviation of its name opposite that Coverage Part.

The companies listed below (each a stock company), have executed this policy, but it is valid only if countersigned on the Common Policy Declarations by our authorized representative.

The Travelers Indemnity Company (IND)
The Phoenix Insurance Company (PHX)
The Charter Oak Fire Insurance Company (COF)
The Travelers Indemnity Company of Illinois (TIL)
The Travelers Indemnity Company of Connecticut (TCT)
The Travelers Indemnity Company of America (TIA)

Secretary

Vice President

IL T3 18 03 98

NON-STANDARD PAYMENT SCHEDULE

POLICY NUMBER: Y-630-843K1319-TCT-04
EFFECTIVE DATE:  01/01/04
ISSUE DATE: 01/16/04

PAYMENT DUE DATES                              AMOUNT

        01/01/04
        02/01/04
        03/01/04
        04/01/04
        05/01/04
        06/01/04
        07/01/04
        08/01/04
        09/01/04
        10/01/04

IL T0 30 12 90       PAGE  1 OF  1

OFFICE: NAPERVILLE IL         888
PRODUCER NAME: SUMMIT INS AGCY INC              F4279

**LOCATION SCHEDULE**  **POLICY NUMBER:** Y-630-843K1319-TCT-04

This Schedule of Locations and Buildings applies to the Common Policy Declarations for the period

01-01-04 to 01-01-05.

| Loc. No. | Bldg. No. | Address | Occupancy |
|---|---|---|---|
| 1 | 1 | 1707 - 11 WEST 47TH STREET<br>CHICAGO, IL 60609 | BAKERY |
| 2 | 2 | 1840-50 W. 43RD STREET<br>CHICAGO, IL 60609 | BAKERY |
| 3 | 3 | 1901 W. 43RD STREET<br>CHICAGO, IL 60609 | BAKERY |
| 4 | 4 | 4911-13 S. MARSHFIELD<br>CHICAGO, IL 60609 | TRUCK STORAGE |
| 5 | 5 | 4741-43 S. WOOD<br>CHICAGO, IL 60609 | VACANT LOT |
| 6 | 6 | 4649 S. PAULINA<br>CHICAGO, IL 60609 | GARAGE |
| 7 | 7 | 4219 S. WOLCOTT<br>CHICAGO, IL 60609 | BAKERY |

**IL T0 03 04 96**

POLICY NUMBER: Y-630-843K1319-TCT-04          GENERAL PURPOSE ENDORSEMENT

ITEM 1 NAMED INSURED TO READ:

TORTILLERIA ATOTONILCO, INC.

MUNOZ FLOUR TORTILLERIA, INC.

DROVERS/COLE TAYLOR BANK A/T/U/T #76131

MARQUETTE NATIONAL BANK U/T #8122

COLE TAYLOR BANK A/T/U/T #92-2065, DATED 6/22/92
AND ALL BENEFICIARIES THEREUNDER

DROVERS COLE TAYLOR BANK A/T/U/T #891002
AND ALL BENEFICIARIES THEREUNDER

**IL T8 00**                                    Page    1

One Tower Square, Hartford, Connecticut  06183

**Travelers**

| | |
|---|---|
| **COMMERCIAL GENERAL LIABILITY**<br>**COVERAGE PART DECLARATIONS** | **POLICY NO.:**  Y-630-843K1319-TCT-04<br>**ISSUE DATE:**  01-16-04 |

**INSURING COMPANY:**
THE TRAVELERS INDEMNITY COMPANY OF CONNECTICUT

**DECLARATIONS PERIOD:** From 01-01-04 to 01-01-05 12:01 A.M. Standard Time at your mailing address shown in the Common Policy Declarations.

The Commercial General Liability Coverage Part consists of these Declarations and the Coverage Form shown below.

1. **COVERAGE AND LIMITS OF INSURANCE:**

   | **COMMERCIAL GENERAL LIABILITY COVERAGE FORM** | **LIMITS OF INSURANCE** |
   |---|---|
   | General Aggregate Limit<br>    (Other than Products-Completed Operations) | $    2,000,000 |
   | Products-Completed Operations Aggregate Limit | $    2,000,000 |
   | Personal & Advertising Injury Limit | $    1,000,000 |
   | Each Occurrence Limit | $    1,000,000 |
   | Fire Damage Limit (any one fire) | $      100,000 |
   | Medical Expense Limit (any one person) | $        5,000 |

2. **AUDIT PERIOD:**  ANNUAL

3. **FORM OF BUSINESS:** CORPORATION

4. **NUMBERS OF FORMS, SCHEDULES AND ENDORSEMENTS FORMING PART OF THIS COVERAGE PART ARE ATTACHED AS A SEPARATE LISTING.**

## COMMERCIAL GENERAL LIABILITY COVERAGE
## IS SUBJECT TO A GENERAL AGGREGATE LIMIT

CG T0 01 03 94                                                                    Page 1 of 1

PRODUCER: SUMMIT INS AGCY INC                    F4279    OFFICE: NAPERVILLE IL          888

**DECLARATIONS PREMIUM SCHEDULE**          POLICY NUMBER: Y-630-843K1319-TCT-04

This Schedule applies to the Declarations for the period of   01-01-04   to   01-01-05

It shows all of your known rating classes as of the effective date.  Any exceptions will be so noted.  This includes all locations you own, rent or occupy.

| OPN NO. | LOC/ BLDG NO. | CLASS DESCRIPT/ CODE NO. | SUBLINE | PREMIUM BASE/ EXPOSURE | RATES | ADVANCE PREMIUM |
|---|---|---|---|---|---|---|
| | | MINIMUM PREMIUMS | | | | |
| | LOB | | | | | |
| | 1/ 1 | FOOD PREPARATIONS, NEC | | | | |
| 001 | | 20990 | PREM/OPS | S | | |
| 002 | | | PROD/C-OPS | S | | |
| | | COVERAGE PART TOTAL | | | | |

*This class is subject to the prem/ops transition program.

☐ If an "X" is entered in this box, these Declarations are completed on the Premium Schedule Extension CG T0 12.

**CG T0 07 09 87**                              PAGE    1  (END)

**KEY TO DECLARATIONS PREMIUM SCHEDULE**

**ABBREVIATIONS:**

— CLASS DESCRIP — means CLASS DESCRIPTION

— LOC/BLDG NO. — means LOCATION/BUILDING NUMBER

— OPN NO. — means OPERATION NUMBER

— PREM/OPS — means PREMISES/OPERATIONS

— PROD/C-OPS — means PRODUCTS/COMPLETED OPERATIONS

**PREMIUM BASE:**

| Key Letter | Premium Base | How Rates Apply |
|---|---|---|
| a | Area | per 1,000 square feet |
| c | Total Cost | per $1,000 of total cost |
| m | Admissions | per 1,000 admissions |
| p | Payroll | per $1,000 of payroll |
| s | Gross Sales | per $1,000 of gross sales |
| t | (see note * below) | (see note * below) |
| u | Units | per unit |

*Premium base t is used for a number of rarely used premium bases.
The specific base and how rates apply are shown with the Class Description
on the DECLARATIONS-PREMIUM SCHEDULE.

CG T0 08 07 86

**TABLE OF CONTENTS**

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM
## (CG 00 01 10 93)

SECTION I–COVERAGES

Beginning on Page

Coverage A–
  Bodily Injury        Insuring Agreement ................................. 1
  and Property
  Damage Liability       Exclusions ................................................ 1

Coverage B--
  Personal and         Insuring Agreement ................................. 4
  Advertising
  Injury Liability         Exclusions ................................................ 4

Coverage C–
  Medical Payments      Insuring Agreement ................................. 4
                           Exclusions ................................................ 5

Supplementary Payments                                    5

SECTION II--WHO IS AN INSURED ..................................................... 5

SECTION III--LIMITS OF INSURANCE ................................................. 6

SECTION IV--COMMERCIAL GENERAL LIABILITY CONDITIONS ............... 7

  Bankruptcy ................................................................................. 7
  Duties in the Event of Occurrence, Claim or Suit ......................... 7
  Legal Action Against Us .............................................................. 7
  Other Insurance .......................................................................... 8
  Premium Audit ............................................................................ 8
  Representations .......................................................................... 8
  Separation of Insureds ............................................................... 8
  Transfer of Rights of Recovery Against Others To Us .................. 9
  When We Do Not Renew ............................................................. 9

SECTION V--DEFINITIONS ................................................................ 9

CG T0 34 10 93

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (SECTION II).

Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (SECTION V).

## SECTION I – COVERAGES

### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement.**

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:

        (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

        (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

        No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

    b. This insurance applies to "bodily injury" and "property damage" only if:

        (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

        (2) The "bodily injury" or "property damage" occurs during the policy period.

    c. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

2. **Exclusions.**

    This insurance does not apply to:

    a. Expected or Intended Injury

        "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

    b. Contractual Liability

        "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

        (1) Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

        (2) That the insured would have in the absence of the contract or agreement.

    c. Liquor Liability

        "Bodily injury" or "property damage" for which any insured may be held liable by reason of:

        (1) Causing or contributing to the intoxication of any person;

        (2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

        (3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

        This exclusion applies only if you are in the business of manufacturing distributing, selling, serving or furnishing alcoholic beverages.

Copyright, Insurance Services Office, Inc., 1992

COMMERCIAL GENERAL LIABILITY

**d. Workers Compensation and Similar Laws**

Any obligation of the insured under a workers compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of (1) above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

**(i)** if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

**(ii)** if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

Subparagraphs (a) and (d)(i) do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**g. Aircraft, Auto or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

Copyright, Insurance Services Office, Inc., 1992    CG 00 01 10 93

COMMERCIAL GENERAL LIABILITY

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph f.(2) or f.(3) of the definition of "mobile equipment".

**h.** Mobile Equipment

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i.** War

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j.** Damage to Property

"Property damage" to:

**(1)** Property you own, rent, or occupy;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**k.** Damage to Your Product

"Property damage" to "your product" arising out of it or any part of it.

**l.** Damage to Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.** Damage to Impaired Property or Property Not Physically Injured

"Property damage" to "impaired property" or property that has not been physically injured arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.** Recall of Products, Work or Impaired Property

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

COMMERCIAL GENERAL LIABILITY

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in LIMITS OF INSURANCE (SECTION III).

## COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

1. **Insuring Agreement.**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

   b. This insurance applies to:

      (1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

      (2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;

      but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions.**

   This insurance does not apply to:

   a. "Personal injury" or "advertising injury":

      (1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

      (2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

      (3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured; or

      (4) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

   b. "Advertising injury"' arising out of:

      (1) Breach of contract, other than misappropriation of advertising ideas under an implied contract;

      (2) The failure of goods, products or services to conform with advertised quality or performance;

      (3) The wrong description of the price of goods, products or services; or

      (4) An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

## COVERAGE C. MEDICAL PAYMENTS

1. **Insuring Agreement.**

   a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

      (1) On premises you own or rent;

      (2) On ways next to premises you own or rent; or

      (3) Because of your operations;

      provided that:

      (1) The accident takes place in the "coverage territory" and during the policy period;

      (2) The expenses are incurred and reported to us within one year of the date of the accident; and

      (3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

   b. We will make these payments regardless of fault. These payments will not exceed the

Copyright, Insurance Services Office, Inc., 1992

COMMERCIAL GENERAL LIABILITY

applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**.

We will not pay expenses for "bodily injury":

**a.** To any insured.

**b.** To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c.** To a person injured on that part of premises you own or rent that the person normally occupies.

**d.** To a person, whether or not an "employee" of any insured, if benefits for the "'bodily injury" are payable or must be provided under a workers compensation or disability benefits law or a similar law.

**e.** To a person injured while taking part in athletics.

**f.** Included within the "products-completed operations hazard."

**g.** Excluded under Coverage A.

**h.** Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

We will pay with respect to any claim or "suit" we defend:

**1.** All expenses we incur.

**2.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**3.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**4.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $100 a day because of time off from work.

**5.** All costs taxed against the insured in the "suit."

**6.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**7.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** An organization other than a partnership or joint venture, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**2.** Each of the following is also an insured:

**a.** Your "employees," other than your "executive officers," but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, no "employee" is an insured for:

**(1)** "Bodily injury" or "personal injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), or to a co-"employee" while in the course of his or her employment or while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of paragraph (1)(a) above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs (1)(a) or (b) above; or

COMMERCIAL GENERAL LIABILITY

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees" or, if you are a partnership or joint venture, by any partner or member.

**b.** Any person (other than your "employee"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

**a.** "Bodily injury" to a co-"employee" of the person driving the equipment; or

**b.** "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**4.** Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage B does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits."

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage C;

**b.** Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage B.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard."

**4.** Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal injury" and all "advertising injury" sustained by any one person or organization.

**5.** Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage A; and

**b.** Medical expenses under Coverage C

because of all "bodily injury" and "property damage" arising out of any one "occurrence."

Copyright, Insurance Services Office, Inc., 1992

CG 00 01 10 93

COMMERCIAL GENERAL LIABILITY

**6.** Subject to 5. above, the Fire Damage Limit is the most we will pay under Coverage A for damages because of "property damage" to premises, while rented to you or temporarily occupied by you with permission of the owner, arising out of any one fire.

**7.** Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy.**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit.**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us.**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance.**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

COMMERCIAL GENERAL LIABILITY

**b. Excess Insurance**

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

**(1)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(2)** That is Fire insurance for premises rented to you; or

**(3)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I).

When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit.**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations.**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds.**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us.**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew.**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

    Copyright, Insurance Services Office, Inc., 1992    CG 00 01 10 93

COMMERCIAL GENERAL LIABILITY

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V – DEFINITIONS

1. "Advertising injury" means injury arising out of one or more of the following offenses:

    a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    b. Oral or written publication of material that violates a person's right of privacy;

    c. Misappropriation of advertising ideas or style of doing business; or

    d. Infringement of copyright, title or slogan.

2. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment."

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

    a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

    b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

    c. All parts of the world if:

        (1) The injury or damage arises out of:

            (a) Goods or products made or sold by you in the territory described in a. above; or

            (b) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and

        (2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker." "Employee" does not include a "temporary worker."

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

    a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    b. You have failed to fulfill the terms of a contract or agreement;

    if such property can be restored to use by:

    a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

    b. Your fulfilling the terms of the contract or agreement.

8. "Insured contract" means:

    a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

    b. A sidetrack agreement;

    c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

    d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

    e. An elevator maintenance agreement;

    f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

    Paragraph f. does not include that part of any contract or agreement:

    (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

    (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

COMMERCIAL GENERAL LIABILITY

**(a)** Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection or engineering services.

**9.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

**10.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

**11.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance but not construction or surfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

**12.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**13.** "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

**e.** Oral or written publication of material that violates a person's right of privacy.

    Copyright, Insurance Services Office, Inc., 1992    CG 00 01 10 93

COMMERCIAL GENERAL LIABILITY

**14. a.** "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

   **(1)** Products that are still in your physical possession; or

   **(2)** Work that has not yet been completed or abandoned.

**b.** "Your work" will be deemed completed at the earliest of the following times:

   **(1)** When all of the work called for in your contract has been completed.

   **(2)** When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

   **(3)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**c.** This hazard does not include "bodily injury" or "property damage" arising out of:

   **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it;

   **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

   **(3)** Products or operations for which the classification in this Coverage Part or in our manual of rules includes products or completed operations.

**15.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

**16.** "Suit" means a civil proceeding in which damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

**17.** "Your product" means:

**a.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

   **(1)** You;

   **(2)** Others trading under your name; or

   **(3)** A person or organization whose business or assets you have acquired; and

**b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**b.** The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**18.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**19.** "Your work" means:

**a.** Work or operations performed by you or on your behalf; and

**b.** Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**b.** The providing of or failure to provide warnings or instructions.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURING AGREEMENT— KNOWN INJURY OR DAMAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART (OCCURRENCE VERSION)

Paragraph **1. Insuring Agreement** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limit Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph **1.** of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive no-

tice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **II** – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

POLICY NUMBER:   Y-630-843K1319-TCT-04

COMMERCIAL GENERAL LIABILITY
ISSUE DATE:   01-16-04

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED–STATE OR POLITICAL SUBDIVISIONS–PERMITS RELATING TO PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**State or Political Subdivision:**

CITY OF CHICAGO


121 N. LASALLE

CHICAGO                   IL 60601

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured any state or political subdivision shown in the Schedule, subject to the following additional provision:

This insurance applies only with respect to the following hazards for which the state or political subdivision has issued a permit in connection with premises you own, rent, or control and to which this insurance applies:

1. The existence, maintenance, repair, construction, erection, or removal of advertising signs, awnings, canopies, cellar entrances, coal holes, driveways, manholes, marquees, hoist away openings, sidewalk vaults, street banners, or decorations and similar exposures; or

2. The construction, erection, or removal of elevators; or

3. The ownership, maintenance, or use of any elevators covered by this insurance.

**CG 20 13 11 85**          Copyright, Insurance Services Office, Inc., 1984          Page 1 of 1

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> UNDERGROUND STORAGE TANK POLICY

With respect to any one or more "certified acts of terrorism", we will not pay any amounts for which we are not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 (including subsequent acts of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a "certified act of terrorism":

1. The act resulted in aggregate losses in excess of $5 million; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OTHER INSURANCE – ADDITIONAL INSUREDS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

Paragraph 4.b. of CONDITIONS (SECTION IV) is amended as follows:

**b.** Excess Insurance

This insurance is excess over any of the other insurance; whether primary, excess, contingent or on any other basis:

**(1)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk, or similar coverage for "your work";

**(2)** That is Fire Insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(3)** If the loss arises out of the maintenance or use of aircraft, "autos", or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I); or

**(4)** That is valid and collectible insurance available to you if you are added as an additional insured under any other policy.

When this insurance is excess, we will have no duty under Coverage A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**CG D0 37 01 99**          Copyright, The Travelers Indemnity Company, 1999          Page 1 of 1

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGES IN COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

PROVISIONS

A. Paragraph **1.a.** of COVERAGE A. – BODILY IN-JURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages) is deleted and replaced by the following:

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUP-PLEMENTARY PAYMENTS – COVER-AGES A AND B.

B. Paragraph **2.b.** of COVERAGE A. – BODILY IN-JURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages) is deleted and replaced by the following:

2. **Exclusions**

   This insurance does not apply to:

   b. "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of li-ability in a contract or agreement. This ex-clusion does not apply to liability for damages:

      (1) That the insured would have in the absence of the contract or agree-ment; or

      (2) Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property dam-age" occurs subsequent to the execu-tion of the contract or agreement. Solely for the purposes of liability as-sumed in an "insured contract", rea-sonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

         (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

         (b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this in-surance applies are alleged.

C. Paragraph **1.a.** of COVERAGE B. – PERSONAL AND ADVERTISING INJURY LIABILITY (Section I – Coverages) is deleted and replaced by the following:

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as dam-ages because of "personal injury" or "ad-vertising injury" to which this insurance

COMMERCIAL GENERAL LIABILITY

applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury" or "advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

D. The following is added to Paragraph 2. Exclusions of COVERAGE B. – PERSONAL AND ADVERTISING INJURY LIABILITY (Section I – Coverages):

(This insurance does not apply to:)

1. "Personal injury" or "advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

2. Any loss, cost or expense arising out of any:

   a. Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

   b. Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

E. SUPPLEMENTARY PAYMENTS – COVERAGES A AND B (Section I – Coverages) is amended as follows:

1. The first sentence is deleted and replaced by the following:

   We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

2. Paragraph 4. is deleted and replaced by the following:

   4. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

3. The following is added:

   If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

   a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

   b. This insurance applies to such liability assumed by the insured;

   c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

   d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

   e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and we agree that we can assign the same counsel to defend the insured and the indemnitee; and

   f. The indemnitee:

      (1) Agrees in writing to:

         (a) Cooperate with us in the investigation, settlement or defense of the "suit";

　　　Copyright, Travelers Indemnity Company, 1997　　　CG D1 94 11 97

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of paragraph **2.b.(2)** of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages), such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys fees and necessary litigation expenses as Supplementary Payments ends when:

a. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b. The conditions set forth above, or the terms of the agreement described in paragraph f. above, are no longer met.

F. WHO IS AN INSURED (Section II) is amended as follows in order to specifically include Limited Liability Companies:

1. Paragraphs **1.** and **2.a.** are deleted and replaced by the following:

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to

the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

a. Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

(1) "Bodily injury" or "personal injury";

(a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

(b) To the spouse , child, parent, brother or sister of that co-"employee" as a conse-

Copyright, Travelers Indemnity Company, 1997

COMMERCIAL GENERAL LIABILITY

quence of paragraph **(1)(a)** above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs **(1)(a)** or **(b)** above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property;

(a) Owned, occupied or used by,

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

2. The first sentence of paragraph **4.** is deleted and replaced by the following:

Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

3. The final paragraph is deleted and replaced by the following:

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

G. Condition 2. Duties In The Event Of Occurrence, Offense, Claim or Suit (Section IV – Commercial General Liability Conditions) is amended as follows:

1. Paragraph **c.(3)** is deleted and replaced by the following:

c. You and any other involved insured must:

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

2. Paragraph **d.** is deleted and replaced by the following:

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

H. Condition 4. Other Insurance (Section IV – Commercial General Liability Conditions) is amended as follows:

The first two paragraphs of paragraph **b.** are deleted and replaced by the following:

b. Excess Insurance

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(2) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner; or

(3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I – Coverages).

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

I. DEFINITIONS (Section V) is amended as follows:

1. Definition 8. "insured contract" is amended as follows:

a. Subpart **f.(2)(a)** is deleted and replaced by the following:

(a) Preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

COMMERCIAL GENERAL LIABILITY

b.  Subpart **f.(3)** is deleted and replaced by the following:

(3)  Under which the insured, if an architect, engineer or surveyor, assumes liability for injury or damage arising out of the insured's rendering or failing to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

2.  Definition **14.** "products-completed operations hazard" is amended as follows:

Paragraph **c.(1)** is deleted and replaced by the following:

c.  This hazard does not include "bodily injury" or "property damage" arising out of:

(1)  The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

3.  Definition **16.** "suit" is deleted and replaced by the following:

"Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

a.  An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b.  Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WEB XTEND—LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY (SECTION I – COVERAGES)** is deleted in its entirety and replaced by the following:

**COVERAGE B. PERSONAL INJURY, ADVERTISING INJURY AND WEB SITE INJURY LIABILITY**

1. **Insuring Agreement.**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury", "advertising injury" or "web site injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury", "advertising injury", or "web site injury" to which this insurance does not apply. We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION – III); and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

   b. This insurance applies to:

      (1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

      (2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services; or

      (3) "Web site injury" caused by an offense committed in the course of the visual or audio presentation of material on "your web site" or in the numerical expression of computer code used to enable "your web site";

   but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions.**

   This insurance does not apply to:

   a. "Personal injury", "advertising injury" or "web site injury":

      (1) Arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity;

      (2) Arising out of oral, written or electronic publication of material whose first publication took place before the beginning of the policy period;

      (3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured; or

      (4) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

   b. Any loss, cost or expense arising out of any:

      (1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants; or

      (2) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of, pollutants.

     Copyright, The Travelers Indemnity Company, 2001

COMMERCIAL GENERAL LIABILITY

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

c. "Personal injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability:

(1) Assumed in a contract or agreement that is an "insured contract", provided the "personal injury" arises out of an offense committed subsequent to the execution of the contract or agreement; or

(2) That the insured would have in the absence of the contract or agreement.

d. "Advertising injury" arising out of:

(1) Breach of contract;

(2) The failure of goods, products or services to conform with advertised quality or performance;

(3) The wrong description of the price of goods, products or services;

(4) An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting; or

(5) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

e. "Web site injury":

(1) arising out of:

(a) Breach of contract;

(b) The failure of goods, products or services to conform with advertised quality or performance;

(c) The wrong description of the price of goods, products or services;

(d) Dishonest, fraudulent, criminal or malicious acts, errors or omissions committed by any insured, or by anyone for whom the insured is legally responsible, whether acting alone or with others;

(e) An offense committed by any insured whose business is providing access

to intellectual property of others via "your web site".

(f) The hosting of an electronic chatroom or bulletin board.

(2) expected or intended by any insured.

**SECTION II – WHO IS AN INSURED**

The introductory sentence of paragraph 2. a. (1) Section II – Who Is An Insured is deleted and replaced by the following:

2. a. (1) "Bodily injury", "personal injury" or "web site injury":

Section II – Who Is An Insured, paragraph 4. c., is deleted and replaced by the following:

4. c. Coverage B does not apply to "personal injury", "advertising injury" or "web site injury" arising out of an offense committed before you acquired or formed the organization.

**SECTION III – LIMITS OF INSURANCE**

**SECTION III – Limits Of Insurance, paragraph 4**, is deleted and replaced by the following:

4. Subject to 2. above, the Personal, Advertising and Web Site Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal injury", "advertising injury" and all "web site injury" sustained by any one person or organization.

**SECTION V – DEFINITIONS**

**ADVERTISING INJURY**

The definition of **"Advertising injury"** (SECTION V – DEFINITIONS) is deleted in its entirety and replaced by the following:

1. "Advertising injury" means injury, arising out of one or more of the following offenses:

a. Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. Oral, written or electronic publication of material that violates a person's right of privacy;

c. Infringement of copyright, title or slogan.

**COVERAGE TERRITORY**

The definition of **"Coverage Territory"**, (SECTION V – DEFINITIONS) is deleted in its entirety and replaced by the following:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

    Copyright, The Travelers Indemnity Company, 2001    CG D2 34 02 01

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

**c.** All parts of the world if:

   **(1)** The injury or damage arises out of:

      **(a)** Goods or products made or sold by you in the territory described in a. above;

      **(b)** The activities of a person whose home is in the territory described in a. above, but who is away for a short time on your business; or

      **(c)** "Personal injury", "advertising injury", and "web site injury" offenses that take place through the Internet or similar electronic means of communication; and

   **(2)** The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

## INSURED CONTRACT

Subparagraph f. of the definition of **"Insured Contract"** (SECTION V – DEFINITIONS) is deleted and replaced by the following:

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury", "property damage" or "personal injury" to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

## PERSONAL INJURY

The definition of **"Personal injury" (SECTION V – DEFINITIONS)** is deleted in its entirety and replaced by the following:

"Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occu-

pies by or on behalf of its owner, landlord or lessor;

**d.** Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

**e.** Oral, written or electronic publication of material that violates a person's right of privacy.

## SUIT

The definition of **"Suit" (SECTION V – DEFINITIONS)** is deleted in its entirety and replaced by the following:

"Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal injury", "advertising injury" or "web site injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

The following definitions are added to **SECTION V – DEFINITIONS**

## WEB SITE INJURY

**"Web site injury"**, means injury, other than "personal injury" or "advertising injury", arising out of one or more of the following offenses:

**a.** Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**b.** Oral, written or electronic publication of material that violates a person's right of privacy;

**c.** Oral, written or electronic publication of material that violates a person's right of publicity; or

**d.** Infringement of copyright, title or slogan.

## YOUR WEB SITE

**"Your web site"** means all computer files and data which may be accessed via the Internet using a Universal Resource Locator that includes any domain name owned by or assigned to you.

 Copyright, The Travelers Indemnity Company, 2001

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT—RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to paragraph 2., Exclusions of COVERAGE A—BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages):

This insurance does not apply to:

1. "Bodily injury" to:

   **a.** A person arising out of any:

   **(1)** Refusal to employ that person;

   **(2)** Termination of that person's employment; or

   **(3)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

   **b.** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in paragraphs (1), (2) or (3) above is directed.

This exclusion applies

**a.** whether the insured may be held liable as an employer or in any other capacity; and

**b.** to any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to paragraph 2., Exclusions of COVERAGE B—PERSONAL AND ADVERTISING INJURY LIABILITY (Section I – Coverages):

This insurance does not apply to:

1. "Personal injury" to:

   **a.** A person arising out of any:

   **(1)** Refusal to employ that person;

   **(2)** Termination of that person's employment; or

   **(3)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or discrimination directed at that person; or

   **b.** The spouse, child, parent, brother or sister of that person as a consequence of "personal injury" to that person at whom any of the employment-related practices described in paragraphs (1), (2) or (3) above is directed.

This exclusion applies:

**a.** Whether the insured may be liable as an employer or in any other capacity; and

**b.** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION—DISCRIMINATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

1. **COVERAGE A – BODILY INJURY AND PROP-ERTY DAMAGE LIABILITY** – is amended by ad-ding the following additional exclusion:

    (This Insurance does not apply to:)

    "Bodily injury" resulting from or as a consequence of discrimination, whether intentional or uninten-tional, based upon a person's sex, sexual prefer-ence, marital status, race, creed, religion, na-tional origin, age, physical capabilities, character-istics or condition, or mental capabilities or con-dition.

2. **COVERAGE B – PERSONAL AND ADVERTIS-ING INJURY LIABILITY** – is amended by adding the following additional exclusion:

    (This insurance does not apply to:)

    "Personal injury" resulting from or as a conse-quence of discrimination, whether intentional or unintentional, based upon a person's sex, sexual preference, marital status, race, creed, religion, national origin, age, physical capabilities, charac-teristics or condition, or mental capabilities or condition.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF POLLUTION EXCLUSION – EXCEPTION FOR BUILDING HEATING EQUIPMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART

Subparagraph **(1)(a)** of the **Pollution** exclusion under Paragraph 2., **Exclusions of Bodily Injury And Property Damage Liability** Coverage **(Section I – Coverages)** is replaced by the following:

This insurance does not apply to:

**POLLUTION**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.

However, Subparagraph **(a)** does not apply to "bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building.

**CG D1 92 08 97**          Copyright, Travelers Indemnity Company, 1997          Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – WAR

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **i.** under Paragraph **2.**, **Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions:**

This insurance does not apply to:

**i. War**

"Bodily injury" or "property damage" arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war; or

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these

regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

**B.** The following exclusion is added to Paragraph **2.**, **Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions:**

This insurance does not apply to:

**War**

"Personal injury" or "advertising injury" arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war; or

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these

regardless of any other cause or event that contributes concurrently or in any sequence to the injury.

    Copyright, The Travelers Indemnity Company, 2002

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION—ASBESTOS

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> CATASTROPHE UMBRELLA POLICY

This insurance does not apply to "bodily injury," "property damage," "personal injury" or "advertising injury" arising out of the actual or alleged presence or actual, alleged or threatened dispersal of asbestos, asbestos fibers or products containing asbestos, provided that the injury or damage is caused or contributed to by the hazardous properties of asbestos. This includes:

a. Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with the above; and

b. Any obligation to share damages with or repay someone else who must pay damages because of such injury or damage.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES – INSURED CONTRACT

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    COMMERCIAL GENERAL LIABILITY – CONTRACTORS COVERAGE PART

The following is added to COMMERCIAL GENERAL LIABILITY DEFINITIONS (Section V):

Definition 8., "Insured contract" is amended to add the following:

"Insured contract" does not include your liability to a third party by reason of a Claim or suit against you by that third party for contribution under the Illinois Joint Tortfeasor Contribution Act for damages claimed against such third party as a result of injury to your employee if you have that liability because you have waived, in a contract, your right to limit such liability to the amount of the workers compensation benefits paid for that injured employee under the Illinois Workers Compensation Act.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITATION WHEN TWO OR MORE POLICIES APPLY

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> EMPLOYEE BENEFITS LIABILITY COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

## PROVISIONS

1. Injury, damage or loss might be covered by this policy and also by other policies issued to you by us or any affiliate. When these other policies contain a provision similar to this one, the amount we will pay is limited. The maximum that we will pay under all such policies combined is the highest limit that applies in any one of these policies.

2. This does not apply to any personal liability policy or to any policy with a policy number containing the letters CUP, EX, PRS, SPS, XS or IXL.

**CG T3 33 12 88**                                                    Page 1 of 1

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES-CANCELLATION AND NONRENEWAL

This endorsement modifies insurance under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

A. CANCELLATION (Common Policy Conditions) is replaced by the following:

**CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

2. **a.** We may cancel this policy by mailing to you written notice stating the reason for cancellation.

   **b.** If we cancel for nonpayment of premium, we will mail the notice at least 10 days prior to the effective date of cancellation.

   **c.** If we cancel for a reason other than nonpayment of premium, we will mail the notice at least;

      **(1)** 30 days prior to the effective date of cancellation if the policy has been in effect for 60 days or less.

      **(2)** 60 days prior to the effective date of cancellation if the policy has been in effect for more than 60 days.

3. If this policy has been in effect for more than 60 days, we may cancel only for one or more of the following reasons:

   **a.** Nonpayment of premium;

   **b.** The policy was obtained through a material misrepresentation;

   **c.** Any insured has violated any of the terms and conditions of the policy;

   **d.** The risk originally accepted has measurably increased;

   **e.** Certification of the Director of Insurance of the loss of reinsurance by the insurer that provided coverage to us for all or a substantial part of the underlying risk insured; or

   **f.** A determination by the Director of Insurance that the continuation of the policy could place us in violation of the insurance laws of this State.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund will be less than pro rata. The cancellation will be effective even if we have not offered a refund.

B. The following is added and supercedes any provision to the contrary:

**NONRENEWAL**

1. If we decide not to renew this policy, we will mail written notice stating the reason for non-renewal no less than 60 days before the expiration date to:

   **a.** You; and

   **b.** The broker, if known to us, or the agent of record.

2. Even if we do not comply with these terms, this policy will terminate:

   **a.** On the expiration date, if:

      **(1)** You fail to perform any of your obligations in connection with the payment of the premium for the policy, or any installment payment, whether payable directly to us or our agents or indirectly under any premium finance plan or extension of credit; or

      **(2)** We have indicated our willingness to renew this policy to you or your representative; or

      **(3)** You have notified us or our agent that you do not want to renew this policy.

   **b.** On the effective date of any other insurance replacing this policy.

C. Mailing of Notices

We will mail cancellation and nonrenewal notices to you, and the agent or broker, at the last addresses known to us. Proof of mailing will be sufficient proof of notice.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FEDERAL TERRORISM RISK INSURANCE ACT DISCLOSURE

This endorsement applies to the insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE FORM – CONTRACTORS
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY - NEW YORK DEPARTMENT OF TRANSPORTATION
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
ENVIRONMENTAL HAZARD POLICY
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
ELECTRONIC MANUFACTURERS AND COMPUTER SERVICES ERRORS AND OMISSIONS LIABILITY COVERAGE FORM
SELF-INSURED EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE FORM
SELF-INSURED EXCESS LIQUOR LIABILITY COVERAGE FORM
SELF-INSURED EXCESS EMPLOYEE BENEFITS LIABILITY COVERAGE FORM
SELF-INSURED EXCESS PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE
EXCESS (FOLLOWING FORM) LIABILITY INSURANCE

**PROVISIONS**

On November 26, 2002, the President of the United States signed into law the Terrorism Risk Insurance Act of 2002 (the "Act"). The Act establishes a short-term program under which the Federal Government will share in the payment of *"Insured Losses"* caused by certain *"Acts of Terrorism"* (each as defined in the Act).

In the event of an *Insured Loss,* Travelers is responsible for a deductible of one percent (1%) of Travelers *"Direct Earned Premiums"* (as used in the Act) for the calendar year 2001 for *Insured Losses* occurring from November 26, 2002 through December 31, 2002; seven percent (7%) of Travelers *Direct Earned Premiums* for the calendar year 2002 for *Insured Losses* occurring during calendar year 2003; ten percent (10%) of Travelers *Direct Earned Premiums* for the calendar year 2003 for *Insured Losses* occurring during calendar year 2004; or fifteen percent (15%) of Travelers *Direct Earned Premiums* for the calendar year 2004 for *Insured Losses* occurring during calendar year 2005. The Federal Government's share of compensation for *Insured Losses* in each year is 90% of the amount of *Insured Losses* in excess of Travelers deductible for that year. Travelers is responsible for the payment of the remaining 10% of *Insured Losses.* In no event,

however, will the Federal Government or any *"Insurer"* (as defined in the Act) be required to pay any portion of the amount of aggregate *Insured Losses* occurring in any one year that exceeds $100,000,000,000, provided that such *Insurer* has met its deductible.

As a requirement of the Act, *Insurers* must make available *"Property and Casualty Insurance"* (as defined in the Act) coverage for *Insured Losses* that does not differ materially from the terms, amounts and other coverage limitations that apply to losses arising from events other than *Acts of Terrorism.* In other words, a loss will not be excluded just because it was caused by an *Act of Terrorism;* conversely, a loss will not be covered just because it was caused by an *Act of Terrorism.* The Act also requires *Insurers* to disclose to policyholders the premium charge for providing such terrorism coverage.

Please note that this Coverage Part <u>does not</u> contain an exclusion that specifically excludes coverage for *Insured Losses.* The charge for this exposure is included in the Coverage Part premium indicated in your policy. The charge that has been included for this Coverage Part is:

- 1% of each applicable Commercial Liability Coverage premium.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
## (Broad Form)

This endorsement modifies Insurance provided under the following:

BUSINESSOWNERS POLICY
COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF
    TRANSPORTATION
UNDERGROUND STORAGE TANK POLICY

1. The Insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2.　As used in this endorsement:

"Hazardous properties" include radioactive, toxic or explosive properties;

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a)　Any "nuclear reactor";

(b)　Any equipment or device designed or used for
　　(1) separating the isotopes of uranium or plu-

tonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c)　Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d)　Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

Copyright, Insurance Services Office, Inc., 1997
IL 00 21 04 98

CHANGE EFFECTIVE DATE: 01-01-04
CHANGE ENDORSEMENT NUMBER: 0001

One Tower Square, Hartford, Connecticut 06183

**Travelers**

CHANGE ENDORSEMENT

Named Insured:
TORTILLERIA ATOTONILCO, INC.

Policy Number: Y-630-843K1319-TCT-04
Policy Effective Date: 01/01/04
Issue Date: 03/25/04
Premium $ 0

INSURING COMPANY:
THE TRAVELERS INDEMNITY COMPANY OF CONNECTICUT

Effective from 01/01/04 at the time of day the policy becomes effective.

THIS INSURANCE IS AMENDED AS FOLLOWS:


"THE ACTUAL EFFECTIVE DATE OF THIS ENDORSEMENT IS 03/03/04."

THE COMMERCIAL GENERAL LIABILITY COVERAGE PART IS AMENDED AS FOLLOWS:

AMENDING ENDORSEMENT CG 20 13 11 85, ADDITIONAL INSURED-STATE OR
POLITICAL SUBDIVISIONS-PERMITS RELATING TO PREMISES, TO INCLUDE CHICAGO
DEPARTMENT OF TRANSPORTATION.


PREMIUM IS PAYABLE AS FOLLOWS:

DUE ON 01/01/04      $ 0
DUE ON 00/00/00      $ SEE IL TO 30

NAME AND ADDRESS OF AGENT OR BROKER:          COUNTERSIGNED BY:
SUMMIT INS AGCY INC (F4279)
PO BOX 170
SUMMIT, IL 60501                               _____
                                              Authorized Representative
                                              DATE: _____

IL TO 07 09 87     PAGE 1 OF 1                 OFFICE: NAPERVILLE IL

CHANGE EFFECTIVE DATE: 01-01-04
CHANGE ENDORSEMENT NUMBER: 0001



|                    |              |
|--------------------|--------------|
| **POLICY NUMBER:** | Y-630-843K1319-TCT-04 |
| **EFFECTIVE DATE:** | 01-01-04 |
| **ISSUE DATE:** | 03-25-04 |

LISTING OF FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

THIS LISTING SHOWS THE NUMBER OF FORMS, SCHEDULES AND ENDORSEMENTS
BY LINE OF BUSINESS.

```
IL T0 07 09 87    CHANGE ENDORSEMENT
IL T8 01 10 93    FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS
IL T0 30 12 90    NON-STANDARD PAYMENT SCHEDULE
```

COMMERCIAL GENERAL LIABILITY

```
CG 20 13 11 85    ADD'L INS-STATE OR POL SUB-PERMITS-PRM
```

IL T8 01 10 93                                   PAGE:   1 OF   1

NON-STANDARD PAYMENT SCHEDULE

POLICY NUMBER: Y-630-843K1319-TCT-04
EFFECTIVE DATE:  01/01/04
ISSUE DATE: 03/25/04

PAYMENT DUE DATES                    AMOUNT

01/01/04                             0.00

IL T0 30 12 90       PAGE  1 OF  1

OFFICE: NAPERVILLE IL        888
PRODUCER NAME: SUMMIT INS AGCY INC              F4279

POLICY NUMBER:  Y-630-843K1319-TCT-04

COMMERCIAL GENERAL LIABILITY
ISSUE DATE:  03-25-04

### THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED–STATE OR POLITICAL SUBDIVISIONS–PERMITS RELATING TO PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**State or Political Subdivision:**

CITY OF CHICAGO

121 N. LASALLE

CHICAGO                    IL 60601

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured any state or political subdivision shown in the Schedule, subject to the following additional provision:

This insurance applies only with respect to the following hazards for which the state or political subdivision has issued a permit in connection with premises you own, rent, or control and to which this insurance applies:

1. The existence, maintenance, repair, construction, erection, or removal of advertising signs, awnings, canopies, cellar entrances, coal holes, driveways, manholes, marquees, hoist away openings, sidewalk vaults, street banners, or decorations and similar exposures; or

2. The construction, erection, or removal of elevators; or

3. The ownership, maintenance, or use of any elevators covered by this insurance.

**CG 20 13 11 85**          Copyright, Insurance Services Office, Inc., 1984          Page 1 of 1

POLICY NUMBER:   Y-630-843K1319-TCT-04

COMMERCIAL GENERAL LIABILITY
ISSUE DATE:   03-25-04

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED–STATE OR POLITICAL SUBDIVISIONS–PERMITS RELATING TO PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

**State or Political Subdivision:**

CHICAGO DEPARTMENT OF
TRANSPORTATION

DRIVEWAY PERMITS
121 N LASALLE, ROOM 905
CHICAGO                IL 60602

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured any state or political subdivision shown in the Schedule, subject to the following additional provision:

This insurance applies only with respect to the following hazards for which the state or political subdivision has issued a permit in connection with premises you own, rent, or control and to which this insurance applies:

1. The existence, maintenance, repair, construction, erection, or removal of advertising signs, awnings, canopies, cellar entrances, coal holes, driveways, manholes, marquees, hoist away openings, sidewalk vaults, street banners, or decorations and similar exposures; or

2. The construction, erection, or removal of elevators; or

3. The ownership, maintenance, or use of any elevators covered by this insurance.

**CG 20 13 11 85**          Copyright, Insurance Services Office, Inc., 1984          Page 1 of 1

CHANGE EFFECTIVE DATE: 01-01-04
CHANGE ENDORSEMENT NUMBER: 0002

One Tower Square, Hartford, Connecticut 06183

**Travelers**

CHANGE ENDORSEMENT

Named Insured:
TORTILLERIA ATOTONILCO, INC.

Policy Number: Y-630-843K1319-TCT-04
Policy Effective Date: 01/01/04
Issue Date: 05/13/04
Additional Premium $ 17,642

INSURING COMPANY:
THE TRAVELERS INDEMNITY COMPANY OF CONNECTICUT

Effective from 01/01/04 at the time of day the policy becomes effective.

THIS INSURANCE IS AMENDED AS FOLLOWS:

THE COMMERCIAL GENERAL LIABILITY COVERAGE PART IS AMENDED AS FOLLOWS:

DECLARATIONS PREMIUM SCHEDULE CG T0 07 09 87 IS AMENDED AS FOLLOWS DUE
TO AUDIT:

AMENDING LOCATION 1, BUILDING 1, CLASS CODE 20990 EXPOSURE TO

PREMIUM IS PAYABLE AS FOLLOWS:

DUE ON 01/01/04
DUE ON 02/01/04      $ SEE IL T0 30

NAME AND ADDRESS OF AGENT OR BROKER:                    COUNTERSIGNED BY:
SUMMIT INS AGCY INC (F4279)
PO BOX 170
SUMMIT, IL 60501                                        Authorized Representative

DATE:_____

IL T0 07 09 87      PAGE  1 OF 1
OFFICE: NAPERVILLE IL

CHANGE EFFECTIVE DATE: 01-01-04
CHANGE ENDORSEMENT NUMBER: 0002

 **Travelers**

POLICY NUMBER: Y-630-843K1319-TCT-04

EFFECTIVE DATE: 01-01-04

ISSUE DATE: 05-13-04

LISTING OF FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

THIS LISTING SHOWS THE NUMBER OF FORMS, SCHEDULES AND ENDORSEMENTS
BY LINE OF BUSINESS.

```
IL T0 07 09 87    CHANGE ENDORSEMENT
IL T8 01 10 93    FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS
IL T0 30 12 90    NON-STANDARD PAYMENT SCHEDULE
```

IL T8 01 10 93                                    PAGE:   1 OF   1

NON-STANDARD PAYMENT SCHEDULE

POLICY NUMBER: Y-630-843K1319-TCT-04
EFFECTIVE DATE:  01/01/04
ISSUE DATE: 05/13/04

PAYMENT DUE DATES                           AMOUNT

        01/01/04
        02/01/04
        03/01/04
        04/01/04
        05/01/04
        06/01/04
        07/01/04
        08/01/04
        09/01/04
        10/01/04

IL T0 30 12 90      PAGE  1 OF  1

OFFICE: NAPERVILLE IL        888
PRODUCER NAME: SUMMIT INS AGCY INC                    F4279

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION--INTERCOMPANY PRODUCTS SUITS

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

This insurance does not apply to any claim for damages by any Named Insured against another Named Insured because of "bodily injury" or "property damage" arising out of "your products" and included within the "products-completed operations hazard."

        Copyright, Insurance Services Office, Inc., 1984        

One Tower Square, Hartford, Connecticut 06183      PH       **Travelers**

REAL ESTATE OWNERS
COMMON POLICY DECLARATIONS
ISSUE DATE: 01/16/04

POLICY NUMBER: Y-660-843K1356-TIL-04

INSURING COMPANY:
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

1. **NAMED INSURED AND MAILING ADDRESS:**
   TAQUERIA ATOTONILCO II,
   ATOTONILCO 2, INC. DBA  (AS PER IL T8 00)
   1707 W 47TH ST
   CHICAGO, IL 60609

2. **POLICY PERIOD:**  From 01/01/04 to 01/01/05 12:01 A.M. Standard Time at
                                                    your mailing address.

3. **LOCATIONS**
   Premises  Bldg.
   Loc. No.  No.  Occupancy              Address

   SEE IL T0 03

4. **COVERAGE PARTS FORMING PART OF THIS POLICY AND INSURING COMPANIES:**
   COMMERCIAL PROPERTY COV PART DECLARATIONS         CP T0 11 01 03 TIL
   COMMERCIAL GENERAL LIABILITY COV PART DECLARATIONS  CG T0 01 03 94 TIL
   COMMERCIAL CRIME COV PART DECLARATIONS            CR T0 01 07 86 TIL
   COMMERCIAL INLAND MARINE COV PART DECLARATIONS    CM T0 01 07 86 TIL

5. **NUMBERS OF FORMS AND ENDORSEMENTS**
   FORMING A PART OF THIS POLICY:   SEE IL T8 01 10 93

6. **SUPPLEMENTAL POLICIES:** Each of the following is a separate policy
                                  containing its complete provisions:
   Policy                    Policy No.              Insuring Company

7. **PREMIUM SUMMARY:**
   Provisional Premium    $
   Due at Inception       $
   Due at Each            $ SEE IL T0 30

NAME AND ADDRESS OF AGENT OR BROKER:        COUNTERSIGNED BY:
   SUMMIT INS AGCY INC (F4279)
   PO BOX 170
   SUMMIT, IL 60501                         Authorized Representative
                                            DATE:

IL T0 02 11 89    PAGE 1 OF 1            OFFICE: NAPERVILLE IL



EXHIBIT
F

**CERTIFIED POLICY**

The policy to which this certification is affixed is a true and accurate copy of the policy contained in company records and used in the regular course of business as of the date shown below. No representation or warranty is made that this copy is identical in all respects to the policy issued.

No insurance is afforded by ~~████████~~

*Travelers Prop CasCo. of America*     *H.E. Fitts*
Name of Insuring Company

*660-843K1356*     Date: *5-1-08*
Policy Number



POLICY NUMBER: Y-660-843K1356-TIL-04

EFFECTIVE DATE: 01-01-04

ISSUE DATE: 01-16-04

LISTING OF FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

THIS LISTING SHOWS THE NUMBER OF FORMS, SCHEDULES AND ENDORSEMENTS
BY LINE OF BUSINESS.

```
IL T0 02 11 89    COMMON POLICY DECLARATIONS
IL T8 01 10 93    FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS
IL T0 01 12 94    COMMON POLICY CONDITIONS
IL T0 30 12 90    NON-STANDARD PAYMENT SCHEDULE
IL T0 03 04 96    LOCATION SCHEDULE
IL T8 00          GENERAL PURPOSE ENDORSEMENT
```

COMMERCIAL PROPERTY

```
CP T0 11 01 03    COMMERCIAL PROPERTY DECLARATIONS
CP T0 05 04 94    MORTGAGEE SCHEDULE
CP 12 18 06 95    LOSS PAYABLE PROVISIONS
CP T0 00 01 03    TABLE OF CONTENTS
CP 00 90 07 88    COMMERCIAL PROPERTY CONDITIONS
CP T1 00 01 03    BUILDING & PERSONAL PROPERTY COV FORM
CP T1 04 01 03    BUSINESS INCOME COV FORM W/EE
CP T1 08 01 03    CAUSES OF LOSS-SPECIAL FORM
CP 04 40 06 95    SPOILAGE COVERAGE
CP T8 00          GENERAL PURPOSE ENDORSEMENT
CP 04 05 10 00    ORDINANCE OR LAW COVERAGE
CP 04 17 06 95    UTILITY SERVICES - DIRECT DAMAGE
CP 15 45 06 95    UTILITY SERVICES - TIME ELEMENT
CP T3 81 11 02    TERRORISM RISK INS ACT 2002 DISCLOSURE
```

COMMERCIAL GENERAL LIABILITY

```
CG T0 01 03 94    COMM'L GENERAL LIABILITY DEC
CG T0 07 09 87    DECLARATIONS PREMIUM SCHEDULE
CG T0 08 07 86    KEY TO DECLARATIONS PREMIUM SCHEDULE
CG T0 34 10 93    TABLE OF CONTENTS
CG 00 01 10 93    COMMERCIAL GENERAL LIABILITY COV FORM
CG T8 00          GENERAL PURPOSE ENDORSEMENT
CG 00 57 09 99    AMENDMENT OF INSURING AGRMNT-KNOWN INJ
CG 20 13 11 85    ADD'L INS-STATE OR POL SUB-PERMITS-PRM
CG 21 70 11 02    CAP ON LOSSES CERTIFIED ACTS TERRORISM
CG 24 07 11 85    PROD/COMPL OPERATIONS HAZARD REDEFINED
CG D0 37 01 99    OTHER INSURANCE-ADDITIONAL INSUREDS
CG D1 94 11 97    CHGS IN COMMERCIAL GENERAL LIAB COV FORM
CG D2 34 02 01    WEB XTEND - LIABILITY
CG 21 00 11 85    EXC-HAZARD-CONNECTED DESIGNATED EXPOSURE
CG 21 47 10 93    EMPLOYMENT-RELATED PRACTICES EXCLUSION
CG D0 76 06 93    EXCLUSION-LEAD
CG D1 42 01 99    EXCLUSION-DISCRIMINATION
CG D1 92 08 97    AMEND POLL EXCL-EXCEPT BLDG HEAT EQUIP
```



POLICY NUMBER:  Y-660-843K1356-TIL-04

EFFECTIVE DATE:  01-01-04

ISSUE DATE:  01-16-04

COMMERCIAL GENERAL LIABILITY (CONTINUED)

```
CG D2 42 01 02   EXCLUSION WAR
CG T4 78 02 90   EXCLUSION-ASBESTOS
CG F2 11 01 01   ILLINOIS CHANGES - INSURED CONTRACT
CG T3 33 12 88   LIMIT WHEN TWO OR MORE POLICIES APPLY
CG 02 00 04 87   IL CHANGES -CANCELLATION AND NONRENEWAL
```

INLAND MARINE

```
CM A0 14 08 93   SIGN DEC
CM T0 11 01 88   TABLE OF CONTENTS
CM 00 01 06 95   COMMERCIAL INLAND MARINE CONDITIONS
CM 00 28 06 95   SIGNS COVERAGE FORM
CM T3 98 11 02   TERRORISM RISK INS ACT 2002 DISCLOSURE
CM 01 28 03 99   ILLINOIS CHANGES - INTENTIONAL ACTS
CM 02 04 04 87   ILLINOIS CHANGES
```

CRIME

```
CR T0 01 07 86   COMMERCIAL CRIME COVERAGE DECLARATION
CR T0 14 10 90   TABLE OF CONTENTS
CR 10 00 10 90   CRIME GENERAL PROVISIONS
CR 00 01 10 90   EMPLOYEE DISHONESTY COV FORM - BLANKET
CR 00 04 10 90   THEFT/DISAPPEARANCE/DESTRUCTION COVERAGE
CR T3 11 11 02   TERRORISM RISK INS ACT 2002 DISCLOSURE
CR 10 04 01 89   EXCLUDE TRADING LOSS
CR 10 05 01 86   EXCLUDE WAREHOUSE RECEIPTS LOSSES
CR 02 02 06 90   ILLINOIS CHANGES
```

INTERLINE ENDORSEMENTS

```
IL T3 68 11 02   FEDERAL TERRORISM RISK INSURANCE ACT
IL 00 21 04 98   NUCLEAR ENERGY LIABILITY EXCLUSION
IL 01 18 03 99   ILLINOIS CHANGES
IL 02 84 05 90   IL CHANGES-CANCELLATION AND NONRENEWAL
IL 04 15 04 98   PROTECTIVE SAFEGUARDS
IL 09 52 11 02   CAP LOSSES-CERTIFIED ACTS OF TERRORISM
IL T3 55 08 98   EXCL OF CERTAIN COMPUTER REL LOSSES
IL T9 01 07 86   ILLINOIS INSURANCE IN THE TIL
IL T0 10 04 94   LENDERS CERTIFICATE  OF INSURANCE-FORM A
IL T0 11 03 96   LENDERS' CERTIFICATE OF INSURANCE-FORM B
```

IL T8 01 10 93                                      PAGE:   2 OF   2

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions:

## A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy or any Coverage Part by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. If the policy is cancelled, that date will become the end of the policy period. If a Coverage Part is cancelled, that date will become the end of the policy period as respects that Coverage Part only.

5. If this policy or any Coverage Part is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us as part of this policy.

## C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. INSPECTIONS AND SURVEYS

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

   Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   1. Are safe or healthful; or

   2. Comply with laws, regulations, codes or standards.

   This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

## E. PREMIUMS

1. The first Named Insured shown in the Declarations:

   a. Is responsible for the payment of all premiums; and

   b. Will be the payee for any return premiums we pay.

2. We compute all premiums for this policy in accordance with our rules, rates, rating plans, premiums and minimum premiums. The premium shown in the Declarations was computed based on rates and rules in effect at the time the policy was issued. On each renewal continuation or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

## F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have rights and duties but only with respect to that property.

Includes copyrighted material of Insurance Services Office, with its permission.   Copyright, Insurance Services Office, 1989

This policy consists of the Common Policy Declarations and the Coverage Parts and endorsements listed in that declarations form.

In return for payment of the premium, The Travelers agrees with the Named Insured to provide the insurance afforded by a Coverage Part forming part of this policy. That insurance will be provided by the company indicated as insuring company in the Common Policy Declarations by the abbreviation of its name opposite that Coverage Part.

The companies listed below (each a stock company) have executed this policy, but it is valid only if countersigned on the Common Policy Declarations by our authorized representative.

The Travelers Indemnity Company (IND)
The Phoenix Insurance Company (PHX)
The Charter Oak Fire Insurance Company (COF)
The Travelers Indemnity Company of Illinois (TIL)
* The Travelers Indemnity Company of Connecticut (TCT)
The Travelers Indemnity Company of America (TIA)

*Formerly known as the Travelers Indemnity Company of Rhode Island (TRI)

_Secretary_                                _President_

The Travelers Insurance Company (INS)

_Secretary_                                _President_

NON-STANDARD PAYMENT SCHEDULE

POLICY NUMBER: Y-660-843K1356-TIL-04
EFFECTIVE DATE:  01/01/04
ISSUE DATE: 01/16/04

PAYMENT DUE DATES                    AMOUNT

      01/01/04
      02/01/04
      03/01/04
      04/01/04
      05/01/04
      06/01/04
      07/01/04
      08/01/04
      09/01/04
      10/01/04

IL T0 30 12 90        PAGE  1 OF  1

OFFICE: NAPERVILLE IL          888
PRODUCER NAME: SUMMIT INS AGCY INC                F4279

**LOCATION SCHEDULE**                    **POLICY NUMBER:** Y-660-843K1356-TIL-04

This Schedule of Locations and Buildings applies to the Common Policy Declarations for the period
01-01-04 to 01-01-05 .

| Loc. No. | Bldg. No. | Address | Occupancy |
|---|---|---|---|
| 1 | 1 | 1650-60 W 47TH ST<br>CHICAGO, IL 60609 | MERCANTILE |
| 2 | 2 | 1651-53 W 47TH ST<br>CHICAGO, IL 60609 | PARKING LOT |
| 3 | 3 | 2001 W 47TH ST<br>CHICAGO, IL 60609 | APARTMENTS |
| 4 | 4 | 2003-05 W 47TH ST<br>CHICAGO, IL 60609 | APARTMENTS |
| 4 | 5 | 2003-05 W 47TH ST<br>CHICAGO, IL 60609 | GARAGE |
| 5 | 6 | 1640-1644 N PULASKI<br>CHICAGO, IL 60609 | BANQUET HALL |
| 6 | 7 | 4745 S HERMITAGE<br>CHICAGO, IL 60609 | APARTMENTS |
| 6 | 8 | 4745 S HERMITAGE<br>CHICAGO, IL 60609 | GARAGE |
| 7 | 9 | 1649 W 47TH ST<br>CHICAGO, IL 60609 | RESTAURANT |
| 8 | 10 | 4538 S MARSHFIELD<br>CHICAGO, IL 60609 | VACANT BUILDING - CGL ONLY |
| 9 | 11 | 6922 W 111TH ST<br>WORTH, IL 60482 | RESTAURANT |
| 9 | 12 | 6922 W 111TH ST<br>WORTH, IL 60482 | ADDL GLASS COVERAGE FOR 09/11 |
| 10 | 13 | 5656 S KEDZIE<br>CHICAGO, IL 60609 | RESTAURANT |

IL T0 03 04 96                                    Page     1

**LOCATION SCHEDULE**                     **POLICY NUMBER:** Y-660-843K1356-TIL-04

This Schedule of Locations and Buildings applies to the Common Policy Declarations for the period
01-01-04  to  01-01-05 .

| Loc. No. | Bldg. No. | Address | Occupancy |
|---|---|---|---|
| 10 | 14 | 5656 S KEDZIE<br>CHICAGO, IL 60609 | ADDL GLASS COVERAGE FOR 10/13 |
| 11 | 15 | 5659 S SAWYER<br>CHICAGO, IL 60632 | PARKING LOT |
| 12 | 16 | W.HALF OF THE S.E.QUARTER OF SEC 23<br>TOWNSHIP 31 N, RANGE 12 EAST<br>KANKAKEE CO, IL 60901 | FARM LAND - LESSORS RISK |
| 13 | 17 | 1648 N PULASKI<br>CHICAGO, IL 60609 | PARKING LOT |
| 14 | 18 | 1629-37 S BLUE ISLAND<br>CHICAGO, IL 60608 | APARTMENT/MERCANTILE |
| 15 | 19 | 4129 S. WOLCOTT<br>CHICAGO, IL 60609 | INDUSTRIAL BUILDING |
| 16 | 20 | 5347-5353 S. KEDZIE<br>CHICAGO, IL 60609 | VACANT LAND |

IL T0 03 04 96                                         Page    2  (END)

POLICY NUMBER: Y-660-843K1356-TIL-04          GENERAL PURPOSE ENDORSEMENT

ITEM 1 NAMED INSURED TO READ:

TAQUERIA ATOTONILCO II, ATOTONILCO 2, INC. DBA

COLE TAYLOR BANK FORMERLY KNOWN AS
COLE TAYLOR BANK/DROVERS FORMERLY KNOWN AS
THE DROVERS NATIONAL BANK OF CHICAGO,
A NATIONAL BANKING ASSOCIATION, A/T/U/T #75183, DATED 09/23/75

AMERICAN NATIONAL BANK A/T/U/T #057373-0-9

MARQUETTE NATIONAL BANK A/T/U/T #8122
AND ALL BENEFICIARIES THEREUNDER AND AGENTS THEREOF

WESTERN NATIONAL BANK OF CICIERO A/T/U/T #8065
AND ALL BENEFICIARIES THEREUNDER

AMERICAN NATIONAL BANK & TRUST CO. A/T/U/T #120140-07, DATED 02/28/95

TAQUERIA ATOTONILCO., TORTILLERIA TAQUERIA ATOTONILCO #1, INC. DBA

TAQUERIA ATOTONILCO., OSCAR, INC. DBA

AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO
A/T/U/T AGREEMENT DATED 02/01/1999 AND KNOWN AS TRUST #124837-07

LOC. 1, BLDG. 1          COLE TAYLOR BANK A/T/U/T #92-2065 DATED 06/22/92
                         AND ALL BENEFICIARIES THEREUNDER

LOC. 2, BLDG. 2          COLE TAYLOR BANK A/T/U/T #92-2065 DATED 06/22/92
                         AND ALL BENEFICIARIES THEREUNDER

LOC. 9, BLDG. 11 & 12    COLE TAYLOR BANK A/T/U/T #97-7195, DATED 04/02/97

LOC. 8, BLDG. 10         AMERICAN NATIONAL BANK #117313-04

LOC. 11, BLDG. 15        OSCAR MUNOZ

LOC. 13, BLDG. 17        OSCAR MUNOZ

LOC. 14, BLDG. 18        LASALLE BANK NATIONAL ASSOCIATION TRUST #131136
                         DATED 4/11/2003

LOC. 15, BLDG. 19        OSCAR MUNOZ

LOC. 16, BLDG. 20        LASALLE BANK NATIONAL ASSOCIATION U/T 1201407
                         DATED 2/28/95

**GENERAL LIABILITY**



One Tower Square, Hartford, Connecticut  06183



**COMMERCIAL GENERAL LIABILITY**          **POLICY NO.:**  Y-660-843K1356-TIL-04
**COVERAGE PART DECLARATIONS**             **ISSUE DATE:**  01-16-04

**INSURING COMPANY:**
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

**DECLARATIONS PERIOD:** From 01-01-04 to 01-01-05  12:01 A.M. Standard Time at your mailing address shown in the Common Policy Declarations.

The Commercial General Liability Coverage Part consists of these Declarations and the Coverage Form shown below.

1. **COVERAGE AND LIMITS OF INSURANCE:**

   **COMMERCIAL GENERAL LIABILITY COVERAGE FORM**          **LIMITS OF INSURANCE**

| | |
|---|---|
| General Aggregate Limit<br>   (Other than Products-Completed Operations) | $   2,000,000 |
| Products-Completed Operations Aggregate Limit | $   2,000,000 |
| Personal & Advertising Injury Limit | $   1,000,000 |
| Each Occurrence Limit | $   1,000,000 |
| Fire Damage Limit (any one fire) | $     100,000 |
| Medical Expense Limit (any one person) | $       5,000 |

2. **AUDIT PERIOD:**  ANNUAL

3. **FORM OF BUSINESS:** INDIVIDUAL

4. **NUMBERS OF FORMS, SCHEDULES AND ENDORSEMENTS FORMING PART OF THIS COVERAGE PART ARE ATTACHED AS A SEPARATE LISTING.**

## COMMERCIAL GENERAL LIABILITY COVERAGE
## IS SUBJECT TO A GENERAL AGGREGATE LIMIT

CG T0 01 03 94                                                      Page 1 of 1

PRODUCER: SUMMIT INS AGCY INC          F4279     OFFICE: NAPERVILLE IL          888

**DECLARATIONS PREMIUM SCHEDULE**          **POLICY NUMBER:** Y-660-843K1356-TIL-04

This Schedule applies to the Declarations for the period of   01-01-04   to   01-01-05

It shows all of your known rating classes as of the effective date.  Any exceptions will be so noted.  This includes all locations you own, rent or occupy.

| OPN NO. | LOC/ BLDG NO. | CLASS DESCRIPT/ CODE NO. | SUBLINE | PREMIUM BASE/ EXPOSURE | RATES | ADVANCE PREMIUM |
|---|---|---|---|---|---|---|
| | | MINIMUM PREMIUMS | | | | |
| | | PREM/OPS | $166 | | | |
| | | PROD/C-OPS | $342 | | | |
| | | LOB | $250 | | | |
| | 1/ 1 | OFFICE, MERCANTILE OR MANUFACTURING BUILDINGS (LRO); MAINTAINED BY OR ON BEHALF OF THE INSURED INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | | | | |
| 001 | | 65121 | PREM/OPS | A | | |
| | 2/ 2 | PARKING - PRIVATE - INDOOR OR OUTDOOR INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | | | | |
| 002 | | 65202 | PREM/OPS | A | | |
| | 3/ 3 | APARTMENT BUILDINGS (LRO) INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | | | | |
| 003 | | 65130 | PREM/OPS | U | | |
| | 4/ 4 | APARTMENT BUILDINGS (LRO) INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | | | | |
| 004 | | 65130 | PREM/OPS | U | | |
| | 5/ 6 | OFFICE, MERCANTILE OR MANUFACTURING BUILDINGS (LRO); MAINTAINED BY OR ON BEHALF OF THE INSURED INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | | | | |
| 005 | | 65121 | PREM/OPS | A | | |
| | 6/ 7 | APARTMENT BUILDINGS (LRO) INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | | | | |
| 006 | | 65130 | PREM/OPS | U | | |

*This class is subject to the prem/ops transition program.

☐ If an "X" is entered in this box, these Declarations are completed on the Premium Schedule Extension CG T0 12.

CG T0 07 09 87                                        PAGE    1

**DECLARATIONS PREMIUM SCHEDULE**         **POLICY NUMBER:** Y-660-843K1356-TIL-04

This Schedule applies to the Declarations for the period of   01-01-04   to   01-01-05

It shows all of your known rating classes as of the effective date.  Any exceptions will be so noted.  This includes all locations you own, rent or occupy.

| OPN NO. | LOC/ BLDG NO. | CLASS DESCRIPT/ CODE NO. | SUBLINE | PREMIUM BASE/ EXPOSURE | RATES | ADVANCE PREMIUM |
|---|---|---|---|---|---|---|
| | 7/ 9 | RESTAURANTS - WITH NO SALE OF ALCOHOLIC BEVERAGES - WITHOUT DANCE FLOOR | | | | |
| 007 | | 84583 | PREM/OPS | S | | |
| 008 | | | PROD/C-OPS | S | | |
| | 8/ 10 | VACANT BUILDINGS - OTHER THAN FACTORIES INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | | | | |
| 009 | | 65192 | PREM/OPS | A | | |
| | 9/ 11 | OFFICE, MERCANTILE OR MANUFACTURING BUILDINGS (LRO); MAINTAINED BY OR ON BEHALF OF THE INSURED INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | | | | |
| 010 | | 65121 | PREM/OPS | A | | |
| | 10/ 13 | RESTAURANTS - WITH NO SALE OF ALCOHOLIC BEVERAGES - WITHOUT DANCE FLOOR | | | | |
| 011 | | 84583 | PREM/OPS | S | | |
| 012 | | | PROD/C-OPS | S | | |
| | 11/ 15 | PARKING - PRIVATE - INDOOR OR OUTDOOR INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | | | | |
| 013 | | 65202 | PREM/OPS | A | | |
| | 12/ 16 | LAND - OCCUPIED BY PERSONS OTHER THAN THE INSURED FOR BUSINESS PURPOSES - (LESSOR'S RISK ONLY) INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | | | | |
| 014 | | 84984 EACH | PREM/OPS | T FLAT CHARGE ACRE | | |
| | 13/ 17 | PARKING - PRIVATE - INDOOR OR OUTDOOR INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | | | | |
| 015 | | 65202 | PREM/OPS | A | | |

*This class is subject to the prem/ops transition program.

☐ If an "X" is entered in this box, these Declarations are completed on the Premium Schedule Extension CG T0 12.

CG T0 07 09 87                                              PAGE      2

**DECLARATIONS PREMIUM SCHEDULE**          **POLICY NUMBER:** Y-660-843K1356-TIL-04

This Schedule applies to the Declarations for the period of   01-01-04   to   01-01-05

It shows all of your known rating classes as of the effective date.  Any exceptions will be so noted.  This includes all locations you own, rent or occupy.

| OPN NO. | LOC/ BLDG NO. | CLASS DESCRIPT/ CODE NO. | SUBLINE | PREMIUM BASE/ EXPOSURE | RATES | ADVANCE PREMIUM |
|---|---|---|---|---|---|---|
| | 14/ 18 | OFFICE, MERCANTILE OR MANUFACTURING BUILDINGS (LRO); MAINTAINED BY OR ON BEHALF OF THE INSURED INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | | | | |
| 016 | | 65121 | PREM/OPS | A | | |
| | 14/ 18 | APARTMENT BUILDINGS (LRO) INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | | | | |
| 017 | | 65130 | PREM/OPS | U | | |
| | 15/ 19 | OFFICE, MERCANTILE OR MANUFACTURING BUILDINGS (LRO); MAINTAINED BY OR ON BEHALF OF THE INSURED INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | | | | |
| 018 | | 65121 | PREM/OPS | A | | |
| | 16/ 20 | VACANT LAND INCLUDING PRODUCTS AND/OR COMPLETED OPERATIONS | | | | |
| 019 | | 65190 EACH | PREM/OPS | T ACRE | 1 | |
| | | COVERAGE PART TOTAL | | | | |

*This class is subject to the prem/ops transition program.

☐ If an "X" is entered in this box, these Declarations are completed on the Premium Schedule Extension CG T0 12.

CG T0 07 09 87                              PAGE     3  (END)

# KEY TO DECLARATIONS PREMIUM SCHEDULE

**ABBREVIATIONS:**

— CLASS DESCRIP — means CLASS DESCRIPTION

— LOC/BLDG NO. — means LOCATION/BUILDING NUMBER

— OPN NO. — means OPERATION NUMBER

— PREM/OPS — means PREMISES/OPERATIONS

— PROD/C-OPS — means PRODUCTS/COMPLETED OPERATIONS

**PREMIUM BASE:**

| Key Letter | Premium Base | How Rates Apply |
|---|---|---|
| a | Area | per 1,000 square feet |
| c | Total Cost | per $1,000 of total cost |
| m | Admissions | per 1,000 admissions |
| p | Payroll | per $1,000 of payroll |
| s | Gross Sales | per $1,000 of gross sales |
| t | (see note * below) | (see note * below) |
| u | Units | per unit |

*Premium base t is used for a number of rarely used premium bases.
The specific base and how rates apply are shown with the Class Description
on the DECLARATIONS-PREMIUM SCHEDULE.

**CG T0 08 07 86**

**TABLE OF CONTENTS**

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM
## (CG 00 01 10 93)

SECTION I--COVERAGES

Beginning on Page

Coverage A--              Insuring Agreement ................................. 1
  Bodily Injury
  and Property            Exclusions .......................................... 1
  Damage Liability

Coverage B--              Insuring Agreement ................................. 4
  Personal and
  Advertising             Exclusions .......................................... 4
  Injury Liability

Coverage C--              Insuring Agreement ................................. 4
  Medical Payments        Exclusions .......................................... 5

Supplementary Payments                                                       5

SECTION II--WHO IS AN INSURED ............................................... 5

SECTION III--LIMITS OF INSURANCE ........................................... 6

SECTION IV--COMMERCIAL GENERAL LIABILITY CONDITIONS ........................ 7

  Bankruptcy ................................................................. 7
  Duties in the Event of Occurrence, Claim or Suit .......................... 7
  Legal Action Against Us ................................................... 7
  Other Insurance ........................................................... 8
  Premium Audit ............................................................. 8
  Representations ........................................................... 8
  Separation of Insureds .................................................... 8
  Transfer of Rights of Recovery Against Others To Us ....................... 9
  When We Do Not Renew ...................................................... 9

SECTION V--DEFINITIONS ..................................................... 9

CG T0 34 10 93

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us"' and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (SECTION II).

Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (SECTION V).

## SECTION I – COVERAGES

### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement.**

  **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:

    **(1)** The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

    **(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

  No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

  **b.** This insurance applies to "bodily injury" and "property damage" only if:

    **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

    **(2)** The "bodily injury" or "property damage" occurs during the policy period.

  **c.** Damages because of "`bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

**2. Exclusions.**

This insurance does not apply to:

  **a.** Expected or Intended Injury

  "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

  **b.** Contractual Liability

  "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

    **(1)** Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "`property damage" occurs subsequent to the execution of the contract or agreement; or

    **(2)** That the insured would have in the absence of the contract or agreement.

  **c.** Liquor Liability

  "Bodily injury" or "property damage" for which any insured may be held liable by reason of:

    **(1)** Causing or contributing to the intoxication of any person;

    **(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

    **(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

  This exclusion applies only if you are in the business of manufacturing distributing, selling, serving or furnishing alcoholic beverages.

Copyright, Insurance Services Office, Inc., 1992

COMMERCIAL GENERAL LIABILITY

**d.** Workers Compensation and Similar Laws

Any obligation of the insured under a workers compensation, disability benefits or unemployment compensation law or any similar law.

**e.** Employer's Liability

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of (1) above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract."

**f.** Pollution

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

**(i)** if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

**(ii)** if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

Subparagraphs (a) and (d)(i) do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**g.** Aircraft, Auto or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

Copyright, Insurance Services Office, Inc., 1992    **CG 00 01 10 93**

COMMERCIAL GENERAL LIABILITY

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph f.(2) or f.(3) of the definition of "mobile equipment".

**h.** Mobile Equipment

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i.** War

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j.** Damage to Property

"Property damage" to:

**(1)** Property you own, rent, or occupy;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**k.** Damage to Your Product

"Property damage" to "your product" arising out of it or any part of it.

**l.** Damage to Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.** Damage to Impaired Property or Property Not Physically Injured

"Property damage" to "impaired property" or property that has not been physically injured arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.** Recall of Products, Work or Impaired Property

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

COMMERCIAL GENERAL LIABILITY

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in LIMITS OF INSURANCE (SECTION III).

## COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY

1. **Insuring Agreement.**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

   b. This insurance applies to:

      (1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

      (2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;

      but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions.**

   This insurance does not apply to:

   a. "Personal injury" or "advertising injury":

      (1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

      (2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

      (3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured; or

      (4) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

   b. "Advertising injury'" arising out of:

      (1) Breach of contract, other than misappropriation of advertising ideas under an implied contract;

      (2) The failure of goods, products or services to conform with advertised quality or performance;

      (3) The wrong description of the price of goods, products or services; or

      (4) An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

## COVERAGE C. MEDICAL PAYMENTS

1. Insuring Agreement.

   a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

      (1) On premises you own or rent;

      (2) On ways next to premises you own or rent; or

      (3) Because of your operations;

      provided that:

      (1) The accident takes place in the "coverage territory" and during the policy period;

      (2) The expenses are incurred and reported to us within one year of the date of the accident; and

      (3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

   b. We will make these payments regardless of fault. These payments will not exceed the

Copyright, Insurance Services Office, Inc., 1992                    CG 00 01 10 93

COMMERCIAL GENERAL LIABILITY

applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**.

We will not pay expenses for "bodily injury":

**a.** To any insured.

**b.** To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c.** To a person injured on that part of premises you own or rent that the person normally occupies.

**d.** To a person, whether or not an "employee" of any insured, if benefits for the "`bodily injury`" are payable or must be provided under a workers compensation or disability benefits law or a similar law.

**e.** To a person injured while taking part in athletics.

**f.** Included within the "products-completed operations hazard."

**g.** Excluded under Coverage A.

**h.** Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

We will pay with respect to any claim or "suit" we defend:

**1.** All expenses we incur.

**2.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**3.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**4.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $100 a day because of time off from work.

**5.** All costs taxed against the insured in the "suit."

**6.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**7.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**SECTION II – WHO IS AN INSURED**

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** An organization other than a partnership or joint venture, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**2.** Each of the following is also an insured:

**a.** Your "employees," other than your "executive officers," but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, no "employee" is an insured for:

(1) "Bodily injury" or "personal injury":

(a) To you, to your partners or members (if you are a partnership or joint venture), or to a co-"employee" while in the course of his or her employment or while performing duties related to the conduct of your business;

(b) To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of paragraph (1)(a) above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs (1)(a) or (b) above; or

 Copyright, Insurance Services Office, Inc., 1992

COMMERCIAL GENERAL LIABILITY

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees" or, if you are a partnership or joint venture, by any partner or member.

**b.** Any person (other than your "employee"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

**a.** "Bodily injury" to a co-"employee" of the person driving the equipment; or

**b.** "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**4.** Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage B does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits."

**2.** The General Aggregate Limit is the most we will pay for the sum of:

**a.** Medical expenses under Coverage C;

**b.** Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**c.** Damages under Coverage B.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard."

**4.** Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal injury" and all "advertising injury" sustained by any one person or organization.

**5.** Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under Coverage A; and

**b.** Medical expenses under Coverage C

because of all "bodily injury" and "property damage" arising out of any one "occurrence."

    Copyright, Insurance Services Office, Inc., 1992    **CG 00 01 10 93**

COMMERCIAL GENERAL LIABILITY

6. Subject to 5. above, the Fire Damage Limit is the most we will pay under Coverage A for damages because of "property damage" to premises, while rented to you or temporarily occupied by you with permission of the owner, arising out of any one fire.

7. Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

1. **Bankruptcy.**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit.**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation, settlement or defense of the claim or "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us.**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Other Insurance.**

   If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

   a. **Primary Insurance**

      This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

COMMERCIAL GENERAL LIABILITY

**b. Excess Insurance**

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

**(1)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(2)** That is Fire insurance for premises rented to you; or

**(3)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I).

When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit.**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations.**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds.**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us.**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew.**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

Copyright, Insurance Services Office, Inc., 1992
CG 00 01 10 93

COMMERCIAL GENERAL LIABILITY

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V – DEFINITIONS

1. "Advertising injury" means injury arising out of one or more of the following offenses:

   a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   b. Oral or written publication of material that violates a person's right of privacy;

   c. Misappropriation of advertising ideas or style of doing business; or

   d. Infringement of copyright, title or slogan.

2. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment."

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

   c. All parts of the world if:

      (1) The injury or damage arises out of:

         (a) Goods or products made or sold by you in the territory described in a. above; or

         (b) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and

      (2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker." "Employee" does not include a "temporary worker."

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

   b. Your fulfilling the terms of the contract or agreement.

8. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph f. does not include that part of any contract or agreement:

   (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

   (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

COMMERCIAL GENERAL LIABILITY

(a) Preparing, approving or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection or engineering services.

9. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

10. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

11. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance but not construction or surfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

12. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

13. "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

e. Oral or written publication of material that violates a person's right of privacy.

    Copyright, Insurance Services Office, Inc., 1992    CG 00 01 10 93

COMMERCIAL GENERAL LIABILITY

**14. a.** "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

  **(1)** Products that are still in your physical possession; or

  **(2)** Work that has not yet been completed or abandoned.

**b.** "Your work" will be deemed completed at the earliest of the following times:

  **(1)** When all of the work called for in your contract has been completed.

  **(2)** When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

  **(3)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

  Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**c.** This hazard does not include "bodily injury" or "property damage" arising out of:

  **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it;

  **(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

  **(3)** Products or operations for which the classification in this Coverage Part or in our manual of rules includes products or completed operations.

**15.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

**16.** "Suit" means a civil proceeding in which damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

**17.** "Your product" means:

**a.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

  **(1)** You;

  **(2)** Others trading under your name; or

  **(3)** A person or organization whose business or assets you have acquired; and

**b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**b.** The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**18.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**19.** "Your work" means:

**a.** Work or operations performed by you or on your behalf; and

**b.** Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**b.** The providing of or failure to provide warnings or instructions.

POLICY NUMBER: Y-660-843K1356-TIL-04

COMMERCIAL GENERAL LIABILITY
GENERAL PURPOSE ENDORSEMENT

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

DESIGNATED ENTITIES - LIMITATION OF COVERAGE TO DESIGNATED PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

Designated Person(s) or Organization(s):

Oscar Munoz

Designated Premises:

Loc. 11, Bldg. 15    5659 S Sawyer, Chicago IL 60632

Loc. 13, Bldg. 17    1648 N Pulaski, Chicago IL 60609

Loc. 15, Bldg. 19    4129 S Wolcott, Chicago IL 60609

PROVISIONS

With respect to the Person(s) or Organization(s) designated in the Schedule
above, this insurance applies only to "bodily injury", "property damage",
"personal injury", "advertising injury" and medical expenses arising out of
the ownership, maintenance or use of the premises shown in the Schedule above
and operations necessary or incidental to those premises.

**CG T8 00**                                                          Page    1

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURING AGREEMENT— KNOWN INJURY OR DAMAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART (OCCURRENCE VERSION)

Paragraph **1. Insuring Agreement** of Section I – **Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

1. **Insuring Agreement**

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

        (1) The amount we will pay for damages is limited as described in Section III – Limit Of Insurance; and

        (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

        No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

    b. This insurance applies to "bodily injury" and "property damage" only if:

        (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        (2) The "bodily injury" or "property damage" occurs during the policy period; and

        (3) Prior to the policy period, no insured listed under Paragraph **1.** of Section II – Who Is An Insured and no "employee" authorized by you to give or receive no-

tice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

    c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

    d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

        (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

        (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

        (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

    e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

CG 00 57 09 99                    Copyright, Insurance Services Office, Inc., 1998                    Page 1 of 1

POLICY NUMBER:  Y-660-843K1356-TIL-04

COMMERCIAL GENERAL LIABILITY
ISSUE DATE:  01-16-04

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED–STATE OR POLITICAL SUBDIVISIONS–PERMITS RELATING TO PREMISES

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

**State or Political Subdivision:**

CITY OF CHICAGO
DEPARTMENT OF TRANSPORTATION


30 N LASALLE STE 100

CHICAGO                IL 60602

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured any state or political subdivision shown in the Schedule, subject to the following additional provision:

This insurance applies only with respect to the following hazards for which the state or political subdivision has issued a permit in connection with premises you own, rent, or control and to which this insurance applies:

1. The existence, maintenance, repair, construction, erection, or removal of advertising signs, awnings, canopies, cellar entrances, coal holes, driveways, manholes, marquees, hoist away openings, sidewalk vaults, street banners, or decorations and similar exposures; or

2. The construction, erection, or removal of elevators; or

3. The ownership, maintenance, or use of any elevators covered by this insurance.

**CG 20 13 11 85**          Copyright, Insurance Services Office, Inc., 1984          Page 1 of 1

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> UNDERGROUND STORAGE TANK POLICY

With respect to any one or more "certified acts of terrorism", we will not pay any amounts for which we are not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 (including subsequent acts of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a "certified act of terrorism":

1. The act resulted in aggregate losses in excess of $5 million; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

POLICY NUMBER: Y-660-843K1356-TIL-04

COMMERCIAL GENERAL LIABILITY
ISSUE DATE: 01-16-04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PRODUCTS/COMPLETED OPERATIONS HAZARD REDEFINED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

**Description of Premises and Operations:**

RESTAURANTS-WITH NO SALE OF ALCOHOLIC
BEVERAGES W/O DANCE FLOOR

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to "bodily injury" or "property damage" arising out of "your products" manufactured, sold, handled or distributed:

1. On, from or in connection with the use of any premises described in the Schedule, or

2. In connection with the conduct of any operation described in the Schedule, when conducted by you or on your behalf,

Paragraph a. of the definition of "Products - completed operations hazard" in the DEFINITIONS Section is replaced by the following:

a. "Products - completed operations hazard" includes all "bodily injury" and "property damage" that arises out of "your products" if the "bodily injury" or "property damage" occurs after you have relinquished possession of those products.

**CG 24 07 11 85**          Copyright, Insurance Services Office, Inc., 1984          Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OTHER INSURANCE – ADDITIONAL INSUREDS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

Paragraph 4.b. of CONDITIONS (SECTION IV) is amended as follows:

**b.** Excess Insurance

This insurance is excess over any of the other insurance; whether primary, excess, contingent or on any other basis:

**(1)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk, or similar coverage for "your work";

**(2)** That is Fire Insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(3)** If the loss arises out of the maintenance or use of aircraft, "autos", or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I); or

**(4)** That is valid and collectible insurance available to you if you are added as an additional insured under any other policy.

When this insurance is excess, we will have no duty under Coverage A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGES IN COMMERCIAL GENERAL LIABILITY COVERAGE FORM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

PROVISIONS

**A.** Paragraph **1.a.** of COVERAGE A. – BODILY IN-JURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages) is deleted and replaced by the following:

   **1. Insuring Agreement**

     **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

       **(1)** The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

       **(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

     No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

**B.** Paragraph **2.b.** of COVERAGE A. – BODILY IN-JURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages) is deleted and replaced by the following:

   **2. Exclusions**

     This insurance does not apply to:

     **b.** "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

       **(1)** That the insured would have in the absence of the contract or agreement; or

       **(2)** Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

         **(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

         **(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**C.** Paragraph **1.a.** of COVERAGE B. – PERSONAL AND ADVERTISING INJURY LIABILITY (Section I – Coverages) is deleted and replaced by the following:

   **1. Insuring Agreement**

     **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance

COMMERCIAL GENERAL LIABILITY

applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury" or "advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

D. The following is added to Paragraph 2. Exclusions of COVERAGE B. – PERSONAL AND ADVERTISING INJURY LIABILITY (Section I – Coverages):

(This insurance does not apply to:)

1. "Personal injury" or "advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

2. Any loss, cost or expense arising out of any:

a. Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

b. Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

E. SUPPLEMENTARY PAYMENTS – COVERAGES A AND B (Section I – Coverages) is amended as follows:

1. The first sentence is deleted and replaced by the following:

We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

2. Paragraph 4. is deleted and replaced by the following:

4. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

3. The following is added:

If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and we agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

    Copyright, Travelers Indemnity Company, 1997    **CG D1 94 11 97**

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of paragraph **2.b.(2)** of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages), such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys fees and necessary litigation expenses as Supplementary Payments ends when:

**a.** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

**b.** The conditions set forth above, or the terms of the agreement described in paragraph f. above, are no longer met.

**F.** WHO IS AN INSURED (Section II) is amended as follows in order to specifically include Limited Liability Companies:

**1.** Paragraphs **1.** and **2.a.** are deleted and replaced by the following:

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to

the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**2.** Each of the following is also an insured:

**a.** Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

(1) "Bodily injury" or "personal injury";

(a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

(b) To the spouse , child, parent, brother or sister of that co-"employee" as a conse-

    Copyright, Travelers Indemnity Company, 1997

COMMERCIAL GENERAL LIABILITY

quence of paragraph **(1)(a)** above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs **(1)(a)** or **(b)** above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property;

(a) Owned, occupied or used by,

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

2. The first sentence of paragraph **4.** is deleted and replaced by the following:

Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

3. The final paragraph is deleted and replaced by the following:

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**G.** Condition **2.** Duties In The Event Of Occurrence, Offense, Claim or Suit (Section IV – Commercial General Liability Conditions) is amended as follows:

1. Paragraph **c.(3)** is deleted and replaced by the following:

c. You and any other involved insured must:

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

2. Paragraph **d.** is deleted and replaced by the following:

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**H.** Condition **4.** Other Insurance (Section IV – Commercial General Liability Conditions) is amended as follows:

The first two paragraphs of paragraph **b.** are deleted and replaced by the following:

b. Excess Insurance

This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(2) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner; or

(3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I – Coverages).

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**I.** DEFINITIONS (Section V) is amended as follows:

1. Definition **8.** "insured contract" is amended as follows:

a. Subpart **f.(2)(a)** is deleted and replaced by the following:

(a) Preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**b.** Subpart **f.(3)** is deleted and replaced by the following:

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for injury or damage arising out of the insured's rendering or failing to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**2.** Definition **14.** "products-completed operations hazard" is amended as follows:

Paragraph **c.(1)** is deleted and replaced by the following:

**c.** This hazard does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**3.** Definition **16.** "suit" is deleted and replaced by the following:

"Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

Copyright, Travelers Indemnity Company, 1997

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WEB XTEND—LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY (SECTION I – COVERAGES)** is deleted in its entirety and replaced by the following:

**COVERAGE B. PERSONAL INJURY, ADVERTISING INJURY AND WEB SITE INJURY LIABILITY**

1. **Insuring Agreement.**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury", "advertising injury" or "web site injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury", "advertising injury", or "web site injury" to which this insurance does not apply. We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION – III); and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.

   b. This insurance applies to:

      (1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

      (2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services; or

      (3) "Web site injury" caused by an offense committed in the course of the visual or audio presentation of material on "your web site" or in the numerical expression of computer code used to enable "your web site";

   but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions.**

   This insurance does not apply to:

   a. "Personal injury", "advertising injury" or "web site injury":

      (1) Arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity;

      (2) Arising out of oral, written or electronic publication of material whose first publication took place before the beginning of the policy period;

      (3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured; or

      (4) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

   b. Any loss, cost or expense arising out of any:

      (1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants; or

      (2) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of, pollutants.

COMMERCIAL GENERAL LIABILITY

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**c.** "Personal injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability:

**(1)** Assumed in a contract or agreement that is an "insured contract", provided the "personal injury" arises out of an offense committed subsequent to the execution of the contract or agreement; or

**(2)** That the insured would have in the absence of the contract or agreement.

**d.** "Advertising injury" arising out of:

**(1)** Breach of contract;

**(2)** The failure of goods, products or services to conform with advertised quality or performance;

**(3)** The wrong description of the price of goods, products or services;

**(4)** An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting; or

**(5)** For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**e.** "Web site injury":

**(1)** arising out of:

**(a)** Breach of contract;

**(b)** The failure of goods, products or services to conform with advertised quality or performance;

**(c)** The wrong description of the price of goods, products or services;

**(d)** Dishonest, fraudulent, criminal or malicious acts, errors or omissions committed by any insured, or by anyone for whom the insured is legally responsible, whether acting alone or with others;

**(e)** An offense committed by any insured whose business is providing access

to intellectual property of others via "your web site".

**(f)** The hosting of an electronic chatroom or bulletin board.

**(2)** expected or intended by any insured.

**SECTION II – WHO IS AN INSURED**

The introductory sentence of paragraph 2. a. (1) Section II – Who Is An Insured is deleted and replaced by the following:

**2. a. (1)** "Bodily injury", "personal injury" or "web site injury":

Section II – Who Is An Insured, paragraph 4. c., is deleted and replaced by the following:

**4. c.** Coverage B does not apply to "personal injury", "advertising injury" or "web site injury" arising out of an offense committed before you acquired or formed the organization.

**SECTION III – LIMITS OF INSURANCE**

**SECTION III – Limits Of Insurance, paragraph 4**, is deleted and replaced by the following:

**4.** Subject to 2. above, the Personal, Advertising and Web Site Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal injury", "advertising injury" and all "web site injury" sustained by any one person or organization.

**SECTION V – DEFINITIONS**

**ADVERTISING INJURY**

The definition of **"Advertising injury" (SECTION V – DEFINITIONS)** is deleted in its entirety and replaced by the following:

**1.** "Advertising injury" means injury, arising out of one or more of the following offenses:

**a.** Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**b.** Oral, written or electronic publication of material that violates a person's right of privacy;

**c.** Infringement of copyright, title or slogan.

**COVERAGE TERRITORY**

The definition of **"Coverage Territory", (SECTION V – DEFINITIONS)** is deleted in its entirety and replaced by the following:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

        Copyright, The Travelers Indemnity Company, 2001        **CG D2 34 02 01**

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

**c.** All parts of the world if:

  **(1)** The injury or damage arises out of:

    **(a)** Goods or products made or sold by you in the territory described in a. above;

    **(b)** The activities of a person whose home is in the territory described in a. above, but who is away for a short time on your business; or

    **(c)** "Personal injury", "advertising injury", and "web site injury" offenses that take place through the Internet or similar electronic means of communication; and

  **(2)** The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

## INSURED CONTRACT

Subparagraph f. of the definition of **"Insured Contract"** (SECTION V – DEFINITIONS) is deleted and replaced by the following:

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury", "property damage" or "personal injury" to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

## PERSONAL INJURY

The definition of **"Personal injury"** (SECTION V – DEFINITIONS) is deleted in its entirety and replaced by the following:

"Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occu-

pies by or on behalf of its owner, landlord or lessor;

**d.** Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

**e.** Oral, written or electronic publication of material that violates a person's right of privacy.

## SUIT

The definition of **"Suit"** (SECTION V – DEFINITIONS) is deleted in its entirety and replaced by the following:

"Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal injury", "advertising injury" or "web site injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

The following definitions are added to **SECTION V – DEFINITIONS**

## WEB SITE INJURY

**"Web site injury"**, means injury, other than "personal injury" or "advertising injury", arising out of one or more of the following offenses:

**a.** Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**b.** Oral, written or electronic publication of material that violates a person's right of privacy;

**c.** Oral, written or electronic publication of material that violates a person's right of publicity; or

**d.** Infringement of copyright, title or slogan.

## YOUR WEB SITE

**"Your web site"** means all computer files and data which may be accessed via the Internet using a Universal Resource Locator that includes any domain name owned by or assigned to you.

POLICY NUMBER: Y-660-843K1356-TIL-04

COMMERCIAL GENERAL LIABILITY
ISSUE DATE: 01-16-04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - ALL HAZARDS IN CONNECTION WITH DESIGNATED PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Description and Location of Premises:**

1335 - 1337 W 37TH PL, CHICAGO IL 60608

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance does not apply to "bodily injury," "property damage," "personal injury," or "advertising injury" arising out of:

1. The ownership, maintenance or use of the premises shown in the Schedule or any property located on these premises;

2. Operations on those premises shown in the Schedule or any property located on these premises; or

3. Goods or products manufactured at or distributed from those premises.

**CG 21 00 11 85**         Copyright, Insurance Services Office, Inc., 1984         Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT—RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to paragraph 2., Exclusions of COVERAGE A—BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages):

This insurance does not apply to:

**1.** "Bodily injury" to:

  **a.** A person arising out of any:

   **(1)** Refusal to employ that person;

   **(2)** Termination of that person's employment; or

   **(3)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

  **b.** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in paragraphs (1), (2) or (3) above is directed.

This exclusion applies

  **a.** whether the insured may be held liable as an employer or in any other capacity; and

  **b.** to any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to paragraph 2., Exclusions of COVERAGE B—PERSONAL AND ADVERTISING INJURY LIABILITY (Section I – Coverages):

This insurance does not apply to:

**1.** "Personal injury" to:

  **a.** A person arising out of any:

   **(1)** Refusal to employ that person;

   **(2)** Termination of that person's employment; or

   **(3)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or discrimination directed at that person; or

  **b.** The spouse, child, parent, brother or sister of that person as a consequence of "personal injury" to that person at whom any of the employment-related practices described in paragraphs (1), (2) or (3) above is directed.

This exclusion applies:

  **a.** Whether the insured may be liable as an employer or in any other capacity; and

  **b.** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION—LEAD

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
CATASTROPHE UMBRELLA POLICY

**PROVISIONS**

This insurance does not apply to any injury, damage, loss, cost, payment or expense, including, but not limited to, defense and investigation, of any kind arising out of, resulting from, caused by or contributed to by the actual or alleged presence or actual, alleged or threatened dispersal, release, ingestion, inhalation or absorption of lead, lead compounds or lead which is or was contained or incorporated into any material or substance. This exclusion applies, but is not limited to:

1. Any supervision, instructions, recommendations, warnings or advice given in connection with the above;

2. Any obligation to share damages, losses, costs, payments or expenses with or repay someone else who must make payment because of such injury or damage, loss, cost, payment or expense; or

3. Any request, order or requirement to abate, mitigate, remediate, contain, remove or dispose of lead, lead compounds or materials or substances containing lead.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION—DISCRIMINATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**PROVISIONS**

**1. COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** – is amended by adding the following additional exclusion:

(This Insurance does not apply to:)

"Bodily injury" resulting from or as a consequence of discrimination, whether intentional or unintentional, based upon a person's sex, sexual preference, marital status, race, creed, religion, national origin, age, physical capabilities, characteristics or condition, or mental capabilities or condition.

**2. COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY** – is amended by adding the following additional exclusion:

(This insurance does not apply to:)

"Personal injury" resulting from or as a consequence of discrimination, whether intentional or unintentional, based upon a person's sex, sexual preference, marital status, race, creed, religion, national origin, age, physical capabilities, characteristics or condition, or mental capabilities or condition.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF POLLUTION EXCLUSION – EXCEPTION FOR BUILDING HEATING EQUIPMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART

Subparagraph **(1)(a)** of the **Pollution** exclusion under Paragraph **2., Exclusions of Bodily Injury And Property Damage Liability** Coverage **(Section I – Coverages)** is replaced by the following:

This insurance does not apply to:

**POLLUTION**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.

However, Subparagraph **(a)** does not apply to "bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – WAR

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **i.** under Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions:**

This insurance does not apply to:

**i. War**

"Bodily injury" or "property damage" arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war; or

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these

regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

**B.** The following exclusion is added to Paragraph **2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions:**

This insurance does not apply to:

**War**

"Personal injury" or "advertising injury" arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war; or

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these

regardless of any other cause or event that contributes concurrently or in any sequence to the injury.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION — ASBESTOS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
CATASTROPHE UMBRELLA POLICY

This insurance does not apply to "bodily injury," "property damage," "personal injury" or "advertising injury" arising out of the actual or alleged presence or actual, alleged or threatened dispersal of asbestos, asbestos fibers or products containing asbestos, provided that the injury or damage is caused or contributed to by the hazardous properties of asbestos. This includes:

a. Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with the above; and

b. Any obligation to share damages with or repay someone else who must pay damages because of such injury or damage.

**CG T4 78 02 90**          Copyright, The Travelers Indemnity Company.          Page 1 of 1

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES – INSURED CONTRACT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL GENERAL LIABILITY – CONTRACTORS COVERAGE PART

The following is added to COMMERCIAL GENERAL LIABILITY DEFINITIONS (Section V):

Definition 8., "Insured contract" is amended to add the following:

"Insured contract" does not include your liability to a third party by reason of a Claim or suit against you by that third party for contribution under the Illinois Joint Tortfeasor Contribution Act for damages claimed against such third party as a result of injury to your employee if you have that liability because you have waived, in a contract, your right to limit such liability to the amount of the workers compensation benefits paid for that injured employee under the Illinois Workers Compensation Act.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITATION WHEN TWO OR MORE POLICIES APPLY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

## PROVISIONS

1. Injury, damage or loss might be covered by this policy and also by other policies issued to you by us or any affiliate. When these other policies contain a provision similar to this one, the amount we will pay is limited. The maximum that we will pay under all such policies combined is the highest limit that applies in any one of these policies.

2. This does not apply to any personal liability policy or to any policy with a policy number containing the letters CUP, EX, PRS, SPS, XS or IXL.

CG T3 33 12 88

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES-CANCELLATION AND NONRENEWAL

This endorsement modifies insurance under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**A.** CANCELLATION (Common Policy Conditions) is replaced by the following:

**CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

2. **a.** We may cancel this policy by mailing to you written notice stating the reason for cancellation.

   **b.** If we cancel for nonpayment of premium, we will mail the notice at least 10 days prior to the effective date of cancellation.

   **c.** If we cancel for a reason other than nonpayment of premium, we will mail the notice at least;

      **(1)** 30 days prior to the effective date of cancellation if the policy has been in effect for 60 days or less.

      **(2)** 60 days prior to the effective date of cancellation if the policy has been in effect for more than 60 days.

3. If this policy has been in effect for more than 60 days, we may cancel only for one or more of the following reasons:

   **a.** Nonpayment of premium;

   **b.** The policy was obtained through a material misrepresentation;

   **c.** Any insured has violated any of the terms and conditions of the policy;

   **d.** The risk originally accepted has measurably increased;

   **e.** Certification of the Director of Insurance of the loss of reinsurance by the insurer that provided coverage to us for all or a substantial part of the underlying risk insured; or

   **f.** A determination by the Director of Insurance that the continuation of the policy could place us in violation of the insurance laws of this State.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund will be less than pro rata. The cancellation will be effective even if we have not offered a refund.

**B.** The following is added and supercedes any provision to the contrary:

**NONRENEWAL**

1. If we decide not to renew this policy, we will mail written notice stating the reason for nonrenewal no less than 60 days before the expiration date to:

   **a.** You; and

   **b.** The broker, if known to us, or the agent of record.

2. Even if we do not comply with these terms, this policy will terminate:

   **a.** On the expiration date, if:

      **(1)** You fail to perform any of your obligations in connection with the payment of the premium for the policy, or any installment payment, whether payable directly to us or our agents or indirectly under any premium finance plan or extension of credit; or

      **(2)** We have indicated our willingness to renew this policy to you or your representative; or

      **(3)** You have notified us or our agent that you do not want to renew this policy.

   **b.** On the effective date of any other insurance replacing this policy.

**C.** Mailing of Notices

We will mail cancellation and nonrenewal notices to you, and the agent or broker, at the last addresses known to us. Proof of mailing will be sufficient proof of notice.

CG 02 00 04 87    Copyright, Insurance Services Office, Inc., 1987    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FEDERAL TERRORISM RISK INSURANCE ACT DISCLOSURE

This endorsement applies to the insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE FORM – CONTRACTORS
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY - NEW YORK DEPARTMENT OF
  TRANSPORTATION
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
ENVIRONMENTAL HAZARD POLICY
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
ELECTRONIC MANUFACTURERS AND COMPUTER SERVICES ERRORS AND OMISSIONS
  LIABILITY COVERAGE FORM
SELF-INSURED EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE FORM
SELF-INSURED EXCESS LIQUOR LIABILITY COVERAGE FORM
SELF-INSURED EXCESS EMPLOYEE BENEFITS LIABILITY COVERAGE FORM
SELF-INSURED EXCESS PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE
EXCESS (FOLLOWING FORM) LIABILITY INSURANCE

## PROVISIONS

On November 26, 2002, the President of the United States signed into law the Terrorism Risk Insurance Act of 2002 (the "Act"). The Act establishes a short-term program under which the Federal Government will share in the payment of *"Insured Losses"* caused by certain *"Acts of Terrorism"* (each as defined in the Act).

In the event of an *Insured Loss,* Travelers is responsible for a deductible of one percent (1%) of Travelers *"Direct Earned Premiums"* (as used in the Act) for the calendar year 2001 for *Insured Losses* occurring from November 26, 2002 through December 31, 2002; seven percent (7%) of Travelers *Direct Earned Premiums* for the calendar year 2002 for *Insured Losses* occurring during calendar year 2003; ten percent (10%) of Travelers *Direct Earned Premiums* for the calendar year 2003 for *Insured Losses* occurring during calendar year 2004; or fifteen percent (15%) of Travelers *Direct Earned Premiums* for the calendar year 2004 for *Insured Losses* occurring during calendar year 2005. The Federal Government's share of compensation for *Insured Losses* in each year is 90% of the amount of *Insured Losses* in excess of Travelers deductible for that year. Travelers is responsible for the payment of the remaining 10% of *Insured Losses.* In no event,

however, will the Federal Government or any *"Insurer"* (as defined in the Act) be required to pay any portion of the amount of aggregate *Insured Losses* occurring in any one year that exceeds $100,000,000,000, provided that such *Insurer* has met its deductible

As a requirement of the Act, *Insurers* must make available *"Property and Casualty Insurance"* (as defined in the Act) coverage for *Insured Losses* that does not differ materially from the terms, amounts and other coverage limitations that apply to losses arising from events other than *Acts of Terrorism.* In other words, a loss will not be excluded just because it was caused by an *Act of Terrorism;* conversely, a loss will not be covered just because it was caused by an *Act of Terrorism.* The Act also requires *Insurers* to disclose to policyholders the premium charge for providing such terrorism coverage.

Please note that this Coverage Part <u>does not</u> contain an exclusion that specifically excludes coverage for *Insured Losses.* The charge for this exposure is included in the Coverage Part premium indicated in your policy. The charge that has been included for this Coverage Part is:

- 1% of each applicable Commercial Liability Coverage premium.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
## (Broad Form)

This endorsement modifies Insurance provided under the following:

> BUSINESSOWNERS POLICY
> COMMERCIAL AUTO COVERAGE PART
> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
> FARM COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> PROFESSIONAL LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF TRANSPORTATION
> UNDERGROUND STORAGE TANK POLICY

1. The Insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

"Hazardous properties" include radioactive, toxic or explosive properties;

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

Copyright, Insurance Services Office, Inc., 1997

**IL 00 21 04 98**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

**A.** When this endorsement is attached to Standard Property Policy **CP 00 99** the terms Coverage Part and Coverage Form in this endorsement are replaced by the term Policy.

**B.** The following is added to the **Legal Action Against Us** Condition:

The 2 year period for legal action against us is extended by the number of days between the date the proof of loss is filed with us and the date we deny the claim in whole or in part.

**C.** If this policy covers:

**1.** The following in **a.** and **b.**, then Paragraphs **2.** and **3.** apply:

    **a.** Real property used principally for residential purposes up to and including a four family dwelling; or

    **b.** Household or personal property that is usual or incidental to the occupancy of any premises used for residential purposes.

**2.** The second paragraph of the **Appraisal** Condition is deleted and replaced by the following:

    **a.** Each party will pay its own appraiser and bear the other expenses of the appraisal and umpire equally, except as provided in **b.** below.

    **b.** We will pay your appraiser's fee and the umpire's appraisal fee, if the following conditions exist:

        **(1)** You demanded the appraisal ; and

        **(2)** The full amount of loss, as set by your appraiser, is agreed to by our appraiser or by the umpire.

**3.** The **Concealment, Misrepresentation Or Fraud** Condition is replaced by the following:

    **CONCEALMENT, MISREPRESENTATION OR FRAUD**

    **a.** This Coverage Part or Coverage Form is void if you or any insured ("insured") commit fraud or conceal or misrepresent a fact in the process leading to the issuance of this insurance, and such fraud, concealment or misrepresentation is stated in the policy or endorsement or in written application for this policy and:

        **(1)** Was made with actual intent to deceive; or

        **(2)** Materially affected either our decision to provide this insurance or the hazard we assumed.

    However, this condition will not serve as a reason to void this Coverage Part or Coverage Form after the Coverage Part or Coverage Form has been in effect for one year or one policy term, whichever is less.

    **b.** This Coverage Part or Coverage Form is void if you or any other insured ("insured"), at any time subsequent to the issuance of this insurance, commit fraud or intentionally conceal or misrepresent a material fact relating to:

        **(1)** This Coverage Part or Coverage Form:

        **(2)** The Covered Property:

        **(3)** Your interest in the Covered Property: or

        **(4)** A claim under this Coverage Part or Coverage Form.

    **c.** Notwithstanding the limitations stated in **3.a.** above, we may cancel the Coverage Part or Coverage Form in accordance with the terms of the Cancellation Condition.

**D.** For the Commercial Property Coverage Part and the Standard Property Policy, the following exclusion and related provisions are added to Para-

graph **B.2.** Exclusions in the Causes of Loss Forms and to any Coverage Form or policy to which a Causes of Loss Form is not attached:

1.  We will not pay for loss or damage arising out of any act committed:

    a.  By or at the direction of any insured; and

    b.  With the intent to cause a loss.

2.  However, this exclusion will not apply to deny payment to an innocent co-insured who did not cooperate in or contribute to the creation of the loss if:

    a.  The loss arose out of a pattern of criminal domestic violence; and

    b.  The perpetrator of the loss is criminally prosecuted for the act causing the loss.

3.  If we pay a claim pursuant to Paragraph **D.2.**, our payment to the insured is limited to that insured's insurable interest in the property less any payments we first made to a mortgagee or other party with a legal secured interest in the property. In no event will we pay more than the Limit of Insurance.

E.  The **Intenational Loss Exclusion** in the Causes of Loss Form – Farm Property, Mobile Agricultural Machinery And Equipment Coverage Form

and Livestock Coverage Form is replaced by the following:

1.  We will not pay loss ("loss") or damage arising out of any act committed:

    a.  By or at the direction of any "insured"; and

    b.  With the intent to cause a loss ("loss").

2.  This exclusion, however, will not apply to deny payment to an innocent co-"insured" who did not cooperate in or contribute to the creation of the loss ("loss") if:

    a.  The loss ("loss") arose out of a pattern of criminal domestic violence; and

    b.  The perpetrator of the loss ("loss") is criminally prosecuted for the act causing the loss.

3.  If we pay a claim pursuant to Paragraph **E.2.**, our payment to the "insured" is limited to that "insured's insurable interest in the property less any payments we first made to a mortgagee or other party with a legal secured interest in the property. In no event will we pay more than the Limit of Insurance.

    Copyright, Insurance Services Office, Inc., 1999    **IL 01 18 03 99**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES — CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS POLICY
COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART

**A.** The CANCELLATION Common Policy Condition is replaced by the following:

**CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

2. If this policy has been in effect for 60 days or less, except as provided in paragraphs 9. and 10. below, we may cancel this policy by mailing written notice of cancellation at least:

   **a.** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   **b.** 30 days before the effective date of cancellation if we cancel for any other reason.

3. If this policy has been in effect for more than 60 days, except as provided in paragraphs 9. and 10. below, we may cancel this policy only for one or more of the following reasons:

   **a.** Nonpayment of premium;

   **b.** The policy was obtained through a material misrepresentation;

   **c.** You have violated any of the terms and conditions of the policy;

   **d.** The risk originally accepted has measurably increased;

   **e.** Certification to the Director of Insurance of the loss of reinsurance by the insurer which provided coverage to us for all or a substantial part of the underlying risk insured; or

   **f.** A determination by the Director that the continuation of the policy could place us in violation of the insurance laws of this State.

   If we cancel this policy based on one or more of the above reasons except for non-payment of premium, we will mail written notice at least 60 days before the effective date of cancellation. When cancellation is for nonpayment of premium, we will mail written notice at least 10 days before the effective date of cancellation.

4. We will mail our notice to you, any mortgagee or lienholder known to us and to the agent or broker, at the last addresses known to us.

5. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

6. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

7. Proof of mailing will be sufficient proof of notice.

8. Our notice of cancellation will state the reason for cancellation.

9. **REAL PROPERTY OTHER THAN RESIDENTIAL PROPERTIES OCCUPIED BY 4 FAMILIES OR LESS:**

   The following applies only if this policy covers real property other than residential property occupied by 4 families or less:

   If any one or more of the following conditions exists at any building that is Covered Proper-

IL 02 84 05 90

Copyright, Insurance Services Office, Inc., 1990
Copyright, ISO Commercial Risk Services, Inc., 1990

Page 1 of 2

ty in this policy, we may cancel this policy by mailing to you written notice of cancellation at least 10 days before the effective date of cancellation.

**a.** After a fire loss, permanent repairs to the building have not started within 60 days of satisfactory adjustment of loss, unless the delay is due to a labor dispute or weather conditions.

**b.** The building has been unoccupied 60 or more consecutive days. This does not apply to:

**(1)** Seasonal unoccupancy; or

**(2)** Buildings under repair, construction or reconstruction, if properly secured against unauthorized entry.

**c.** The building has:

**(1)** An outstanding order to vacate; or

**(2)** An outstanding demolition order; or

**(3)** Been declared unsafe in accordance with the law.

**d.** Heat, water, sewer service or public lighting have not been connected to the building for 30 consecutive days or more.

**10. RESIDENTIAL PROPERTIES OCCUPIED BY 4 FAMILIES OR LESS:**

The following applies if this policy covers residential properties occupied by 4 families or less:

If this policy has been in effect for 60 days or if this is a renewal policy, we may only cancel this policy for one or more of the following reasons:

**a.** Nonpayment of premium;

**b.** The policy was obtained by misrepresentation or fraud; or

**c.** Any act that measurably increases the risk originally accepted.

The provisions of paragraphs 9. and 10. above do not apply to coverage under the Glass Coverage Form.

**11.** For insurance provided under the COMMERCIAL PROPERTY COVERAGE PART, the following applies:

**GRAIN IN PUBLIC GRAIN WAREHOUSES**

(Not applicable to grain owned by the Commodity Credit Corporation)

The following applies only with respect to grain in public grain warehouses:

The first Named Insured or we may cancel this policy at any time by mailing to:

**a.** The other; and

**b.** The Director of the Illinois Department of Agriculture (at its Springfield Office);

60 days' written notice of cancellation.

**B.** The following is added:

**NONRENEWAL**

**1.** If we decide not to renew this policy, we will mail written notice stating the reason for non-renewal to your last mailing address known to us at least 60 days before the expiration date of the policy. A copy of the notice will also be sent to:

**a.** The broker, if known to us, or the agent of record; and

**b.** The last known mortgagee or lienholder named in the policy at the last mailing address known to us.

This paragraph does not apply if we have manifested our willingness to renew directly to you.

**2.** The following provision applies only if this policy covers residential properties occupied by 4 families or less:

If this policy has been issued to you and in effect with us for 5 or more years, we may not fail to renew this policy unless:

**a.** The policy was obtained by misrepresentation or fraud;

**b.** The risk originally accepted has measurably increased; or

**c.** You received 60 days' notice of our intent not to renew as provided in 1. above.

The provisions of paragraph B.2. above do not apply to coverage under the Glass Coverage Form.

Copyright, Insurance Services Office, Inc., 1990
Copyright, ISO Commercial Risk Services, Inc., 1990
**IL 02 84 05 90**

COMMERCIAL MULTIPLE LINE

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS INSURANCE IN THE TRAVELERS INDEMNITY COMPANY OF ILLINOIS

This endorsement modifies insurance provided under the following:

    BOILER AND MACHINERY COVERAGE PART
    BUSINESS AUTO COVERAGE PART
    BUSINESSOWNERS COVERAGE PART
    COMMERCIAL CRIME COVERAGE PART
    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    COMMERCIAL INLAND MARINE COVERAGE PART
    COMMERCIAL PROPERTY COVERAGE PART
    EMPLOYEE BENEFITS LIABILITY COVERAGE PART
    FARM COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART

**PROVISIONS**

The obligations expressed in the policy as obligations of the company indicated as insuring company in the Common Policy Declarations subject to the exclusions, conditions and other terms thereof, are the obligations of The Travelers Indemnity Company of Illinois to the extent that such obligations are with respect to risks located in Illinois and that the policy to such extent as a contract between the insured and The Travelers Indemnity Company of Illinois and no other.

**IL T9 01 07 86**

CHANGE EFFECTIVE DATE: 01-01-04
CHANGE ENDORSEMENT NUMBER: 0002

One Tower Square, Hartford, Connecticut  06183



CHANGE ENDORSEMENT

Named Insured:
TAQUERIA ATOTONILCO II,
ATOTONILCO 2, INC. DBA

Policy Number: Y-660-843K1356-TIL-04
Policy Effective Date: 01/01/04
Issue Date: 03/17/04
Premium $ 0

INSURING COMPANY:
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

Effective from 01/01/04 at the time of day the policy becomes effective.

THIS INSURANCE IS AMENDED AS FOLLOWS:

LOCATION SCHEDULE IL T0 03 04 96 IS AMENDED AS FOLLOWS:

| LOCATION | BUILDING | ADDRESS |
|---|---|---|
| 15 | 19 | 4219 S. WOLCOTT<br>CHICAGO, IL  60609 |
| 16 | 20 | 5343-5353 S. KEDZIE<br>CHICAGO, IL  60609 |

PREMIUM IS PAYABLE AS FOLLOWS:

DUE ON 01/01/04    $ 0
DUE ON 00/00/00    $ SEE IL T0 30

NAME AND ADDRESS OF AGENT OR BROKER:          COUNTERSIGNED BY:
  SUMMIT INS AGCY INC (F4279)
  PO BOX 170                                  _____
  SUMMIT, IL 60501                            Authorized Representative
                                              DATE: _____

IL T0 07 09 87    PAGE  1 OF  1            OFFICE: NAPERVILLE IL

CHANGE EFFECTIVE DATE: 01-01-04
CHANGE ENDORSEMENT NUMBER: 0002



**POLICY NUMBER:** Y-660-843K1356-TIL-04

**EFFECTIVE DATE:** 01-01-04

**ISSUE DATE:** 03-17-04

LISTING OF FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

THIS LISTING SHOWS THE NUMBER OF FORMS, SCHEDULES AND ENDORSEMENTS
BY LINE OF BUSINESS.

```
IL T0 07 09 87    CHANGE ENDORSEMENT
IL T8 01 10 93    FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS
IL T0 30 12 90    NON-STANDARD PAYMENT SCHEDULE
```

NON-STANDARD PAYMENT SCHEDULE

POLICY NUMBER: Y-660-843K1356-TIL-04
EFFECTIVE DATE:  01/01/04
ISSUE DATE: 03/17/04


PAYMENT DUE DATES                    AMOUNT

   01/01/04                              0.00



IL T0 30 12 90       PAGE  1 OF  1

OFFICE: NAPERVILLE IL         888
PRODUCER NAME: SUMMIT INS AGCY INC              F4279

CHANGE EFFECTIVE DATE: 03-25-04
CHANGE ENDORSEMENT NUMBER: 0003

One Tower Square, Hartford, Connecticut  06183

**Travelers**

CHANGE ENDORSEMENT

Named Insured:
TAQUERIA ATOTONILCO II,
ATOTONILCO 2, INC. DBA

Policy Number: Y-660-843K1356-TIL-04
Policy Effective Date: 01/01/04
Issue Date: 04/19/04
Premium $ NIL

INSURING COMPANY:
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

Effective from 03/25/04 at the time of day the policy becomes effective.

THIS INSURANCE IS AMENDED AS FOLLOWS:

THE COMMERCIAL GENERAL LIABILITY COVERAGE PART IS AMENDED AS FOLLOWS:

ADDING ENDORSEMENT CG D1 26 10 95, ADDITIONAL INSURED-VENDORS BROAD
FORM, AS PER THE ATTACHED.

NAME AND ADDRESS OF AGENT OR BROKER:          COUNTERSIGNED BY:
    SUMMIT INS AGCY INC (F4279)
    PO BOX 170
    SUMMIT, IL 60501                          Authorized Representative
                                              DATE:

IL T0 07 09 87    PAGE  1 OF  1              OFFICE: NAPERVILLE IL

CHANGE EFFECTIVE DATE: 03-25-04
CHANGE ENDORSEMENT NUMBER: 0003



POLICY NUMBER:  Y-660-843K1356-TIL-04

EFFECTIVE DATE:  01-01-04

ISSUE DATE:  04-19-04

LISTING OF FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

THIS LISTING SHOWS THE NUMBER OF FORMS, SCHEDULES AND ENDORSEMENTS
BY LINE OF BUSINESS.

    IL T0 07 09 87    CHANGE ENDORSEMENT
    IL T8 01 10 93    FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

COMMERCIAL GENERAL LIABILITY

    CG D1 26 10 95    ADDITIONAL INSURED-VENDORS BROAD FORM

IL T8 01 10 93                                          PAGE:   1 OF   1

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED — VENDORS BROAD FORM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

## A. SCHEDULE

**Name of Person or Organization (Vendor):**

Any vendor with whom you have agreed in a written contract, executed prior to loss, to name as an additional insured, but only for the limits agreed to in such contract or the limits of insurance of this policy, whichever is less.

**Your products:**

Any of "your products"

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

## B. PROVISIONS

WHO IS AN INSURED (Section II) is amended to include as an insured any person or organization (referred to below as "vendor") shown in the Schedule, but only with respect to "bodily injury" or "property damage" arising out of "your products" shown in the Schedule which are distributed or sold in the regular course of the vendor's business subject to the following additional provisions:

1. The insurance afforded the vendor does not apply to:

   a. "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

   b. Any express warranty, or any distribution or sale for a purpose unauthorized by you;

   c. Any physical or chemical change in the product made intentionally by the vendor;

   d. Repackaging, unless unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

   e. Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

   f. Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor;

   g. The sole negligence of the vendor.

2. This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

Copyright, The Travelers Indemnity Company.
Includes copyrighted material of Insurance Services Office, Inc. with its permission.
Copyright, Insurance Services Office, Inc., 1984

One Tower Square, Hartford, Connecticut 06183                **Travelers**

---

**POLICY DECLARATIONS**
**COMMERCIAL EXCESS LIABILITY**
**(UMBRELLA) INSURANCE POLICY**

PH   **POLICY NO.: YSM-CUP-571K7746-TIL-04**
     **ISSUE DATE: 01-16-04**

**INSURING COMPANY:**
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

**1. NAMED INSURED AND MAILING ADDRESS:**
TORTILLERIA ATOTONILCO, INC.
AND AS PER CG D0 74
1707 W. 47TH STREET

CHICAGO                    IL 60609

THIS POLICY DOES NOT
COVER LIABILITY
ARISING OUT OF
ASBESTOS MATERIAL
SEE ENDORSEMENT
UM 01 96 07 96

**2. THE NAMED INSURED IS A:**

[X] CORPORATION   [ ] SOLE PROPRIETOR   [ ] PARTNERSHIP OR JOINT VENTURE   [ ] OTHER

**3. POLICY PERIOD:** From 01-01-04 to 01-01-05 12:01 A.M. Standard Time at your mailing address.

**4. PREMIUM:** *   $ ▒▒▒▒▒   [X] Flat Charge   [ ] Adjustable (See premium schedule)
    *   SEE END. CG D0 31 10 91

**5. LIMITS OF INSURANCE:**

| COVERAGES | | LIMITS OF LIABILITY |
|---|---|---|
| AGGREGATE LIMITS OF LIABILITY | 9,000,000 | Products/Completed Operations Aggregate |
| | 9,000,000 | General Aggregate |
| COVERAGE A - Bodily Injury and Property Damage Liability | 9,000,000 | any one occurrence subject to the Products/ Completed Operations and the General Aggregate Limits |
| COVERAGE B - Personal and Advertising Injury Liability | 9,000,000 | any one person or organization subject to the General Aggregate Limit of Liability |
| RETAINED LIMIT | 10,000 | any one occurrence or offense |

**6. SCHEDULE OF UNDERLYING INSURANCE:**

| POLICY | LIMITS (000 omitted) | COVERAGE | COMPANY |
|---|---|---|---|
| SEE ENDORSEMENT CG D0 23 04 96 | | | |

**7.** On the effective date shown in Item 3, the Commercial Excess Liability (Umbrella) Insurance Policy numbered above includes this Declarations Page and the Policy Jacket (Form UM 00 76 which contains the Nuclear Energy Liability Exclusion) and any endorsements listed hereafter:
SEE END. IL T8 01 01 01

**NAME AND ADDRESS OF AGENT OR BROKER:**

SUMMIT INS AGCY INC        F4279
PO BOX 170
SUMMIT                     IL 60501

**COUNTERSIGNED BY:**

_____
Authorized Representative

DATE: _____

CG T0 14 04 96
OFFICE: NAPERVILLE IL


EXHIBIT
G

Page 1 of 1

COMMERCIAL GENERAL LIABILITY
POLICY NUMBER:YSM-CUP-571K7746-TIL-04                    ISSUE DATE:01-16-04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NAMED INSURED

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

Item 1 of the Declarations is amended as follows:
** TITLE:NAMED INSURED

TORTILLERIA ATOTONILCO, INC.

MUNOZ FLOUR TORTILLERIA, INC.

TAQUERIA ATOTONILCO II, ATOTONILCO 2, INC. DBA

COLE TAYLOR BANK FORMERLY KNOWN AS
COLE TAYLOR BANK/DROVERS FORMERLY KNOWN AS
THE DROVERS NATIONAL BANK OF CHICAGO,
A NATIONAL BANKING ASSOCIATION, A/T/U/T #75183, DATED 09/23/75

AMERICAN NATIONAL BANK A/T/U/T #057373-0-9

DROVERS COLE TAYLOR BANK A/T/U/T #891002
AND ALL BENEFICIARIES THEREUNDER AND AGENTS THEREOF

MARQUETTE NATIONAL BANK A/T/U/T #8122
AND ALL BENEFICIARIES THEREUNDER AND AGENTS THEREOF

WESTERN NATIONAL BANK OF CICIERO A/T/U/T #8065
AND ALL BENEFICIARIES THEREUNDER

AMERICAN NATIONAL BANK & TRUST CO. A/T/U/T #120140-07, DATED 02/28/95

TAQUERIA ATOTONILCO., TORTILLERIA TAQUERIA ATOTONILCO #1, INC. DBA

TAQUERIA ATOTONILCO., OSCAR, INC. DBA

AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO
A/T/U/T AGREEMENT DATED 02/01/1999 AND KNOWN AS TRUST #124837-07

COLE TAYLOR BANK A/T/U/T #92-2065 DATED 06/22/92
AND ALL BENEFICIARIES THEREUNDER

COLE TAYLOR BANK A/T/U/T #97-7195, DATED 04/02/97

AMERICAN NATIONAL BANK #117313-04

LASALLE BANK NATIONAL ASSOCIATION TRUST #131136 DATED 4/11/2003

OSCAR MUNOZ

PRODUCER: SUMMIT INS AGCY INC                    OFFICE: 888  NAPERVILLE IL

CG D0 74 04 93                                    Page   1 of 1

POLICY NUMBER: YSM-CUP-571K7746-TIL-04

EFFECTIVE DATE: 01-01-04

ISSUE DATE: 01-16-04

LISTING OF FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

THIS LISTING SHOWS THE NUMBER OF FORMS, SCHEDULES AND ENDORSEMENTS
BY LINE OF BUSINESS.

| | | |
|---|---|---|
| CG T0 14 04 96 | COML EXCESS LIABILITY (UMBRELLA) DEC |
| CG D0 74 04 93 | NAMED INSURED |
| IL T8 01 01 01 | FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS |

UMBRELLA / EXCESS

| | |
|---|---|
| CG D0 23 04 96 | UNDERLYING POLICIES AND LIMITS END |
| UM 00 01 01 86 | COML EXCESS LIAB (UMBRELLA) INSURANCE |
| UM 03 23 02 98 | AMENDMENT-WHO IS AN INSURED |
| UM 03 43 09 99 | AMENDMENT OF INSURING AGREEMENT |
| UM 02 59 02 98 | NOTICE OF OCCURRENCE |
| UM 03 81 01 03 | CAP ON LOSSES FROM CERT ACTS OF TERRISM |
| CG T8 00 | DESIGNATED ENTITIES - LIMITATION OF COVE |
| UM 00 94 08 86 | AMENDMENT OF COVERAGE-NAMED INSURED |
| UM 03 11 07 97 | PREJUDGMENT INTEREST DEFENSE AMENDMENT |
| UM 03 55 08 00 | EXCESS, PERSONAL, ADV, WEB SITE INJ LIAB |
| UM 00 30 01 86 | EXCLUSION-REAL AND/OR PERSONAL PROP |
| UM 00 66 01 86 | LIMITATION OF COV-CONTRACTUAL LIAB |
| UM 00 76 01 86 | NUCLEAR ENERGY LIAB EXCL ENDT(BROAD FORM |
| UM 01 44 01 02 | EXCLUSION-POLLUTION-ILLINOIS |
| UM 01 66 08 91 | EXCL-LEAD INCL PRODUCTS-COMPLETED OPS HA |
| UM 01 81 01 95 | EMPLOYMENT-RELATED PRACTICES EXCL |
| UM 01 88 04 96 | AMDT OF PERS INJURY AND ADV INJURY LIAB |
| UM 01 89 04 96 | UNINSD/UNDINSD MTRST & AUTO NOFAULT EXCL |
| UM 01 90 01 99 | DISCRIMINATION EXCLUSION |
| UM 01 91 01 02 | WAR EXCLUSION |
| UM 01 96 07 96 | EXCLUSION-ASBESTOS |
| UM 02 02 07 96 | EXCL-ALL HAZARDS IN CONNECTION WITH DESI |
| UM 02 07 07 96 | EXCL-ALL HAZARDS IN CONNECTION WITH A DE |
| UM 02 71 10 96 | EXCLUSION-EMPLOYEE BENEFIT LIABILITY |
| UM 01 01 07 88 | ILLINOIS CHANGES-CANC AND NONRENEW |

INTERLINE ENDORSEMENTS

| | |
|---|---|
| IL T3 68 11 02 | FEDERAL TERRORISM RISK INSURANCE ACT |

UMBRELLA

POLICY NUMBER: YSM-CUP-571K7746-TIL-04                ISSUE DATE: 01-16-04

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.
# SCHEDULE OF UNDERLYING INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

Item 6 of the Declarations to include:

| POLICY | LIMITS (000 OMITTED) | COVERAGE | COMPANY |
|---|---|---|---|
| 810  609K690A  04 | 1000 CSL | BAP | TCT |
| 630  843K1319  04 | 1000 EACH OCCURRENCE<br>1000 EACH PERSON OR ORG<br>2000 GEN.AGG.<br>2000 PROD/COMP OPS AGG | CGL | TCT |
| 660  843K1356  04 | 1000 EACH OCCURRENCE<br>1000 EACH PERSON OR ORG<br>2000 GEN. AGG.<br>2000 PROD/COMP OPS AGG | CGL | TIL |
| WCV5000138 | 1000 PER ACCIDENT<br>1000 POLICY LIMIT FOR DISEASE<br>1000 PER EMPLOYEE (DISEASE) | EMPLOYERS LIAB. | ACCIDENT FUND CO |
| WC 314-86-34 | 1000 PER ACCIDENT<br>1000 POLICY LIMIT FOR DISEASE<br>1000 PER EMPLOYEE (DISEASE) | EMPLOYERS LIAB. | AIG |

(If you have any employee exposure in the State of New York,
the Employers Liability Limits are applicable only to bodily injury to your
"non-subject employees" as defined under Rule VIII - Limits of Liability,
A.2., of the WC/EL Manual of the State of New York)

# COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this insurance the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we," "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under **SECTION II—WHO IS AN INSURED**.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION V—DEFINITIONS**.

## SECTION I—COVERAGES

**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY; and COVERAGE B. PERSONAL INJURY AND ADVERTISING INJURY LIABILITY.**

**1. INSURING AGREEMENT.**

  **a.** We will pay on behalf of the insured the "ultimate net loss" in excess of the "applicable underlying limit" which the insured becomes legally obligated to pay as damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies. This insurance applies only to:

    **(1)** "Bodily injury" or "property damage":

      **(a)** Occurring during the policy period; and

      **(b)** Caused by an "occurrence"; and

    **(2)** "Personal injury" or "advertising injury" caused by an "offense" committed during the policy period.

  **b.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

  **c.** "Property damage" that is loss of use of tangible property that is not physically injured shall be deemed to occur at the time of the "occurrence" that caused it.

  **d.** The amount we will pay for damages is limited as described in **SECTION III—LIMITS OF INSURANCE**.

This insurance applies anywhere in the world.

**2. DEFENSE OF CLAIMS OR SUITS.**

  **a.** We will have no duty to defend any claim or "suit" that any other insurer has a duty to defend. If we elect to join in the defense of such claims or "suits," we will pay all expenses we incur.

  **b.** We will have the right and duty to defend any "suit" for damages which are payable under Coverages A or B (including damages wholly or partly within the "retained limit") but which are not payable by a policy of "underlying insurance," or any other available insurance, because:

    **(1)** Such damages are not covered; or

    **(2)** The "underlying insurance" has been exhausted by the payment of claims.

  **c.** We may investigate and settle any claim or "suit" in **b.** above at our discretion.

  **d.** Our right and duty in **b.** above end when we have used up the "applicable limit of insurance" in the payment of judgments or settlements.

  **e.** We will pay, with respect to any claim or "suit" we defend in **b.** above:

    **(1)** All expenses we incur.

    **(2)** The cost of appeal bonds and bonds to release attachments, but only for bond amounts within the "applicable limit of insurance." We do not have to furnish these bonds.

    **(3)** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up

UMBRELLA

to $100 a day because of time off from work.

**(4)** All costs taxed against the insured in the "suit."

**(5)** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have:

**(a)** paid, or offered to pay; or

**(b)** deposited in court:

the part of the judgment that is within the "applicable limit of insurance."

These payments will not reduce the limits of insurance.

In any jurisdiction outside the United States of America (including its territories and possessions), Puerto Rico or Canada where we may be prevented by law or otherwise from carrying out this agreement:

**a.** You must arrange to investigate, defend or settle any claim or "suit."

**b.** You will not make any settlement without our consent.

**c.** We will pay expenses incurred with our consent.

**3. EXCLUSIONS.**

This insurance does not apply to:

**a.** "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b.** "Advertising injury" arising out of:

**(1)** Breach of contract, other than misappropriation of advertising ideas under an implied contract;

**(2)** The failure of goods, products or services to conform with advertised quality or performance;

**(3)** The wrong description of the price of goods, products or services; or

**(4)** An "offense" committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

**c.** "Bodily injury" consisting of humiliation, mental injury or mental anguish directly or indi-

rectly related to the employment of any person or persons by any insured.

**d.** "Bodily injury," "property damage," "personal injury" or "advertising injury" for which the insured assumed liability under a contract or agreement. This exclusion applies only if the damage or injury occurred prior to the effective date of the contract or agreement.

**e.** Any obligation of the insured under a workers compensation, disability benefits or unemployment compensation law or any similar law. This exclusion does not apply to liability you assume under any contract or agreement.

**f. (1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

**(a)** At or from premises you own, rent or occupy;

**(b)** At or from any site or location used by or for you or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are at any time transported, handled, stored, treated, disposed of, or processed as waste by or for you or any person or organization for whom you may be legally responsible; or

**(d)** At or from any site or location on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations:

**(i)** If the pollutants are brought on or to the site or location in connection with such operations; or

**(ii)** If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

**(e)** that are or that are contained in any property that is:

**(i)** being transported or towed by, or handled for movement into, onto or from the covered "auto";

**(ii)** otherwise in the course of transit; or

(iii) being stored, disposed of, treated or processed in or upon the covered "auto";

(f) before the pollutants or any property in which the pollutants are contained are moved from the place where they are accepted by the insured for movement into or onto the covered "auto"; or

(g) after the pollutants or any property in which the pollutants are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the insured.

(2) Any loss, cost, or expense arising out of any governmental direction or request that you test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Paragraphs **(1)(a)** through **(1)(d)** and **(1)(e)(iii)** do not apply to fuels, lubricants, fluids, exhaust gases or other similar pollutants that are needed for or result from the normal electrical, hydraulic or mechanical function of the covered "auto" or its parts, if the pollutants escape or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such pollutants.

Paragraphs **(1)(a)** through **(1)(d)** do not apply to pollutants not in or upon the covered "auto" if:

(1) the pollutants or any property in which the pollutants are contained are upset, overturned or damaged as a result of the maintenance or use of the covered "auto";

(2) the discharge, dispersal, release or escape of the pollutants is caused directly by such upset, overturn or damage; and

(3) the "personal injury" or "property damage" is not otherwise excluded under paragraphs **(1)(e)**, **(1)(f)** or **(1)(g)** of this exclusion.

This exclusion does not apply to "bodily injury" to any employee of the insured arising out of and in the course of employment by the insured.

g. Bodily injury" or "property damage" arising out of the ownership, maintenance, operation, use, including loading or unloading, or entrustment to others of watercraft over 50 feet in length or any aircraft:

(1) Owned by any insured;

(2) Chartered without crew by or on behalf of any insured; or

(3) Owned and operated by an employee of any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent; or

(2) Liability assumed under any contract or agreement.

h. "Personal injury" consisting of discrimination directly or indirectly related to the employment or prospective employment of any person or persons by any insured.

i. "Personal injury" or "advertising injury":

(1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity; or

(2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period. All "personal injury" or "advertising injury" arising out of publication of the same or similar material subsequent to the beginning of the policy period is also excluded.

j. "Property damage" to:

(1) Property you rent, occupy or which is in your care, custody or control if:

(a) You agreed to provide insurance for it; or

(b) Such property is owned by a person or organization controlling the insured or is under the control of the insured.

k. "Property damage" to "your product" arising out of it or any part of it.

UMBRELLA

l. Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m. "Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

n. Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Exclusions **b.** through **n.** do not apply to damage by fire to premises rented to you.

## SECTION II—WHO IS AN INSURED.

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. An organization other than a partnership or joint venture, you are an insured.

2. Each of the following is also an insured:

a. As respects the "auto hazard":

(1) Anyone using an "auto" you own, hire or borrow including any person or organization legally responsible for such use provided it is with your permission; and

(2) Any of your executive officers, directors, partners, employees or stockholders, operating an "auto" you do not own, hire or borrow while it is being used in your business.

None of the following is an insured under **(1)** or **(2)** above:

(a) Any person employed by or engaged in the duties of an auto sales agency, repair shop, service station, storage garage or public parking place that you do not operate;

(b) The owner or lessee of any "auto" hired by or for you or loaned to you, and any agent or employee of such owner or lessee.

b. As respects aircraft:

Anyone using an aircraft chartered with crew by you or on your behalf and anyone legally responsible for its use except:

(1) The owner or crew of the aircraft or any person operating such aircraft;

(2) Any manufacturer of the aircraft or any of its parts;

(3) Any sales, service or repair company;

(4) Any airport or hangar operator;

or any employee of **(2)**, **(3)** or **(4)**.

c. Except as respects aircraft and the "auto hazard":

(1) Your executive officers, employees, directors or stockholders while acting within the scope of their duties; and

(2) Any person or organization while acting as real estate manager for you.

d. Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership or majority interest, will be deemed to be a Named Insured. However, coverage does not apply to:

Copyright, The Travelers Indemnity Company.

(1) "Bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

(2) "Personal injury" or "advertising injury" arising out of an "offense" committed before you acquired or formed the organization.

e. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

f. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this insurance.

g. Any person or organization for whom you agreed in writing to provide this insurance for operations you perform or facilities you own or use. This insurance is subject to your "applicable underlying limits" for such operations or facilities.

h. Any other person or organization insured under any policy of the "underlying insurance." This grant is subject to all the limitations upon coverage under such policy other than the limits of the "underlying insurers'" liability.

No person or organization is an insured with respect to the conduct of any current or past partnership or joint venture that is not shown as a Named Insured in the Declarations.

No person is an insured as respects "bodily injury" to a fellow employee unless insurance for such liability is afforded by the "underlying insurance".

## SECTION III—LIMITS OF INSURANCE.

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits."

2. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of injury and damage included in the "products-completed operations hazard."

3. The General Aggregate Limit is the most we will pay for damages under Coverage A and Coverage B, except:

a. Damages because of injury and damage included in the "products-completed operations hazard;" and

b. Damages because of injury and damage included in the "auto hazard".

4. Subject to 3. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal injury" and all "advertising injury" sustained by any one person or organization.

5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of damages under Coverage A because of all "bodily injury" and "property damage" arising out of any one "occurrence".

To determine the limit of our liability, all "bodily injury" and "property damage" arising out of continuous or repeated exposure to the same general conditions shall be considered one "occurrence".

The limits of this insurance apply separately to each consecutive annual period and to any remaining period of less than 12 months. The policy period begins with the effective date shown in the Declarations. If the policy period is extended after issuance for an additional period of less than 12 months, the additional period will be deemed part of the last preceding period.

## SECTION IV—CONDITIONS.

1. APPEALS.

a. If the insured or the insured's "underlying insurer" elects not to appeal a judgment which exceeds the "applicable underlying limit", we may do so.

b. If we do, we will pay all costs of the appeal. We will also pay all costs on appeals related to the defense of the insured as provided in SECTION I, 2. These sums are in addition to the "applicable limit of insurance". In no event shall our liability for "ultimate net loss" exceed the "applicable limit of insurance."

2. BANKRUPTCY.

Bankruptcy or insolvency of the insured or the insured's estate will not relieve us of our obligations under this insurance.

UMBRELLA

**3. CANCELLATION.**

    **a.** You may cancel this insurance by mailing or delivering to us advance written notice of cancellation.

    **b.** We may cancel this insurance by mailing or delivering to you written notice of cancellation at least:

        **(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

        **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

    **c.** We will mail or deliver our notice to your last mailing address known to us.

    **d.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

    **e.** If this insurance is cancelled, we will send you any premium refund due. If we cancel, the refund will be pro rata. If you cancel, the refund will be pro rata less 10% of the pro rata unearned premium. The cancellation will be effective even if we have not made or offered a refund.

    **f.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**4. CHANGES.**

This contract contains all the agreements between you and us concerning the insurance afforded. No change can be made in the terms of this insurance except with our consent. The terms of this insurance can be amended or waived only by endorsement issued by us and made a part of this insurance.

**5. DUTIES IN THE EVENT OF OCCURRENCE OR OFFENSE, CLAIM OR SUIT.**

    **a.** You must see to it that we are notified promptly of an "occurrence" or an "offense" which may result in a claim under this insurance. Notice should include:

        **(1)** How, when and where the "occurrence" or "offense" took place; and

        **(2)** The names and addresses of any injured persons and witnesses.

    **b.** If a claim is made or "suit" is brought against any insured which may result in a claim against this insurance, you must see to it that we receive prompt written notice of the claim or "suit".

    **c.** The insured must:

        **(1)** Cooperate with the "underlying insurers";

        **(2)** Comply with the terms of the "underlying insurance"; and

        **(3)** Pursue all rights of contribution or indemnity against any person or organization who may be liable to the insured because of "bodily injury," "property damage," "personal injury" or "advertising injury" with respect to which insurance is provided under this or any policy of "underlying insurance."

    **d.** When we believe that a claim may exceed the "underlying insurance", we may join with the insured and the "underlying insurer" in the investigation, settlement and defense of all claims and "suits" in connection with such "occurrence" or "offense." In such event, the insured must cooperate with us.

**6. EXAMINATION OF YOUR BOOKS AND RECORDS.**

We may examine and audit your books and records as they relate to this insurance:

    **a.** At any time during the policy period;

    **b.** Up to three years afterward; or

    **c.** Within one year after final settlement of all claims under this insurance.

**7. INSPECTIONS AND SURVEYS.**

We have the right but are not obligated to:

    **a.** Make inspections and surveys at any time;

    **b.** Give you reports on the conditions we find; and

    **c.** Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. We do not warrant that conditions:

    **a.** Are safe or healthful; or

    **b.** Comply with laws, regulations, codes or standards.

    Copyright, The Travelers Indemnity Company.    UM 00 01 01 86

8. **LEGAL ACTION AGAINST US.**

No person or organization has a right under this insurance:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this insurance unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial. We will not be liable for damages that:

a. Are not payable under the terms of this insurance; or

b. Are in excess of the "applicable limit of insurance".

An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

9. **MAINTENANCE OF UNDERLYING INSURANCE.**

The insurance afforded by each policy in the schedule of "underlying insurance" in the Declarations will be maintained for the full term of this insurance. This provision does not apply to the reduction of the aggregate limit or limits due to payment of claims for "bodily injury," or "personal injury," "property damage" or "advertising injury." As these policies expire, you will renew them at limits at least equal to the expiring limits of insurance.

If you fail to comply with the above, this insurance is not invalidated. However, in the event of a loss, we will pay only to the extent that we would have paid had you so complied.

You must give us a written notice of any change in the "underlying insurance" as respects:

a. Coverage;

b. Limits of insurance;

c. Termination of any coverage; or

d. Exhaustion of aggregate limits.

10. **OTHER INSURANCE.**

This insurance is excess over any other valid and collectible insurance whether such other insurance is stated to be primary, contributing, excess, contingent or otherwise. This provision does not apply to a policy bought specifically to apply in excess of this insurance.

11. **OUR RIGHT TO RECOVER FROM OTHERS.**

If we make a payment under this insurance, the insured will assist us and the "underlying insurer" in recovering what we paid by using the insured's rights of recovery. Reimbursement will be made in the following order:

a. First, to any interest (including the insured) who has paid any amount in excess of the limits of this insurance;

b. Next to us; and

c. Then to any interest (including the insured and the "underlying insurer") as are entitled to claim the remainder, if any.

A different order may apply if agreed upon by all interests. Expenses incurred in the process of recovery will be divided among all interests according to the ratio of their respective recoveries.

12. **PREMIUM.**

a. You are responsible for the payment of all premiums and will be the payee for any return premiums.

b. If the premium is a flat charge, it is not subject to adjustment except as provided in **d.** below.

c. If the premium is other than a flat charge, it is an advance premium only. The earned premium will be computed at the end of each year in which this insurance is in force at the rate shown in the Declarations, subject to the Minimum Annual Premium.

d. Additional premium may become payable when coverage is provided for additional insureds and named insureds under the provisions of **SECTION II—2.d.**, **g.** and **h.**

13. **PREMIUM AUDIT.**

a. You must keep records of the information we need for premium computation, and send us copies at such times as we may request.

b. At the close of each audit period we will compute the earned premium for that period.

c. Audit premiums are due and payable on notice to you.

d. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to you subject to the minimum premiums.

    Copyright, The Travelers Indemnity Company.

UMBRELLA

**14. REPRESENTATION.**

By accepting this insurance, you agree:

a. The statements in the Declarations and any subsequent notice relating to "underlying insurance" are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this insurance in reliance upon your representations.

**15. SEPARATION OF INSUREDS.**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned to you in this insurance, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

**16. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS INSURANCE.**

Your rights and duties under this insurance may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**17. WHEN LOSS IS PAYABLE.**

If we are liable under this insurance, we will pay for "ultimate net loss" after:

a. (1) The insured's liability is established by court decision; or

   (2) There is a written agreement between the claimant, the insured, any "underlying insurer" and us; and

b. The amount of the "applicable underlying limit" is paid by or on behalf of the insured.

We will pay all claims within thirty days provided all terms of this insurance are met.

The insured will reimburse us for any payment we make for damages which are within the "retained limit".

**SECTION V—DEFINITIONS.**

1. "Advertising injury" means injury arising out of one or more of the following "offenses":

a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

Such "offenses" must be committed in the course of advertising your goods or products.

2. "Applicable limit of insurance" means the maximum amount we will pay as damages in accordance with **SECTION III—LIMITS OF INSURANCE.**

3. "Applicable underlying limit" means:

a. If the policies of "underlying insurance" apply to the "occurrence" or "offense," the greater of:

   (1) The amount of insurance stated in the policies of "underlying insurance" in the Declarations or any other available insurance less the amount by which any aggregate limit so stated has been reduced solely due to payment of claims; or

   (2) The "retained limit" shown in the Declarations; or

b. If the policies of "underlying insurance" do not apply to the "occurrence" or "offense", the amount stated in the Declarations as the "retained limit."

The limits of insurance in any policy of "underlying insurance" will apply even if:

a. The "underlying insurer" claims the insured failed to comply with any condition of the policy; or

b. The "underlying insurer" becomes bankrupt or insolvent.

4. "Auto" means a land motor vehicle, trailer or semi-trailer.

5. "Auto hazard" means all "bodily injury" and "property damage" for which liability insurance is afforded under the terms, other than limits of insurance, of the auto policy of "underlying insurance."

    Copyright, The Travelers Indemnity Company.    UM 00 01 01 86

6. "Bodily injury" means bodily injury, shock, fright, mental injury, disability, mental anguish, humiliation, sickness or disease sustained by a person, including death resulting from any of these at any time.

7. "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

   b. Your fulfilling the terms of the contract or agreement.

8. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

9. "Offense" means any of the offenses listed in the definition of "personal injury" or "advertising injury."

10. "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

    a. False arrest, detention or imprisonment;

    b. Malicious prosecution;

    c. Wrongful entry into, or eviction of a person from a room, dwelling or premises that the person occupies;

    d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    e. Oral or written publication of material that violates a person's right of privacy; or

    f. Discrimination because of race, religion, age, sex or physical disability. This does not apply:

       (1) To "offenses" committed by or at the direction of the insured; or

       (2) If insurance for such "offenses" is prohibited by law.

    Such "offenses" must arise out of the conduct of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you.

11. a. "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

       (1) Products that are still in your physical possession; or

       (2) Work that has not yet been completed or abandoned.

    b. "Your work" will be deemed completed at the earliest of the following times:

       (1) When all of the work called for in your contract has been completed.

       (2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

       (3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

12. "Property damage" means physical injury to tangible property, including all resulting loss of use of that property.

13. "Retained limit" is the sum stated in the Declarations as such. If the policies of "underlying insurance" do not apply to the "occurrence" or "offense", the insured shall retain this amount as self insurance with respect to:

    a. "Bodily injury" or "property damage" caused by each "occurrence"; or

    b. "Personal injury" or "advertising injury" sustained by any one person or organization and caused by an "offense."

14. "Suit" means a civil proceeding in which damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes an arbitration proceeding alleging such damages to which you must submit or submit with our consent.

15. "Ultimate net loss" means the sum actually paid or payable due to a claim for which the insured is liable either by a settlement to which we agreed or

UMBRELLA

a final judgment. Such sum will include proper adjustments for recoveries and salvage.

16. "Underlying insurance" means the policies listed in the Schedule of Underlying Insurance and includes:

    **a.** Any renewal or replacement of such policies; and

    **b.** Any other insurance available to the insured.

17. "Underlying insurer" means any insurer which provides a policy listed in the Schedule of Underlying Insurance or any other insurance available to the insured.

18. "Your product" means:

    **a.** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

        **(1)** You;

        **(2)** Others trading under your name; or

        **(3)** A person or organization whose business or assets you have acquired; and

    **b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in **a.** and **b.** above.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

19. "Your work" means:

    **a.** Work or operations performed by you or on your behalf; and

    **b.** Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in **a.** or **b.** above.

Copyright, The Travelers Indemnity Company.

UM 00 01 01 86

UMBRELLA

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT—WHO IS AN INSURED

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

Parts 2.g. and 2.h. of SECTION II – WHO IS AN INSURED are deleted and replaced by the following:

g.  Any person or organization for whom you agreed in writing to provide this insurance for operations you perform or facilities you own or use. This insurance is subject to the following provisions:

   (a) The person or organization is insured only for injury or damages:

   (i) Which are covered by this policy; and

   (ii) Which are covered by the "underlying insurance" or which would be covered but for the exhaustion of its limits; and

   (b) The limits of insurance afforded to such person or organization will be:

   (i) The difference between the "underlying insurance" limits and the minimum limits of insurance which you agreed to provide; or

   (ii) The limits of insurance of this policy

   whichever is less.

If the minimum limits of insurance you agreed to provide such person or organization are wholly within the "underlying insurance", this policy shall not apply.

h.  Any other person or organization insured under any policy of the "underlying insurance". This insurance is subject to all the limitations upon coverage under such policy, and:

   (a) The limits of insurance afforded to such person or organization will be:

   (i) The difference between the "underlying insurance" limits and the minimum limits of insurance which you agreed to provide; or

   (ii) The limits of insurance of this policy

   whichever is less.

   If the minimum limits of insurance you agreed to provide such person or organization are wholly within the "underlying insurance", this policy shall not apply.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURING AGREEMENT — KNOWN INJURY OR DAMAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

**PROVISIONS:**

**A.** Only as respects **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** Part **1.a. INSURING AGREEMENT** of **SECTION I – COVERAGES** is deleted and replaced by the following:

    **1. Insuring Agreement**

        **a.** We will pay on behalf of the insured the "ultimate net loss" in excess of the "applicable underlying limit" which the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. This insurance applies to "bodily injury" or "property damage" only if:

            **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place anywhere in the world;

            **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

            **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of **Section II – Who Is An Insured** and no employee authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized employee knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**B.** The following provisions apply only with respect to PROVISION **A.** above in this endorsement:

    **1.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of **Section II – Who Is An Insured** or any employee authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

    **2.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of **Section II – Who Is An Insured** or any employee authorized by you to give or receive notice of an "occurrence" or claim:

        **(a)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

        **(b)** Receives a written or verbal demand or claim for damages because of "bodily injury" or "property damage"; or

        **(c)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# KNOWLEDGE AND NOTICE OF OCCURRENCE OR OFFENSE UNINTENTIONAL OMISSION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

**PROVISIONS**

1. **KNOWLEDGE AND NOTICE OF OCCURRENCE OR OFFENSE**

   The following is added to SECTION IV – CONDITIONS, Part 5. DUTIES IN THE EVENT OF OCCURRENCE OR OFFENSE, CLAIM OR SUIT:

   e. Notice of an "occurrence" or of an "offense" which may result in a claim under this insurance shall be given as soon as practicable after knowledge of the "occurrence" or "offense" has been reported to you, one of your executive officers (if you are a corporation), one of your partners (if you are a partnership), one of your managers (if you are a limited liability company), or an employee (such as an insurance, loss control or risk manager or administrator) designated by you to give such notice.

      Knowledge by other employee(s) of an "occurrence" or of an "offense" does not imply that you also have such knowledge.

   f. Notice shall be deemed prompt if given in good faith as soon as practicable to your workers' compensation company. This applies only if you subsequently give notice to us as soon as practicable after you, one of your "ex-ecutive officers" (if you are a corporation), one of your partners (if you are a partnership), one of your managers (if you are a limited liability company), or an "employee" (such as an insurance, loss control or risk manager or administrator) designated by you to give such notice discovers that the "occurrence", offense" or claim may involve this policy.

   g. However, this Provision 1. does not apply as respects the specific number of days within which you are required to notify us in writing of the abrupt commencement of a discharge, release or escape of "pollutants" which causes "bodily injury" or "property damage" which may otherwise be covered under this policy, or, any applicable policy of "underlying insurance".

2. **UNINTENTIONAL OMISSION**

   The following is added to SECTION IV – CONDITIONS, Part 14. REPRESENTATION:

   The unintentional omission of, or unintentional error in, any information by you shall not prejudice your rights under this insurance. However, this Provision 2. does not affect our right to collect additional premium or to exercise our right of cancellation or nonrenewal.

UMBRELLA

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

With respect to any one or more "certified acts of terrorism", we will not pay any amounts for which we are not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 (including subsequent acts of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a "certified act of terrorism":

1.  The act resulted in aggregate losses in excess of $5 million; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

COMMERCIAL GENERAL LIABILITY

POLICY NUMBER: YSM-CUP-571K7746-TIL-04                ISSUE DATE: 01-16-04

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

DESIGNATED ENTITIES - LIMITATION OF COVERAGE TO DESIGNATED PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

SCHEDULE

DESIGNATED PERSON(S) OR ORGANIZATION(S):

OSCAR MUNOZ

DESIGNATED PREMISES:

LOC. 11, BLDG. 15    5659 S SAWYER, CHICAGO IL 60632

LOC. 13, BLDG. 17    1648 N PULASKI, CHICAGO IL 60609

LOC. 15, BLDG. 19    4129 S WOLCOTT, CHICAGO IL 60609

PROVISIONS

WITH RESPECT TO THE PERSON(S) OR ORGANIZATION(S) DESIGNATED IN THE SCHEDULE
ABOVE, THIS INSURANCE APPLIES ONLY TO "BODILY INJURY", "PROPERTY DAMAGE",
"PERSONAL INJURY" AND "ADVERTISING INJURY" ARISING OUT OF THE OWNERSHIP,
MAINTENANCE OR USE OF THE PREMISES SHOWN IN THE SCHEDULE ABOVE AND OPERATIONS
NECESSARY OR INCIDENTAL TO THOSE PREMISES.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF COVERAGE — NAMED INSURED

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

The second paragraph of this insurance is replaced by:

Throughout this insurance the words "you" and "your" refer to the Named Insured shown in the Declarations and any subsidiary thereof. The words "we", "us" and "our" refer to the Company providing this insurance.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PREJUDGMENT INTEREST
# DEFENSE AMENDMENT

This endorsement modifies insurance provided under the following:

    COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

**SECTION I – COVERAGES**, Part **2. DEFENSE OF CLAIMS OR SUITS** is amended by adding the following to paragraph **e.**:

    **(6)**    Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the "applicable limit of insurance", we will not pay any prejudgment interest based on that period of time after the offer.

UMBRELLA

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCESS PERSONAL, ADVERTISING AND WEB SITE INJURY LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

Only as respects the insurance provided by this endorsement, none of the insuring agreements, terms, definitions or exclusions of the policy to which this endorsement is attached apply, except for **SECTION IV – CONDITIONS.**

## SECTION I – INSURING AGREEMENT

1. We will pay on behalf of the insured those sums, in excess of the amount payable under the terms of any Personal, Advertising and Web Site Injury Liability Insurance included in the "underlying insurance", that the insured becomes legally obligated to pay as damages because of:

   **a.** "Personal injury" and "advertising injury"; and,

   **b.** "Web site injury" caused by an offense committed in the course of the visual or audio presentation of material on "your web site" or in the numerical expression of computer code used to enable "your web site";

   provided that the Personal, Advertising and Web Site Injury Liability Insurance applies or would apply except for the exhaustion of its "underlying personal, advertising or web site injury liability limit".

2. The amount we will pay is limited as described in **SECTION III – LIMITS OF INSURANCE** in this endorsement.

3. This insurance is subject to the same insuring agreements, terms, definitions, exclusions and conditions as any Personal, Advertising and Web Site Injury Liability Insurance included in the "underlying insurance", except for the provisions of this endorsement.

## SECTION II – WHO IS AN INSURED

Any person or organization qualifying as an insured subject to the terms and provisions of any Personal, Advertising and Web Site Injury Liability Insurance included in the "underlying insurance" is an insured under the insurance provided by this endorsement.

## SECTION III – LIMITS OF INSURANCE

1. As respects the insurance provided by this endorsement, the Limit of Insurance shown in the Declarations of the policy to which this endorsement is attached and the rules below fix the most we will pay regardless of the number of:

   **a.** Insureds;

   **b.** Claims made or "suits" brought; or

   **c.** Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit shown in the Declarations of the policy to which this endorsement is attached is the most we will pay for all sums payable under this endorsement.

   The sum of all payments made under this endorsement and all payments made under the policy to which it is attached shall not exceed the General Aggregate Limit shown on the Declarations of the policy to which this endorsement is attached.

3. Subject to **2.** above, the Personal, Advertising and Web Site Injury Limit is the most we will pay under COVERAGE B for the sum of all damages because of all "personal injury", all "advertising injury" and all "web site injury" sustained by any one person or organization.

## SECTION IV – MAINTENANCE OF UNDERLYING PERSONAL, ADVERTISING AND WEB SITE INJURY LIABILITY INSURANCE

The insurance afforded by the Personal, Advertising and Web Site Injury Liability insurance included in the "underlying insurance" in the Declarations of the policy to which this endorsement is attached will be maintained for the full term of this endorsement. This provision does not apply to the reduction of the "underlying personal, advertising and web site injury liability limit" due to payment of claims or "suits" arising out of damages. As coverage for Personal, Advertising and Web Site Injury Liability insurance included in the "underlying insurance" expires, you

UMBRELLA

will renew it at limits at least equal to the expiring limits of insurance.

If you fail to comply with the above, this insurance is not invalidated. However, in the event of a loss, we will pay only to the extent that we would have paid had you so complied.

## SECTION V – CONDITIONS

Any references to "advertising injury" or "personal injury" throughout **SECTION IV – CONDITIONS** of the policy to which this endorsement is attached, will have the same meaning as defined below in **SECTION VI – DEFINITIONS** of this endorsement.

## SECTION VI – DEFINITIONS

1. "Advertising injury" has the same meaning as defined in any Personal, Advertising and Web Site Injury Liability insurance included in the "underlying insurance" of policies listed in the Schedule of Underlying Insurance on the policy to which this endorsement is attached.

2. "Personal injury" has the same meaning as defined in any Personal, Advertising and Web Site Injury Liability insurance included in the "underlying insurance" of policies listed in the Schedule of Underlying Insurance on the policy to which this endorsement is attached.

3. "Suit" has the same meaning as defined in any Personal, Advertising and Web Site Injury Liability insurance included in the "underlying insurance" of policies listed in the Schedule of Underlying Insurance on the policy to which this endorsement is attached.

4. "Underlying insurance" means the policy(ies) listed in the Schedule of Underlying Insurance

on the policy to which this endorsement is attached, and includes any renewal or replacement of such policy(ies).

5. "Underlying insurer" means any insurer which provides a policy(ies) listed in the Schedule of Underlying Insurance on the policy to which this endorsement is attached.

6. "Underlying personal, advertising and web site injury liability limit" means the amount of insurance stated in the "underlying insurance" in the Declarations of the policy to which this endorsement is attached, less the amount by which any aggregate limit so stated has been reduced solely due to payment of claims.

   The limits of insurance in any policy of "underlying insurance" will apply even if:

   a. The "underlying insurer" claims the insured failed to comply with any condition of the policy; or

   b. The "underlying insurer" becomes bankrupt or insolvent.

7. "Your web site" has the same meaning as defined in any Personal, Advertising and Web Site Injury Liability insurance included in the "underlying insurance" of policies listed in the Schedule of Underlying Insurance on the policy to which this endorsement is attached.

8. "Web site injury" has the same meaning as defined in any Personal, Advertising and Web Site Injury Liability insurance included in the "underlying insurance" of policies listed in the Schedule of Underlying Insurance on the policy to which this endorsement is attached.

Copyright, The Travelers Indemnity Company, 2000          **UM 03 55 08 00**

POLICY NUMBER: YSM-CUP-571K7746-TIL-04

UMBRELLA<br>ISSUE DATE: 01-16-04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION—REAL AND/OR PERSONAL PROPERTY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

This endorsement modifies the insurance provided for the following property:

(Check the appropriate block(s))

[X] Real property

[X] Personal property

As respects the type(s) of property checked above, this insurance does not apply to "property damage" to:

1. property you own, rent, or occupy;

2. property loaned to you; or

3. property in your care, custody, or control.

Parts **2.** and **3.** above do not apply to liability assumed under a sidetrack agreement.

POLICY NUMBER: YSM-CUP-571K7746-TIL-04

UMBRELLA
ISSUE DATE: 01-16-04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE — CONTRACTUAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

SECTION I COVERAGES, Exclusion **d.**, is replaced by:

(The following applies only if indicated by "X")

☐ d. "Bodily injury," "property damage," "personal injury," or "advertising injury" for which the insured assumed liability under a contract or agreement.

☒ d. "Bodily injury," "property damage," "personal injury," or "advertising injury" for which the insured assumed liability under a contract or agreement. This exclusion does not apply if a policy of "underlying insurance" provides coverage for such liability, unless the damage or injury occurred prior to the effective date of the contract or agreement.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT (BROAD FORM)

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

1. The insurance does not apply:

   a. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   b. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   c. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property threat.

2. As used in this endorsement:

   "Hazardous properties" include radioactive, toxic or explosive properties;

   "Nuclear material" means "source material", "Special nuclear material" or "by-product material";

   "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

   "Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

   "Nuclear facility" means:

   a. Any "nuclear reactor";

   b. Any equipment or device designed or used for (1) separating the isotopes of uranium or pluto-

UMBRELLA

nium, (2) processing or utilizing "spent fuel," or (3) handling, processing or packaging "waste";

c.  Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

d.  Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Property damage" includes all forms of radioactive contamination of property.

   Copyright, The Travelers Indemnity Company   UM 00 76 01 86

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – POLLUTION – ILLINOIS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

Exclusion **f.** is replaced by the following:

**f.** "Bodily injury", "property damage", "personal injury" or "advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants, or any loss, cost, expense or damages resulting therefrom, but this exclusion does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" to which any policy listed in the the SCHEDULE OF UNDERLYING INSURANCE of the DECLARATIONS of this insurance, or any renewal or replacement thereof, applies or would apply but for the exhaustion of its limits of liability. Coverage will follow the same provisions, terms, definitions, exclusions, limitations and conditions of the policy(ies) of "underlying insurance" listed in the SCHEDULE OF UNDERLYING INSURANCE of the DECLARATIONS of this insurance.

This exclusion does not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire:

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

**(b)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor, or subcontractor.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

"Pollutants" means one or more solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION—LEAD
# (INCLUDING PRODUCTS-COMPLETED OPERATIONS HAZARD)

This endorsement clarifies the scope of insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

This insurance does not apply to:

1. "Bodily injury" or "property damage" arising out of the actual, alleged or threatened absorption, adsorption, ingestion or inhalation by any person of lead:

    (a) at or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

    (b) at or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing, or treatment of lead;

    (c) which arises from the transportation, handling, storage, treatment, disposal, or processing of lead as waste by or for any insured or any person for whom you may be legally responsible; or

    (d) at or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

        (i) if the lead is brought on or to the premises, site or location in connection with such operations by such insured, contractor, or subcontractor; or

        (ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of lead.

    (e) if the "bodily injury" or "property damage" is included within the "products-completed operations hazard."

Subparagraphs **(a)** and **(d) (i)** do not apply to "bodily injury" or "property damage" arising out of heat, smoke, or fumes from a hostile fire. As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

(2) Any loss, cost or expense arising out of any:

    (a) request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of lead; or

    (b) claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to or assessing the effects of lead.

Lead means lead in any form, whether in combination with, an ingredient of, or as a contaminant of any other substance or material.

Copyright, The Travelers Indemnity Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT–RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:
    COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

**A.** SECTION I, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, EXCLUSION **3.c.** is replaced by the following:

    **c.** "Bodily injury" arising out of:

        **(1)** Humiliation, mental injury or mental anguish directly or indirectly related to the employment of any person or persons by any insured;

        **(2)** Refusal to employ;

        **(3)** Termination of employment;

        **(4)** Coercion, demotion, evaluation, reassignment, discipline, defamation or other employment-related practices, policies, acts, or omissions; or

        **(5)** Consequential "bodily injury" as a result of **(1)** through **(4)** above.

    This exclusion applies whether the insured may be held liable as an employer or in any other capacity and to any obligation to share damages with or to repay someone else who must pay damages because of the injury.

**B.** SECTION I, COVERAGE B. PERSONAL INJURY AND ADVERTISING INJURY LIABILITY, EXCLUSION **3.h.** is replaced by the following:

    **h.** "Personal injury" arising out of:

        **(1)** Discrimination directly or indirectly related to the employment or prospective employment of any person or persons by any insured;

        **(2)** Refusal to employ;

        **(3)** Termination of employment;

        **(4)** Coercion, demotion, evaluation, reassignment, discipline, defamation or other employment-related practices, policies, acts, or omissions; or

        **(5)** Consequential "bodily injury" as a result of **(1)** through **(4)** above.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF PERSONAL INJURY AND ADVERTISING INJURY LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

SECTION I – COVERAGES, Part **3.i.** of **EXCLU-SIONS** is replaced by the following:

i.    "Personal injury" or "advertising injury":

(1)  Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(2)  Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period. All "personal injury" or "advertising injury" arising out of publication of the same or similar material subsequent to the beginning of the policy period is also excluded;

(3)  Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured; or

(4)  For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

     Copyright, The Travelers Indemnity Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# UNINSURED/UNDERINSURED MOTORISTS AND "AUTO" NO-FAULT EXCLUSION

This endorsement modifies insurance provided under the following:

      COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

This insurance does not apply to any liability imposed on the insured, or the insured's insurer, under any of the following laws:

**(1)** Uninsured Motorists;

**(2)** Underinsured Motorists; or

**(3)** "Auto" No-Fault law.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION — DISCRIMINATION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

**PROVISIONS**

1. Paragraph f. of the definition of "personal injury" is deleted.

2. **SECTION I — COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY; and COVERAGE B. PERSONAL INJURY AND ADVERTISING INJURY LIABILITY** is amended by adding the following additional exclusion:

(This insurance does not apply to:)

"Bodily injury" or "personal injury" resulting from or as a consequence of discrimination, whether intentional or unintentional, based upon a person's sex, sexual preference, marital status, race, creed, religion, national origin, age, physical capabilities, characteristics or condition, or mental capabilities or condition.

UMBRELLA

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WAR EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

The following exclusion is added to Paragraph **3.**, **EXCLUSIONS** of **SECTION I – COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY; and COVERAGE B. PERSONAL INJURY AND ADVERTISING INJURY LIABILITY:**

**3. Exclusions**

This insurance does not apply to:

**War**

"Bodily injury", "property damage", "personal injury" or "advertising injury" arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war; or

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these

regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

UMBRELLA

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION — ASBESTOS

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

This insurance does not apply to "bodily injury," "property damage," "personal injury" or "advertising injury" arising out of the actual or alleged presence or actual, alleged or threatened dispersal of asbestos, asbestos fibers or products containing asbestos, provided that the injury or damage is caused or contributed to by the hazardous properties of asbestos. This includes:

a. Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with the above; and

b. Any obligation to share damages with or repay someone else who must pay damages because of such injury or damage.

UMBRELLA

POLICY NUMBER: YSM-CUP-571K7746-TIL-04

ISSUE DATE: 01-16-04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION — ALL HAZARDS IN CONNECTION WITH DESIGNATED PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

**SCHEDULE**

**DESCRIPTION AND LOCATION OF PREMISES:**

AS SHOWN BELOW

1334-1337 W 37TH PLACE

CHICAGO                    IL  60608

This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of:

1.  The ownership, maintenance or use of the premises shown in the Schedule or any property located on those premises;

2.  Operations on those premises or elsewhere which are necessary or incidental to the ownership, maintenance or use of those premises; or

3.  Goods or products manufactured at or distributed from those premises.

UMBRELLA

POLICY NUMBER: YSM-CUP-571K7746-TIL-04          ISSUE DATE: 01-16-04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – ALL HAZARDS IN CONNECTION WITH A DESIGNATED EXPOSURE

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

**SCHEDULE**

**DESCRIPTION:**

FARM OPERATIONS

This insurance does not apply to "bodily injury," "property damage," "personal injury," or "advertising injury" arising out of:

1.  any exposure shown in the above schedule; or

2.  any supervision, instructions, recommendations or advice given or which should have been given in connection therewith.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION—EMPLOYEE BENEFIT LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

This insurance does not apply to any claim against any insured arising out of the "administration" of your "employee benefit program".

As used in this endorsement:

"Administration" means:

a. Counseling employees, including their dependents and beneficiaries, with respect to the "employee benefit program";

b. Handling records in connection with the "employee benefit program"; or

c. Effecting or terminating any employee's participation in a plan included in the "employee benefit program".

"Employee benefit program" means:

a. Group life insurance, group accident or health insurance, profit sharing plans, pension plans and stock subscription plans, provided that no one other than an employee may subscribe to such insurance or plans;

b. Unemployment insurance, social security benefits, workers' compensation and disability benefits; and

c. Any other similar plans.

     Copyright, The Travelers Indemnity Company, 1996.

UMBRELLA

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES — CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

INDENT: COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE

SECTION IV—**CONDITIONS** is amended by the following:

1. Part 3., **CANCELLATION.**, is replaced by the following:

   **CANCELLATION**

   a. You may cancel this insurance by mailing to us advance written notice of cancellation.

   b. (1) We may cancel this insurance by mailing to you written notice stating the reason for cancellation.

      (2) If we cancel for nonpayment of premium, we will mail the notice at least 10 days prior to the effective date of cancellation.

      (3) If we cancel for a reason other than nonpayment of premium, we will mail the notice at least:

          (a) 30 days prior to the effective date of cancellation if the insurance has been in effect for 60 days or less.

          (b) 60 days prior to the effective date of cancellation if the insurance has been in effect for more than 60 days.

   c. If this insurance has been in effect for more than 60 days, we may cancel only for one or more of the following reasons:

      (1) Nonpayment of premium;

      (2) The insurance was obtained through a material misrepresentation;

      (3) Any insured has violated any of the terms and conditions of the insurance;

      (4) The risk originally accepted has measurably increased;

      (5) Certification to the Director of Insurance of the loss of reinsurance by the insurer that provided coverage to us for all or a substantial part of the underlying risk insured; or

      (6) A determination by the Director of Insurance that the continuation of the insurance could place us in violation of the insurance laws of this State.

   d. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

   e. If this insurance is canceled, we will send you any premium refund due. If we cancel, the refund will be pro rata. If you cancel, the refund will be pro rata less 10% of the pro rata unearned premium. The cancellation will be effective even if we have not made or offered a refund.

2. The following condition is added:

   **WHEN WE DO NOT RENEW**

   If we decide not to renew this insurance, we will mail written notice stating the reason for nonrenewal no less than 60 days before the expiration date to you and the broker, if known to us, or the agent of record. Even if we do not comply with these terms, this insurance will terminate:

   a. On the expiration date, if:

      (1) You fail to perform any of your obligations in connection with the payment of premium for the insurance, or any installment payment, whether payable directly to us or our agents or indirectly under any premium finance plan or extension of credit; or

      (2) We have indicated our willingness to renew this insurance to you or your representative; or

      (3) You have notified us or our agent that you do not want to renew this insurance.

   b. On the effective date of any other insurance policy replacing this insurance.

3. The following condition is added:

   **MAILING OF NOTICES**

   We will mail cancellation and nonrenewal notices to you, and the agent or broker, at the last addresses known to us. Proof of mailing will be sufficient proof of notice.

# INTERLINE
# ENDORSEMENTS



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FEDERAL TERRORISM RISK INSURANCE ACT DISCLOSURE

This endorsement applies to the insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE FORM – CONTRACTORS
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY - NEW YORK DEPARTMENT OF TRANSPORTATION
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
ENVIRONMENTAL HAZARD POLICY
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
ELECTRONIC MANUFACTURERS AND COMPUTER SERVICES ERRORS AND OMISSIONS LIABILITY COVERAGE FORM
SELF-INSURED EXCESS COMMERCIAL GENERAL LIABILITY COVERAGE FORM
SELF-INSURED EXCESS LIQUOR LIABILITY COVERAGE FORM
SELF-INSURED EXCESS EMPLOYEE BENEFITS LIABILITY COVERAGE FORM
SELF-INSURED EXCESS PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
COMMERCIAL EXCESS LIABILITY (UMBRELLA) INSURANCE
EXCESS (FOLLOWING FORM) LIABILITY INSURANCE

**PROVISIONS**

On November 26, 2002, the President of the United States signed into law the Terrorism Risk Insurance Act of 2002 (the "Act"). The Act establishes a short-term program under which the Federal Government will share in the payment of *"Insured Losses"* caused by certain *"Acts of Terrorism"* (each as defined in the Act).

In the event of an *Insured Loss,* Travelers is responsible for a deductible of one percent (1%) of Travelers *"Direct Earned Premiums"* (as used in the Act) for the calendar year 2001 for *Insured Losses* occurring from November 26, 2002 through December 31, 2002; seven percent (7%) of Travelers *Direct Earned Premiums* for the calendar year 2002 for *Insured Losses* occurring during calendar year 2003; ten percent (10%) of Travelers *Direct Earned Premiums* for the calendar year 2003 for *Insured Losses* occurring during calendar year 2004; or fifteen percent (15%) of Travelers *Direct Earned Premiums* for the calendar year 2004 for *Insured Losses* occurring during calendar year 2005. The Federal Government's share of compensation for *Insured Losses* in each year is 90% of the amount of *Insured Losses* in excess of Travelers deductible for that year. Travelers is responsible for the payment of the remaining 10% of *Insured Losses*. In no event,

however, will the Federal Government or any *"Insurer"* (as defined in the Act) be required to pay any portion of the amount of aggregate *Insured Losses* occurring in any one year that exceeds $100,000,000,000, provided that such *Insurer* has met its deductible

As a requirement of the Act, *Insurers* must make available *"Property and Casualty Insurance"* (as defined in the Act) coverage for *Insured Losses* that does not differ materially from the terms, amounts and other coverage limitations that apply to losses arising from events other than *Acts of Terrorism.* In other words, a loss will not be excluded just because it was caused by an *Act of Terrorism;* conversely, a loss will not be covered just because it was caused by an *Act of Terrorism.* The Act also requires *Insurers* to disclose to policyholders the premium charge for providing such terrorism coverage.

Please note that this Coverage Part does not contain an exclusion that specifically excludes coverage for *Insured Losses.* The charge for this exposure is included in the Coverage Part premium indicated in your policy. The charge that has been included for this Coverage Part is:

- 1% of each applicable Commercial Liability Coverage premium.

One Tower Square, Hartford, Connecticut 06183



**CHANGE ENDORSEMENT**

**INSURING COMPANY:**
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA

|  |  |
|---|---|
| Named Insured: | TORTILLERIA ATOTONILCO, INC. |
|  | AND AS PER CG D0 74 |
| Policy Number: | YSM-CUP-571K7746-TIL-04 |
| Policy Effective Date: | 01-01-04 |
| Policy Expiration Date: | 01-01-05 |
| Issue Date: | 02-18-04 |
| Premium $ | NIL |

Effective from 01-01-04 at the time of day the policy becomes effective.

THIS INSURANCE IS AMENDED AS FOLLOWS:

UNDERLYING POLICIES AND LIMITS ARE CHANGED AS FOLLOW:

| POLICY | LIMITS (000 OMITTED) | COVERAGE | COMPANY |
|---|---|---|---|
| 810  609K690A  04 | 1000 CSL | BAP | TCT |
| 630  843K1319  04 | 1000 EACH OCCURRENCE<br>1000 EACH PERSON OR ORG<br>2000 GEN.AGG.<br>2000 PROD/COMP OPS AGG | CGL | TCT |
| 660  843K1356  04 | 1000 EACH OCCURRENCE<br>1000 EACH PERSON OR ORG<br>2000 GEN. AGG.<br>2000 PROD/COMP OPS AGG | CGL | TIL |
| WCV5000138 | 1000 PER ACCIDENT<br>1000 POLICY LIMIT FOR DISEASE<br>1000 PER EMPLOYEE (DISEASE) | EMPLOYERS LIAB. | ACCIDENT<br>FUND CO |
| WC 344-29-78 | 1000 PER ACCIDENT<br>1000 POLICY LIMIT FOR DISEASE<br>1000 PER EMPLOYEE (DISEASE) | EMPLOYERS LIAB. | AIG |

NAME AND ADDRESS OF AGENT OR BROKER

Countersigned by

SUMMIT INS AGCY INC        F4279
PO BOX 170
SUMMIT                IL   60501

_____
Authorized Representative

DATE: _____

**IL T0 07 09 87** (Page  1  of  1)

Office:  NAPERVILLE IL

POLICY NUMBER:  YSM-CUP-571K7746-TIL-04

EFFECTIVE DATE:  01-01-04

ISSUE DATE:  02-18-04


LISTING OF FORMS, ENDORSEMENTS AND SCHEDULE NUMBERS

THIS LISTING SHOWS THE NUMBER OF FORMS, SCHEDULES AND ENDORSEMENTS
BY LINE OF BUSINESS.


IL T0 07 09 87    CHANGE ENDORSEMENT

3006595-RTV

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA, a Connecticut
corporation, f/k/a THE TRAVELERS
INDEMNITY COMPANY OF ILLINOIS,
and THE TRAVELERS INDEMNITY
COMPANY OF CONNECTICUT, a
Connecticut corporation,

                Plaintiffs,

v.

OSCAR MUNOZ, JOSE LOZADA,
ESTEBAN DELGADO, and SUPERIOR
FOOD MACHINERY, INC., a California
Corp.

                Defendants.

```
08CV5015
JUDGE MORAN
MAGISTRATE JUDGE ASHMAN


PH
  NO:
```

### FRCP 7.1 DISCLOSURE

     Plaintiffs, pursuant to FRCP 7.1, state as follows:

     TRAVELERS PROPERTY AND CASUALTY COMPANY OF AMERICA and
THE TRAVELERS INDEMNITY COMPANY OF CONNECTICUT are Connecticut
corporations with their principal place of business in Hartford, Connecticut. Both are
wholly owned subsidiaries of THE TRAVELERS INDEMNITY COMPANY which is a
wholly owned subsidiary of the TRAVELERS INSURANCE GROUP HOLDINGS
INC., a wholly owned subsidiary of TRAVELERS PROPERTY CASUALTY CORP.
which is a wholly owned subsidiary of THE TRAVELERS COMPANIES, INC. The
Travelers Companies, Inc. is the only publicly held company in the corporate family.

TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA, a Connecticut
corporation, f/k/a THE TRAVELERS
INDEMNITY COMPANY OF ILLINOIS,
and THE TRAVELERS INDEMNITY
COMPANY OF CONNECTICUT, a
Connecticut corporation


By:  s/Richard T. Valentino
       One of Its Attorneys


Richard T. Valentino, Esq. (#6188317)
SmithAmundsen LLC
150 North Michigan Ave., Ste. 3300
Chicago, IL 60601
Phone: (312) 894-3200
FAX:   (312) 894-3210